## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| MAMMOET-STARNETH LLC, | Case No. 17-12925 (LSS) |
| Debtor.[1] | |

**MOTION OF DEBTOR FOR ORDER UNDER 11 U.S.C. §§ 105(a), 362, 363, 364 AND 507 AND DEL. BANKR. L.R. 4001-2 (I) APPROVING POST-PETITION FINANCING, (II) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (III) GRANTING RELATED RELIEF, AND (IV) SCHEDULING A FINAL HEARING**

The debtor in possession in the above-captioned case (the "Debtor") hereby moves (the "Motion") for entry of interim and final orders substantially in the forms attached hereto as **Exhibit A** and **Exhibit B** (respectively, the "Interim Order" and the "Final Order"), under sections 105(a), 362, 363, 364(c)(1), 364(c)(2) and 507 of title 11 of the United States Code (the "Bankruptcy Code"), rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), (i) authorizing the Debtor to enter into and perform under a DIP Credit and Security Agreement in substantially the form attached as **Exhibit C** hereto (the "DIP Credit Agreement") and all related documents (collectively, the "DIP Loan Documents"), (ii) allowing interim borrowing of up to $1 million under the DIP Credit Agreement pursuant to an interim order in substantially the form attached as **Exhibit A** hereto, (iii) setting a date to approve the DIP Loan Documents on a final basis and the borrowing of up to $5.5 million in total under the DIP Credit Agreement pursuant to an order in substantially the form attached as **Exhibit B** hereto, (iv)

---

[1] The last four digits of the Debtor's federal tax identification number is 4518. The Debtor's address is 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808.

granting of an allowed superpriority administrative expense claim status pursuant to section 364(c) of the Bankruptcy Code to all obligations owing under the DIP Credit Agreement or the other DIP Loan Documents (collectively, and including all "Obligations" as described in the DIP Credit Agreement, the "DIP Obligations") subject to the priorities set forth in the applicable order approving the DIP Loan Documents, (v) granting to the DIP Lender automatically perfected security interests in and liens on all of the DIP Collateral (as defined herein), subject to the priorities set forth in the applicable order approving the DIP Loan Documents, and (vi) granting related relief.

In support of the Motion, the Debtor relies upon and incorporates by reference the *Declaration of Christiaan Lavooij In Support of First Day Motions* (the "Lavooij Declaration"),[2] filed with the Court concurrently herewith. In further support of the Motion, the Debtor, by and through its undersigned counsel, respectfully represents:

### PRELIMINARY STATEMENT

1.      By this Motion, the Debtor seeks authority to obtain up to $5.5 million in post-petition financing (including $1 million to be made immediately available on an interim basis) on the terms set forth in the DIP Loan Documents from its affiliate Mammoet USA North Inc. ("MUSA" or "DIP Lender"). As set forth more fully in the Lavooij Declaration, the financing will be used to fund the costs of administration of this bankruptcy case, facilitate the sale of the Debtor's hard assets, and seek confirmation of a plan of liquidation, which the Debtor intends to file in the coming days. Obtaining the post-petition financing as set forth herein, is a critical first step toward preserving the value of the Debtor's assets and an orderly wind down of the Debtor's affairs to maximize creditor recoveries. To the extent the plan is confirmed and goes

---

[2] Capitalized terms used but not defined herein shall have the meanings set forth in the Lavooij Declaration.

effective, the DIP Lender will waive its claims under the DIP Loan Documents, and MUSA will contribute approximately $1 million for distribution to the Debtor's creditors and receive assignment of, and in its discretion, undertake prosecution of, certain causes of action for certain creditors' benefit. The Debtor anticipates that this process will maximize the value of the Debtor's assets, bring in new funds (including the contribution by MUSA) for the benefit of the Debtor's creditors, provide a path for the prosecution of the assigned causes of action, limit any potential future liability of the Debtor and its estate, and provide an efficient means for the Debtor to wind itself down.

2.    As set forth more fully below, post-petition financing on the terms set forth in the DIP Loan Documents – including, among other things, the grant of (i) first priority perfected liens and security interests in all of the Debtor's unencumbered assets; (ii) second priority perfected liens and security interests in all of the Debtor's assets that are subject to valid, perfected, and uncontested prepetition liens (the "Prepetition Permitted Liens"); and (iii) a superpriority claim for amounts borrowed under the DIP Loan Documents – is appropriate under section 364(c) of the Bankruptcy Code because, among other things, (a) the requested financing is essential to fund this chapter 11 case, (b) the requested financing cannot be obtained on more favorable terms, and (c) it is within the Debtor's exercise of its reasonable business judgment to enter into the DIP Loan Documents.

3.    For the foregoing reasons, the Debtor requests that the Court approve the requested post-petition financing on the terms set forth in the DIP Loan Documents and enter the proposed orders submitted herewith.

## JURISDICTION

4.      This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012.

5.      This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2) and, pursuant to Local Rule 9013-1(f), the Debtor consents to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

6.      Venue of this chapter 11 case and related proceedings is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

7.      The statutory predicates for the relief requested herein are sections 105(a), 362, 363, 364, and 507 of the Bankruptcy Code; Bankruptcy Rule 2002, 4001, and 9014; and Local Rule 4001-2.

## BACKGROUND

### I.    Bankruptcy Case

8.      On the date of this Motion (the "Petition Date"), the Debtor filed a voluntary petition in this Court commencing a case for relief under chapter 11 of the Bankruptcy Code. The factual background regarding the Debtor, including the events leading to the filing of this case, is set forth in detail in the Lavooij Declaration and fully incorporated herein by reference.

9.      The Debtor continues to manage and operate its assets as a debtor in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.  No trustee or examiner has been requested in this case and no committees have yet been appointed.

## II.    Necessity of Bankruptcy and Post-Petition Financing

10.    As set forth in the Lavooij Declaration, the Debtor is no longer operating, and although the Debtor owns Project components, the assets are largely held at locations in Europe (and some in the United States). Because of the lack of additional pre-petition funding, the Debtor had no means to liquidate or otherwise dispose of its assets for the benefit of its creditors. Meanwhile, the Debtor continued to accrue debt for the cost of the components' storage. For the same reason, although the Debtor asserted claims against New York Wheel in pending litigation totaling approximately $128.5 million, the Debtor had no means to continue to pursue such claims.

11.    Further, even if the Debtor had been able to dispose of its assets outside of bankruptcy, the Debtor and its creditors, who are mainly subcontractors, would have had no guarantee that future use of the project components would not result in additional claims against the Debtor.

12.    The foregoing left the Debtor without any viable path for winding down and effectuating an orderly disposition of its assets for the benefit of its creditors outside of this chapter 11 case, in which the Debtor proposes to, among other things, (i) sell any interest in Project components in storage free and clear of liens, claims, encumbrances, and interests under section 363(f) of the Bankruptcy Code, (ii) reject any remaining executory contracts, including, subcontracts and (iii) confirm a plan of liquidation under which (a) the claims under the DIP Loan Documents will be waived, (b) MUSA will contribute approximately $1 million for distribution to the Debtor's creditors, and (c) the Debtor's causes of action against New York Wheel will be assigned to MUSA for prosecution in its discretion, with any net recovery to be shared between MUSA and certain creditors under the plan. It is anticipated that this will

maximize the value of the Debtor's assets, bring in new funds (including the MUSA contribution) for the benefit of the Debtor's creditors, provide a path for the prosecution of the Debtor's causes of action against New York Wheel, limit any potential future liability of the Debtor, and provide an efficient means for the Debtor to wind itself down.

13.    In the absence of operations generating income sufficient to meet the Debtor's post-petition expenses and fund this chapter 11 case through the confirmation and implementation of the soon-to-be proposed plan of liquidation, the proposed post-petition financing is essential to the success of this case.

## RELIEF REQUESTED

14.    By this Motion, the Debtor seeks entry of Interim and Final Orders, substantially in the forms of **Exhibit A** and **Exhibit B** attached hereto, approving the DIP Loan Documents which are summarized below:

| Material Provision | Brief Summary |
|---|---|
| **Borrower** | Mammoet-Starneth, LLC. |
| **DIP Lender** | Mammoet USA North, Inc. |
| **DIP Facility** | The DIP Facility shall consist of a line of credit up to $5.5 million, of which $1 million shall be available on an interim basis. |
| **Roll-Up** | None. |
| **Interest Rate**<br><br>DIP Credit Agmt. § 1.22 | 6.00% per annum. |
| **Fees And Expenses**<br><br>DIP Credit Agmt. § 1.14 | Commitment Fee:   $27,500 (0.50% of the DIP Credit Agreement commitment amount). |

RLF1 18599597v.1

| Material Provision | Brief Summary |
|---|---|
| **Maturity**<br><br>DIP Credit Agmt. § 2.2 | The maturity date of the DIP Facility (the "<u>Maturity Date</u>") shall be the earliest of—<br><br>    (i)  March 31 2018, or such other date as may be agreed to in a writing by both the Borrower and the Secured Lender after the date hereof (without the need for further Court approval);<br><br>   (ii)  the expiration of the Budget, which may be updated by the parties as necessary;<br><br>  (iii)  dismissal of the Case or conversion of the Case to a case under another chapter of the Bankruptcy Code;<br><br>  (iv)  the appointment of a Chapter 11 Trustee or a Chapter 11 Examiner with expanded powers;<br><br>   (v)  the date of acceleration of the Obligations by the Secured Lender upon the occurrence of an Event of Default; or<br><br>  (vi)  upon the Effective Date of the Plan. |
| **Milestones**<br><br>DIP Credit Agmt. § 1.27 | The DIP Credit Agreement also contains the following milestones (the "<u>Milestones</u>"):<br><br>    (i)  on the **Petition Date**, the Debtor shall have filed a petition for relief under chapter 11 of the Bankruptcy Code;<br><br>   (ii)  on or before **December 15, 2017**, the Debtor shall have filed the Chapter 11 Plan and Disclosure Statement and the Stored Equipment Sale Motion in form and substance reasonably acceptable to the DIP Lender;<br><br>  (iii)  on or before **January 19, 2018**, the Bankruptcy Court shall have entered an order granting the Subcontract Rejection Motion;<br><br>  (iv)  on or before **January 17, 2018**, the Bankruptcy Court shall have entered an order approving the adequacy of the information in the Disclosure Statement and scheduled a confirmation hearing to be held in March, 2018;<br><br>   (v)  on or before **February 14, 2018**, the Bankruptcy Court shall have entered an order granting the Stored Asset Sale Motion;<br><br>  (vi)  on or before **March 15, 2018**, the Bankruptcy Court shall have entered an order confirming the Plan; and |

| Material Provision | Brief Summary |
|---|---|
| | (vii) on or before **March 31, 2018**, the effective date of the Plan shall have occurred. |
| **Liens, Collateral, and Priority**<br><br>**Bankruptcy Rule 4001(c)(1)(B)(i), (vii) & (xi)**<br><br>Interim Order ¶¶ 6-8 | Effective immediately upon the entry of the Interim Order, pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code, the DIP Lender will be granted continuing, valid, binding, enforceable, non-avoidable and automatically and properly perfected post-petition security interests in and liens on (collectively, the "DIP Liens") any and all presently owned and thereafter acquired assets and real and personal property of the Debtor (the "DIP Collateral").<br><br>The DIP Collateral includes, effective upon the entry of the Final Order, the proceeds from claims or causes of action to avoid a transfer of property (or an interest in property) or an obligation incurred by the Debtor pursuant to any applicable section of the Bankruptcy Code, including, without limitation, chapter 5 and section 724(a) of the Bankruptcy Code (the "Avoidance Actions").<br><br>**More specifically**, the DIP Facility shall—<br><br>    (a) be secured, subject to the DIP Carve Out and any Prepetition Permitted Liens, by (i) first priority perfected liens and security interests in all of the Debtor's unencumbered assets pursuant to section 364(c)(2) of the Bankruptcy Code and (ii) second priority perfected liens and security interests in all of the Debtor's assets that are subject to Prepetition Permitted Liens pursuant to section 364(c)(3) of the Bankruptcy Code, subject to the DIP Carve Out; and<br><br>    (b) constitute (without the need to file a proof of claim) an allowed superpriority administrative expense claim against the Debtor pursuant to section 364(c)(1) of the Bankruptcy Code (the "DIP Superpriority Claim"), senior to any pre- or post-petition claims, with priority over all other costs and expenses of administration of any kind, with recourse to all of the Debtor's assets (including, only upon entry of the Final Order, the proceeds of Avoidance Actions), subject, in each case, only to the DIP Carve Out, the DIP Liens and any Prepetition Permitted Liens. |
| **DIP Carve Out;**<br><br>**Professional Fee Escrow Account** | The "DIP Carve Out" means, collectively, the sum of—<br><br>    (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a) |

RLF1 18599597v.1

| Material Provision | Brief Summary |
|---|---|
| DIP Credit Agmt. § 1.9<br><br>Interim Order ¶ 24 | and section 3717 of title 31 of the United States Code; and<br><br>(ii) the aggregate amount of unpaid fees and expenses of the Debtor's and any Committee's professionals, in each case retained by final order of the Court (which order has not been reversed, vacated or stayed unless such stay is no longer effective) under sections 363(b), 327(a) or 1103(a) of the Bankruptcy Code (the "Case Professionals"), to the extent such fees and expenses are ultimately allowed and payable pursuant to an order of the Court (which order has not been reversed, vacated or stayed) ("Allowed Professional Fees"), which amount under this clause (ii) shall not exceed the sum of: commencing with the week ending December 15, 2017, an aggregate amount per week limited to the amount set forth in the Budget for such week for Allowed Professional Fees incurred prior to the delivery of a Carve-Out Trigger Notice, which amount shall be funded into the Professional Fee Escrow Account on Wednesday of each week (or such other day of the week selected by the Debtor) in accordance with the Budget provided that (I) the Termination Date has not occurred, and (II) no Event of Default has occurred and is continuing, plus (y) $100,000 for Allowed Professional Fees incurred from and after the delivery of a Carve-Out Trigger Notice (the "Post Trigger Notice Carve Out Amount").<br><br>*Professional Fee Escrow Account.* Until an Event of Default or the Termination Date has occurred, the Debtor shall be permitted to borrow under the DIP Credit Agreement on a weekly basis to fund the Professional Fee Escrow Account in the amounts contemplated under clause (x) of the immediately preceding paragraph for the case Professionals. The Debtor also shall be permitted to pay, from the Professional Fee Escrow Account, as and when the same may become due and payable, the Allowed Professional Fees of Case Professionals regardless of whether an Event of Default or the Termination Date has occurred. The aggregate amount of Allowed Professional Fees of Case Professionals paid by the Debtor prior to the delivery of a Carve-Out Trigger Notice from amounts funded into the Professional Fee Escrow Account pursuant to clause (x) of the immediately preceding paragraph (but not, for the avoidance of doubt, amounts paid from any retainers held by such Case Professionals) shall not exceed the amount of such Allowed Professional Fees and Committee Expenses set forth in the Budget. |

| Material Provision | Brief Summary |
|---|---|
| | Notwithstanding anything to the contrary contained in the Interim Order, the Budget, or the DIP Loan Documents, the DIP Lender shall not be responsible for funding into the Professional Fee Escrow Account any "transaction" fees or any other "success" fees payable to any investment banker, and subject to the immediately succeeding sentence, in no event shall any such amounts be paid out of the DIP Carve Out or any funds in the Professional Fee Escrow Account. For the avoidance of doubt, none of the provisions of this Agreement or any other Loan Document shall prohibit or restrict the payment of the fees and expenses of any Case Professional from any retainers paid prior to the Petition Date and held by such Case Professional. Any amounts in the Professional Fee Escrow Account after the payment in full of all Allowed Professional Fees of Case Professionals pursuant to final fee applications and orders shall be returned to the DIP Lender, which amounts shall be applied to the DIP Obligations in any order proscribed in the DIP Credit Agreement. |
| **Events of Default**<br><br>DIP Credit Agmt. § 10.1 | Customary events of default for financings of this type, subject to certain exceptions, grace periods and cure periods (each, an "Event of Default"), including, without limitation—<br><br>(i) the Borrower fails to pay the Loans on the Maturity Date (whether by acceleration or otherwise) or any other Obligation to the Secured Lender when due;<br><br>(ii) the Borrower fails or neglects to perform, keep or observe any provision of this Agreement or any other Post-Petition Loan Document (other than those specifically enumerated in other clauses of this Section 10.1), if such failure is not cured within ten (10) days after written notice from the Secured Lender;<br><br>(iii) the Borrower by motion, adversary action or other means, (i) challenges or disputes the nature, extent or validity of the Secured Lender's Liens on the Collateral or (ii) seeks subordination, in whole or in part, of any Claim filed by the Secured Lender in the Case;<br><br>(iv) if there occurs any uninsured damage to or loss, theft or destruction of any portion of the Collateral that individually or in the aggregate is material to the business, operations or value of the Borrower;<br><br>(v) if the Borrower breaches or violates any term of the Final Post-Petition Financing Order or fails to comply with the |

| Material Provision | Brief Summary |
|---|---|
| | Budget, in each case, in any material respect; |
| | (vi) dismissal of the Case; or conversion of the Case to a case under another Chapter of the Bankruptcy Code; |
| | (vii) the appointment of a Chapter 11 Trustee or a Chapter 11 Examiner; |
| | (viii) the Borrower uses Advances for purposes not authorized under the Budget; |
| | (ix) the failure to timely meet any Milestone; |
| | (x) if any representation or warranty made by the Borrower herein or in any of the Post-Petition Loan Documents, any financial statement, or any statement or representation made in any other certificate, report or opinion delivered in connection herewith or therewith proves to have been incorrect or misleading in any material respect when made; |
| | (xi) the voluntary creation, existence or allowance of any Indebtedness, whether recourse or nonrecourse, and whether superior or junior, resulting from borrowings, loans, advances, or the granting of credit, whether secured or unsecured, except (a) Indebtedness to the Secured Lender arising under or as a consequence of this Agreement or the other Post-Petition Loan Documents and (b) other Indebtedness existing on the Petition Date; |
| | (xii) the creation, existence or allowance of any Liens on any of the Borrower's properties or assets except the Liens created under this Agreement, the other Post-Petition Financing Documents, the Final Post-Petition Financing Order; *provided, however,* if the Liens were created without the Borrower's acquiescence, the Borrower shall have ten (10) days to remove same; or |
| | (xiii) the Borrower gives the Secured Lender notice of any Event of Default that is not waived by the Secured Lender. |
| **Automatic Stay** <br><br> **Bankruptcy Rule 4001 (c)(1)(13) (iv)** | The Interim Order and the Final Order shall include relief from the automatic stay with respect to the exercise of rights and remedies upon the occurrence of an Event of Default, subject to a five Business Day notice period unless otherwise ordered by the Court. |

RLF1 18599597v.1

| Material Provision | Brief Summary |
|---|---|
| Interim Order ¶ 20 | |
| **Limitation On Use of Proceeds**<br><br>**Bankruptcy Rule 4001 (c)(1)(B)(viii)**<br><br>DIP Credit Agmt. § 2.4<br><br>Interim Order ¶ E | Proceeds of the DIP Facility shall be used—<br><br>(i)  in a manner consistent with the terms and conditions of the DIP Loan Documents and in accordance with the Budget or as otherwise permitted by the DIP Lender, and<br><br>(ii) for the payment of the Post Trigger Notice Carve Out Amount. |
| **Indemnification Bankruptcy Rule 4001(c)(1)(B)(ix)** | None. |

## APPLICABLE AUTHORITY

15.    Section 364 of the Bankruptcy Code allows a debtor in possession to obtain credit or incur debt both in and out of the ordinary course of business if it meets certain conditions. Specifically, section 364(c) allows a debtor in possession to grant a post-petition lender a superpriority administrative expense claim, a lien on unencumbered property, and a junior lien on encumbered property, but only if the debtor in possession can show that financing was not available to it without such protections. 11 U.S.C. § 364(c).

## LOCAL RULE 4001-2(a)(1) STATEMENTS

16.    In accordance with Local Rule 4001-2(a)(i), the following provisions of the DIP Facility are highlighted below:

> (a)    ***Provisions that grant cross-collateralization protection (other than replacement liens or other adequate protection) to the prepetition secured creditors.***

There are no such provisions.

RLF1 18599597v.1

(b)  *Provisions or findings of fact that bind the estate or other parties in interest with respect to the validity, perfection or amount of the secured creditor's prepetition lien or the waiver of claims against the secured creditor without first giving parties in interest at least seventy-five (75) days from the entry of the order and the creditors' committee, if formed, at least sixty (60) days from the date of its formation to investigate such matters.*

There are no such provisions.

(c)  *Provisions that seek to waive, without notice, whatever rights the Debtor's estates may have under 11 U.S.C. § 506(c).*

Upon entry of the Final Order, the DIP Lender is entitled to the benefits of a waiver of the provisions of section 506(c) of the Bankruptcy Code.

(d)  *Provisions that immediately grant to the prepetition secured creditors liens on the Debtor's claims and causes of action arising under 11 U.S.C. §§ 544, 545, 547, 548 and 549.*

Liens will be granted on the proceeds from Avoidance Actions to the extent such liens are approved in the Final Order.

(e)  *Provisions that deem prepetition secured debt to be post-petition debt or that use post-petition loans from a prepetition secured creditor to pay part or all of that secured creditor's prepetition debt, other than as provided in 11 U.S.C. § 552(b).*

There are no such provisions.

(f)  *Provisions that provide disparate treatment for the professionals retained by a creditors' committee from those professionals retained by the debtor with respect to a professional fee carve-out.*

Pursuant to the Interim Order, each professional employed by the Debtor and any Committee will be entitled to DIP Carve Out protections to the extent, with respect to the period prior to the delivery of a Carve-Out Trigger Notice, their Allowed Professional Fees are set forth in the Budget. The Budget reflects estimated fees that are commensurate with such professional's efforts in the Cases; but, in recognition of the fact that the Debtor's professionals are expected to perform more work in connection with the Case, the dollar amounts in the Budget for the Debtor's professionals are higher than the dollar amounts set forth in the Budget for the professionals retained by any Committee.

(g)     ***Provisions that prime any secured lien absent consent of the affected creditor***

The DIP Liens will not prime the Prepetition Permitted Liens, if any.

(h)     ***Provisions that seek to affect the Court's power to consider the equities of the case under 11 U.S.C. § 552(b)(1).***

Upon entry of the Final Order, the DIP Lender is entitled to the benefits of a waiver of any "equities of the case" claims under section 552(b) of the Bankruptcy Code.

17.     The provisions of the DIP Facility and the Interim Order were negotiated and are the most favorable that the Debtor was able to negotiate. The DIP Facility enables the Debtor to obtain the financing necessary to maintain its assets and pursue a chapter 11 plan that will maximize the value of the estate.

## RELIEF REQUESTED

18.     The Debtor seeks entry of an order (a) authorizing the Debtor to, among other things, enter into the DIP Facility on the terms described in the Interim Order, the Final Order, and the DIP Loan Documents and (b) establishing deadlines relating to the Final Hearing and order authorizing the Debtor to obtain post-petition financing.

## BASIS FOR RELIEF REQUESTED

**I.     Approval of the DIP Credit Agreement Is Appropriate Under Section 364 of the Bankruptcy Code**

19.     The Debtor is authorized to maintain its assets under section 1108 of the Bankruptcy Code. As part of that operation, the Debtor may incur unsecured debt in the ordinary course of business. 11 U.S.C. § 364(a). The Bankruptcy Code offers a debtor in possession additional flexibility to the extent it needs additional credit, but cannot obtain such credit on unsecured terms. Section 364 of the Bankruptcy Code provides a progression of various protections to induce a post-petition lender to extend credit to a debtor in possession.

Specifically, a post-petition lender can be granted a superpriority administrative expense claim, a lien on unencumbered property, a junior lien on encumbered property, and, if the court finds that the interests of the holders of existing liens are adequately protected, a priming lien on encumbered property.  11 U.S.C. § 364(c), (d).

20.     Provided that an agreement to obtain secured credit is consistent with the provisions of, and policies underlying, the Bankruptcy Code, courts grant a debtor considerable deference in exercising its sound business judgment in obtaining such credit.  *See, e.g., In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest."); *In re Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) (noting that approval of post-petition financing requires, *inter alia*, an exercise of "sound and reasonable business judgment").

21.     Further, in determining whether the Debtor has exercised sound business judgment in deciding to enter into the DIP Documents, the Court may appropriately take into consideration non-economic benefits to the Debtor offered by a proposed post-petition facility. For example, in *In re ION Media Networks, Inc.*, the Bankruptcy Court for the Southern District of New York held that:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms. Relevant features of

> the financing must be evaluated, including noneconomic elements
> such as the timing and certainty of closing, the impact on creditor
> constituencies and the likelihood of a successful reorganization.
> This is particularly true in a bankruptcy setting where cooperation
> and established allegiances with creditor groups can be a vital part
> of building support for a restructuring that ultimately may lead to a
> confirmable reorganization plan. That which helps foster
> consensus may be preferable to a notionally better transaction that
> carries the risk of promoting unwanted conflict.

Case No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009).

22.    The business necessity for obtaining the DIP Facility has been fully described above and in the Lavooij Declaration. The Debtor will not have the cash needed to pay its current expenses absent the DIP Facility or the funds necessary to proceed with the orderly liquidation of the estate.

23.    Section 364 of the Bankruptcy Code does not impose upon a debtor in possession the onerous duty to seek unsecured credit from every possible lender before concluding that such credit is not available. *See Bray v. Shenandoah Fed Say. & Loan Ass'n (In re Snowshoe Co., Inc.),* 789 F.2d 1085, 1088 (4th Cir. 1986). This is true especially when time is of the essence. *See e.g., id; In re Reading Tube Indus.,* 72 B.R. 329, 333 (Bankr. E.D. Pa. 1987); *In re Stacy Farms,* 78 B.R. 494, 498 (Bankr. S.D. Ohio 1987). Moreover, in circumstances where only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *Sky Valley, Inc.,* 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.,* 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Snowshoe Co.,* 789 F.2d 1085, 1088 (4th Cir. 1986).

24.    Here, as described in the Lavooij Declaration, the Debtor, in consultation with its professionals, has determined that post-petition financing could not be obtained on more

RLF1 18599597v.1

favorable terms because, (i) the value of the Debtor's hard assets may be less than the required amount of the loan and (ii) the DIP Lender has agreed to waive the claims arising from the DIP Facility to the extent that the Plan is confirmed and its Effective Date occurs. Notwithstanding the Debtor's lack of alternative financing options, the terms of the DIP Facility are the product of good faith negotiations between the Debtor and the DIP Lender, in which the Debtor was represented by experienced counsel and financial advisor.

25.     As a condition to extending the DIP Facility that the Debtor needs, the DIP Lender requires the protections contained in subsections 364(c) of the Bankruptcy Code, which the facts in this case support. Specifically, the DIP Obligations will be secured, in each case subject to the DIP Carve Out, and any Prepetition Permitted Liens, by (i) first priority perfected liens and security interests in all of the Debtor's unencumbered assets pursuant to section 364(c)(2) of the Bankruptcy Code, and (ii) second priority perfected liens and security interests in all of the Debtor's assets that are subject to Prepetition Permitted Liens pursuant to section 364(c)(3) of the Bankruptcy Code.

26.     In addition, the DIP Lender will receive a DIP Superpriority Claim for any unpaid DIP Obligations. The DIP Superpriority Claim will be subordinate only to the DIP Liens, the DIP Carve Out, and any Prepetition Permitted Liens and will otherwise have priority over any and all administrative expenses of the kinds specified in or ordered pursuant to sections 503(b) and 507(b) of the Bankruptcy Code.

27.     The Debtor is not aware of any creditors holding valid and perfected secured claims against the Debtor's estate. The DIP Lender and its related entities extended to the Debtor pre-petition loans and other advances in excess of $96 million on an unsecured basis.

28.     Simply put, the DIP Facility provides the Debtor with the liquidity its need, at the lowest cost available.  Based upon the foregoing, given all the facts and circumstances present in this chapter 11 cases, the Debtor has amply satisfied the necessary conditions under section 364(c) of the Bankruptcy Code for authority to enter into the DIP Facility.

**II.     Approval of the DIP Facility Is Supported by the Debtor's Exercise of Sound Business Judgment**

29.     Based on the facts of this chapter 11 case, the DIP Facility represents a proper exercise of the Debtor's business judgment.  Bankruptcy courts routinely defer to the debtor's business judgment on most business decisions, including decisions about whether and how to borrow money.  *See, e.g., In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving post-petition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment").

30.     Moreover, a bankruptcy court generally will respect a debtor in possession's business judgment regarding the need for and the proposed use of funds. As the court noted in *In re Ames Dept Stores, Inc.,* 115 B.R. 34, 40 (Bankr. S.D.N.Y 1990):

> A court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party in interest.

Without the ability to incur secured debt, the debtor in possession would be placed at a competitive disadvantage and its efforts to reorganize could be seriously impaired.

31.     To determine whether a debtor has met this business judgment standard, a court need only "examine whether a reasonable business person would make a similar decision under

similar circumstances." *In re Dura Auto. Sys., Inc.*, No. 06-11202, 2007 WL 7728109, at \*97 (Bankr. D. Del. Aug. 15, 2007) (quoting *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006)); *see also In re Stanziale v. Nachtomi (In re Tower Air, Inc.)*, 416 F.3d 229, 239 (3d Cir. 2005); *In re AbitibiBowater*, 418 B.R. 815, 831 (Bankr. D. Del. 2009) (the business judgment standard is "not a difficult standard to satisfy").    Under the business judgment rule, "management of a corporation's affairs is placed in the hands of its board of directors and officers, and the Court should interfere with their decisions only if it is made clear that those decisions are, *inter alia*, clearly erroneous, made arbitrarily, are in breach of the officers' and directors' fiduciary duty to the corporation, are made on the basis of inadequate information or study, are made in bad faith, or are in violation of the Bankruptcy Code." *In re Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) (citing *In re United Artists Theatre Co.*, 315 F.3d 217, 233 (3d Cir. 2003), *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303 (5th Cir. 1985) and *In re Defender Drug Stores, Inc.*, 145 B.R. 312, 317 (B.A.P. 9th Cir. 1992)).

32.    In the present case, the Debtor's decision to obtain the DIP Facility represents an exercise of sound business judgment in the continued effort to preserve and maximize the value of its assets and to seek confirmation of a plan of liquidation that would result in recoveries to creditors that otherwise likely would not be realized.  Without such credit, the Debtor would be unable to administer its estate and any prospects to confirm a chapter 11 plan would be destroyed.

## III.    Immediate Relief Is Justified

33.    Pursuant to Bankruptcy Rule 4001(b) and (c), a final hearing on a motion to use cash collateral or obtain post-petition financing may not be commenced less than fourteen days after service of such motion.  The Court, however, is authorized to conduct an expedited hearing

prior to the expiration of such fourteen-day period and to authorize the debtor to obtain credit to the extent necessary to avoid immediate and irreparable harm to the debtor's estate. Pursuant to Bankruptcy Rule 4001(b) and (c), the Debtor therefore request that the Court (i) authorize the Debtor to obtain financing on an interim basis pursuant to the terms of the Interim Order and (ii) schedule a final hearing to consider approval of the Debtor's request to obtain financing through the DIP Facility on a final basis pursuant to the terms of the Final Order.

34.     As described above and in the Lavooij Declaration, without access to the DIP Facility, the Debtor will have no ability to preserve its assets and maximize their value for the benefit of creditors. In light of the foregoing, the Debtor submits that they have satisfied the requirements of Bankruptcy Rule 4001(b) and (c) to support immediate DIP Facility availability pending the entry of the Final Order. Accordingly, to forestall the immediate and irreparable harm that would inure to the Debtor's estate, creditors and parties in interest absent Court approval of this Motion, the Debtor respectfully requests that the Court grant the relief requested herein.

## REQUEST FOR WAIVER OF STAY

35.     To implement the foregoing, the Debtor seeks a waiver of any stay of the effectiveness of the order approving this Motion. Pursuant to Bankruptcy Rule 6004(h), any "order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). The relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtor for the reasons set forth herein. Accordingly, ample cause exists to justify a waiver of any fourteen-day stay imposed by Bankruptcy Rule 6004(h).

RLF1 18599597v.1

36.     To implement the foregoing immediately, the Debtor respectfully requests a waiver of the notice requirements of Bankruptcy Rule 6004(a) to the extent they are deemed to apply.

## NOTICE

37.     The Debtor will provide notice of this Motion by facsimile, e-mail, overnight delivery, or hand delivery to: (i) Office of the United States Trustee for the District of Delaware; (ii) counsel to the Official Committee of Unsecured Creditors, if one is appointed; (iii) the creditors listed in the Debtor's matrix of all creditors, (iv) counsel to the Official Committee of Unsecured Creditors, if one is appointed; (v) counsel to Mammoet USA North, Inc.; and (vi) all parties entitled to notice pursuant to Local Rule 9013-1(m).  Following the hearing, a copy of this Motion and any order entered with respect to it will be served on the foregoing parties and all parties having filed requests for notice in this case.  In light of the nature of the relief requested herein, the Debtor submits that no other or further notice is necessary.

*[Remainder of page left blank intentionally.]*

RLF1 18599597v.1

WHEREFORE, the Debtor respectfully requests that Court enter orders granting the relief requested in the Motion and such other and further relief as may be just and proper.

Dated: December 13, 2017
        Wilmington, Delaware

                                    Mark D. Collins (No. 2981)
                                    Jason M. Madron (No. 4431)
                                    Joseph C. Barsalona II (No. 6102)
                                    RICHARDS, LAYTON & FINGER, P.A.
                                    One Rodney Square
                                    920 North King St.
                                    Wilmington, DE 19801
                                    Telephone: 302-651-7700
                                    Facsimile: 302-651-7701
                                    E-mail:collins@rlf.com
                                              madron@rlf.com
                                              barsalona@rlf.com

                                  - and -

                                  Andrew H. Sherman
                                  Boris I. Mankovetskiy
                                  SILLS CUMMIS & GROSS P.C.
                                  One Riverfront Plaza
                                  Newark, NJ 07102
                                  Telephone:  973-643-7000
                                  Facsimile:  973-643-6500
                                  Email: asherman@sillscummis.com
                                            bmankovetskiy@sillscummis.com

                                  *Proposed Counsel for Debtor and*
                                  *Debtor in Possession*

## EXHIBIT A

**Proposed Interim Order**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| MAMMOET-STARNETH LLC, | Case No. 17-12925 (LSS) |
| Debtor.[1] | |

**INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 362, 363, 364 AND 507
(I) APPROVING POST-PETITION FINANCING, (II) GRANTING LIENS AND
PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (III)
GRANTING RELATED RELIEF, AND (IV) SCHEDULING A FINAL HEARING**

This matter having come before the Court upon the motion (the "Motion") of Mammoet-Starneth, LLC, a Delaware limited liability company (the "Debtor") in the above-captioned chapter 11 case (the "Case"), pursuant to sections 105, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3) and 507 of title 11 of the United States Code, (11 U.S.C. §§ 101, *et seq.,* as amended, the "Bankruptcy Code"), and rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") for:

(i)    authorization, under section 364(c) of the Bankruptcy Code and Bankruptcy Rule 4001(c), to obtain, as borrower, secured, superpriority post-petition loans, advances and other financial accommodations (the "DIP Facility"), pursuant to the terms and conditions of that certain Debtor-In-Possession Credit Agreement (as amended, restated, supplemented or otherwise modified from time to time, the "DIP Credit Agreement") by and between (a) the Debtor and (b) Mammoet USA North Inc. (the "DIP Lender"), substantially in the form of Exhibit A attached hereto; and

(ii)    authorization to execute and deliver the DIP Credit Agreement and all other related documents and agreements, including security agreements, deposit account control

---

[1] The last four digits of the Debtor's federal tax identification number is 4518.  The Debtor's address is 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808.

agreements and promissory notes (collectively, the "DIP Loan Documents") and to perform such other acts as may be necessary or desirable in connection with the DIP Loan Documents; and

(iii)    until the Termination Date (as defined in the DIP Credit Agreement), and subject to the terms, conditions, limitations on availability and reserves set forth in the DIP Loan Documents, the DIP Facility and this Interim Order, authorization, prior to the entry of the Final Order, to request extensions of credit under the DIP Facility up to an aggregate principal amount of $1,000,000 at any one time outstanding (the "Interim Financing"); and entry of this "Interim Order" approving the Interim Financing; and

(iv)    the granting of allowed superpriority administrative expense claim status pursuant to section 364(c)(1) of the Bankruptcy Code in the Case and any Successor Case (as defined herein) to all obligations owing under the DIP Credit Agreement and the other DIP Loan Documents (collectively, and including all "Obligations" as described in the DIP Credit Agreement, including all obligations with respect to letters of credit issued or deemed issued under the DIP Credit Agreement, respectively, and, together, the "DIP Obligations"), subject to the priorities set forth herein; and

(v)    the granting to the DIP Lender automatically perfected security interests in and liens on all of the DIP Collateral (as defined herein), including, without limitation, which liens shall be subject to the priorities set forth herein; and

(vi)    authorization to pay the principal, interest, fees, expenses and other amounts payable under each of the DIP Loan Documents as they become due, including, without limitation, the commitment fee and any other fees set forth in the DIP Loan Documents, the reasonable fees and disbursements of the DIP Lender's attorneys, and other consultants (solely for their work in such capacity) and all related expenses of the DIP Lender, all to the extent provided by and in accordance with the terms of the respective DIP Loan Documents; and

(vii)    vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Loan Documents and this Interim Order;

(viii)    scheduling a final hearing (the "<u>Final Hearing</u>") to consider the relief requested in the Motion, the entry of an order (a "<u>Final Order</u>") approving the relief requested in the Motion on a final basis, and approving the form of notice with respect to the Final Hearing;

(ix)    granting related relief.

The Court having considered the Motion, the *Declaration of Christiaan Lavoojj in Support of Chapter 11 Petitions and Request for First Day Relief*, the exhibits attached thereto, the DIP Loan Documents, and the evidence submitted or adduced and the arguments of counsel made at the interim hearing held on the Motion (the "<u>Interim Hearing</u>"); and notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 4001, 9014, and Local Rule 9013-1; and the Interim Hearing to consider the interim relief requested in the Motion having been held and concluded; and all objections, if any, to the interim relief requested in the Motion having been withdrawn, resolved or overruled by the Court; and it appearing to the Court that, pursuant to Bankruptcy Rule 4001(c)(2), granting the interim relief requested is necessary to avoid immediate and irreparable harm to the Debtor and its estate pending the Final Hearing, and otherwise is fair and reasonable and in the best interests of the Debtor, its estate, and its creditors and equity holder, and after due deliberation and consideration, and for good and sufficient cause appearing therefor;

BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING BY THE DEBTOR, INCLUDING THE SUBMISSIONS OF THE LAVOOIJ DECLARATION AND THE REPRESENTATIONS OF COUNSEL, THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:[2]

A.    *Petition Date*.  On December 13, 2017 (the "<u>Petition Date</u>"), the Debtor filed a voluntary petition under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "<u>Court</u>"), commencing this Case.

---

[2] The findings and conclusions set forth herein constitute the Bankruptcy Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052. To the extent any findings of fact constitute conclusions of law, they are adopted as such. To the extent any conclusions of law constitute findings of fact, they are adopted as such.

B.      *Debtor in Possession*.   The Debtor is continuing in the management of its properties as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in this Case.

C.      *Jurisdiction and Venue*.   This Court has jurisdiction, pursuant to 28 U.S.C. §§ 157(b) and 1334, over these proceedings, and over the persons and property affected hereby. Consideration of the Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2).   Venue for the Case and proceedings on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.   The bases for the relief sought in the Motion and granted in this Interim Order are sections 105, 362, 363, 364 and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001 and 9014, and Local Rule 4001-2.

D.      *Committee Formation*.   As of the date hereof, the Office of the United States Trustee (the "U.S. Trustee") has not appointed any official committee of unsecured creditors in this Case pursuant to section 1102 of the Bankruptcy Code (a "Committee").

E.      *Findings Regarding the Post-petition Financing*.

(i)      *Request for Post-petition Financing*.   The Debtor seeks authority to enter into the DIP Facility on the terms described herein and in the DIP Loan Documents.   At the Final Hearing, the Debtor will seek final approval of the proposed post-petition financing arrangements pursuant to the Final Order, which shall be in form and substance acceptable to the DIP Lender.   Notice of the Final Hearing and Final Order will be provided in accordance with this Interim Order.

(ii)      *Immediate Need for Post-petition Financing*.   The Debtor's need to obtain credit pursuant to the DIP Facility is immediate and critical in order to enable the Debtor to administer and preserve the value of its estate.   The Debtor does not have sufficient available sources of working capital and financing to maintain its properties in the ordinary course of business without the DIP Facility.

(iii)      *No Credit Available on More Favorable Terms*.   Given its current financial condition, and capital structure, the Debtor is unable to obtain financing from sources

4

other than the DIP Lender on terms more favorable than the DIP Facility. The Debtor has been unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense. The Debtor has also been unable to obtain credit: (a) having priority over that of administrative expenses of the kind specified in sections 503(b), 507(a) and 507(b) of the Bankruptcy Code; (b) secured by a lien on property of the Debtor and its estate that is not otherwise subject to a lien; or (c) secured solely by a junior lien on property of the Debtor and its estates that is subject to a lien. Financing on a post-petition basis is not otherwise available without granting the DIP Lender, (1) perfected security interests in and liens on (each as provided herein) all of the Debtor's existing and after-acquired assets with the priorities set forth herein, (2) superpriority claims, and (3) the other protections set forth in this Interim Order.

(iv)     *Use of Proceeds of the DIP Facility.* As a condition to entry into the DIP Credit Agreement and the extensions of credit under the DIP Facility, the DIP Lender requires, and the Debtor has agreed, that proceeds of the DIP Facility shall be used (a) in a manner consistent with the terms and conditions of the DIP Loan Documents and in accordance with the budget (a copy of which is attached as <u>Exhibit B</u> hereto, as the same may be modified from time to time consistent with the terms of the DIP Loan Documents, and subject to such variances as may be permitted thereby, the "<u>Budget</u>") solely for (i) post-petition operating expenses and other working capital and general business purposes, (ii) certain transaction fees and expenses, (iii) permitted payment of costs of administration of the Case, including prior to the delivery of a Carve-Out Trigger Notice (as defined below), to fund the DIP Carve Out through deposits into the Professional Fee Escrow Account, and (iv) as otherwise permitted under the DIP Loan Documents, and (b) after the delivery of a Carve-Out Trigger Notice to fund the Post Trigger Notice Carve-Out Amount (as defined below).

(v)     *Application of Proceeds of DIP Collateral.* As a condition to entry into the DIP Loan Documents and the extension of credit under the DIP Facility, the Debtor and the DIP Lender have agreed that the proceeds of DIP Collateral (as defined herein) shall be applied in accordance with paragraph 18(a) of this Interim Order.

5

F.     _Sections 506(c) and 552(b)_.     In light of the DIP Lender's agreement to subordinate its liens and superpriority claims, as applicable, to the DIP Carve Out (as defined herein) and any Prepetition Permitted Liens and agreement to fund the Budget in accordance with the terms of the DIP Loan Documents, upon entry of the Final Order, the DIP Lender is entitled to the benefits of a waiver of (a) the provisions of section 506(c) of the Bankruptcy Code, and (b) any "equities of the case" claims under section 552(b) of the Bankruptcy Code.

G.     _Good Faith of the DIP Lender_.

(i)     _Willingness to Provide Financing_.     The DIP Lender has indicated a willingness to provide financing to the Debtor subject to:  (a) the entry of this Interim Order and the Final Order; (b) approval of the terms and conditions of the DIP Facility and the DIP Loan Documents; and (c) entry of findings by this Court that such financing is essential to the Debtor's estate, that the DIP Lender is extending credit to the Debtor pursuant to the DIP Loan Documents in good faith, and that the DIP Lender's claims, superpriority claims, security interests, liens, rights, and other protections granted pursuant to this Interim Order and the DIP Loan Documents will have the protections provided in section 364(e) of the Bankruptcy Code and will not be affected by any subsequent reversal, modification, vacatur, amendment, reargument or reconsideration of this Interim Order or any other order.

(ii)     _Business Judgment and Good Faith Pursuant to Section 364(e)_.     The extension of credit under the DIP Facility reflects the Debtor's exercise of prudent business judgment consistent with its fiduciary duties, and is supported by reasonably equivalent value and consideration.  The DIP Facility was negotiated in good faith and at arms' length by and between the Debtor and the DIP Lender.  The credit to be extended under the DIP Loan Documents shall be deemed to have been so allowed, advanced, made, used or extended in good faith, and for valid business purposes and uses, within the meaning of section 364(e) of the Bankruptcy Code, and the DIP Lender is therefore entitled to the protection and benefits of Section 364(e) of the Bankruptcy Code and this Interim Order.

H.      *Notice*.  Notice of the Interim Hearing and the emergency relief requested in the Motion has been provided by the Debtor, whether by facsimile, email, overnight courier or hand delivery, to certain parties in interest, including:  (i) the U.S. Trustee; (ii) counsel to the Committee, if one is appointed; (iii) the creditors listed in the Debtor's matrix of all creditors, and (iv) all parties entitled to notice pursuant to Local Rule 9013-1(m).  The Debtor has made reasonable efforts to afford the best notice possible under the circumstances and such notice is good and sufficient to permit the interim relief set forth in this Interim Order, and no other or further notice is or shall be required except as set forth in paragraph 37 below.

I.      *Immediate Entry*.  Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2).

Based upon the foregoing findings and conclusions, the Motion and the record before the Court with respect to the Motion, and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED that:

1.      Interim Financing Approved.  The Motion is granted on an interim basis, the Interim Financing (as defined herein) is authorized and approved on an interim basis, subject to the terms and conditions set forth in this Interim Order.

2.      Objections Overruled.  All objections to the Interim Financing to the extent not withdrawn or resolved are hereby overruled.

**DIP Facility Authorization**

3.      Authorization of the DIP Facility and DIP Loan Documents.  The Debtor is expressly and immediately authorized and empowered (i) to execute and deliver the DIP Loan Documents, (ii) to incur and to perform the DIP Obligations in accordance with, and subject to, the terms of this Interim Order, the DIP Loan Documents, and the Budget, and (iii) to deliver all instruments and documents that may be necessary or required for performance by the Debtor under the DIP Facility and the creation and perfection of the DIP Liens described in and provided for by this Interim Order and the DIP Loan Documents.  The Debtor is hereby

7

authorized to pay the principal, interest, fees, expenses and other amounts described in the DIP Loan Documents as such become due and without need to obtain further Court approval, including, without limitation, commitment fees and any additional fees set forth in the DIP Loan Documents, and the reasonable fees and disbursements of the DIP Lender's attorneys and other consultants (solely in connection with the DIP Facility), whether or not the transactions contemplated hereby are consummated, all to the extent provided in the DIP Loan Documents, with invoices to be provided in accordance with paragraph 22 below.  All collections and proceeds, whether from ordinary course collections, asset sales, debt issuances, insurance recoveries, condemnations or otherwise, will be deposited and applied as required by this Interim Order and the DIP Loan Documents.  Upon execution and delivery, the DIP Loan Documents shall represent valid and binding, and joint and several, obligations of the Debtor, enforceable against the Debtor and its estate in accordance with their terms.

4.      <u>Authorization to Borrow</u>.  Until the Termination Date (as defined in the DIP Credit Agreement), and subject to the terms, conditions, limitations on availability and reserves set forth in the DIP Loan Documents, the DIP Facility and this Interim Order, and in order to prevent immediate and irreparable harm to the Debtor's estate, the Debtor is hereby authorized, prior to the entry of the Final Order, to request extensions of credit under the DIP Facility up to an aggregate principal amount of $1,000,000 at any one time outstanding, and the Lender, subject to the satisfaction of the conditions to lending set forth in the DIP Loan Documents and this Interim Order, shall extend such credit Debtor .

5.      <u>DIP Obligations</u>.  The DIP Loan Documents and this Interim Order shall constitute and evidence the validity and binding effect of the Debtor's DIP Obligations, which DIP Obligations shall be valid, binding, and enforceable against the Debtor, its estate and any successors thereto, including without limitation, any trustee or other estate representative appointed in the Case, or any case under chapter 7 of the Bankruptcy Code upon the conversion of any of the Case (collectively, "<u>Successor Cases</u>").  Upon entry of this Interim Order, the DIP Obligations will include all loans and any other indebtedness or obligations, contingent or

8

absolute, which may now or from time to time be owing by the Debtor to the DIP Lender under the DIP Loan Documents or this Interim Order, including, without limitation, all principal, accrued interest, costs, fees, expenses and other amounts owed pursuant to the DIP Loan Documents, and shall be joint and several obligations of the Debtor in all respects.

6.    Post-petition Liens and Collateral.

(a)    Effective immediately upon the entry of this Interim Order, pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code, the DIP Lender is hereby granted, continuing valid, binding, enforceable, non-avoidable and automatically and properly perfected post-petition security interests in and liens on (collectively, the "DIP Liens") any and all presently owned and hereafter acquired assets and real and personal property of the Debtor, including, without limitation, the following (the "DIP Collateral"):[3]

(i)    all of the Borrower's now-owned and hereafter acquired or arising accounts, accounts receivable and rights to payment of every kind and description, and all of the Borrower's contract rights, chattel paper, documents and instruments with respect thereto, together with all fees and other payments due the Borrower and all of the Borrower's rights, remedies, security and liens, in, to and in respect of such accounts, including, without limitation, rights of stoppage in transit, replevin, repossession and reclamation and other rights and remedies of an unpaid vendor, lienor or secured party;

(ii)    all moneys, securities, cash, cash equivalents, and other property and the proceeds thereof, now or hereafter held or received by Borrower;

(iii)    all of the proceeds from the sale of any of the Borrower's assets;

---

[3] All defined terms in the description of DIP Collateral shall have the meanings ascribed thereto in the DIP Loan Documents. All terms not specifically defined in the DIP Loan Documents shall have the meanings ascribed to such terms in Article 8 or 9 of the Uniform Commercial Code, as applicable.

(iv)    all of the Borrower's now owned and hereafter acquired or arising general intangibles and any other property of every kind and description with respect to, evidencing, or relating to its accounts, accounts receivable, and other rights to payment, including, but not limited to, all existing and future customer lists, chose in action, claims, books, records, ledger cards, contracts, licenses, formulae, tax and other types of refunds, deposits, returned and unearned insurance premiums, rights and claims under insurance policies, and computer programs, information, software, records, and data as the same relates to the accounts;

(v)    all of the Borrower's other general intangibles (including, without limitation, any proceeds from insurance policies after payment of prior interests), patents, unpatented inventions, trade secrets, copyrights, contract rights, goodwill, literary rights, rights to performance, rights under licenses, chose-in-action, claims, information contained in computer media (such as data bases, source and object codes, and information therein), things in action, trademarks and trademarks applied for (together with the goodwill associated therewith) and derivatives thereof, trade names, including the right to make, use, and vend goods utilizing any of the foregoing, and permits, licenses, certifications, authorizations and approvals, and the rights of the Borrower thereunder, issued by any governmental, regulatory, or private authority, agency, or entity whether now owned or hereafter acquired, together with all cash and non-cash proceeds and products thereof;

(vi)    all of the Borrower's now owned and hereafter acquired inventory of every kind and character which is held by the Borrower for sale or lease, or is furnished by the Borrower under any contract of service, or is held by the Borrower as raw

materials, work in process, or materials used or consumed in business, wherever located and as the same may now or hereafter be constituted, together with all cash and non-cash proceeds and products thereof;

(vii)    all of the Borrower's now owned or hereafter acquired real property[4], machinery, equipment, tools, tooling, furniture, fixtures, goods, supplies, materials, work in process, together with additions, parts, fittings, accessories, special tools, attachments, and accessions, and all replacements and substitutions thereof;

(viii)   all commercial tort claims; and

(ix)    the income, profits and proceeds of all of the foregoing.[5]

7.    DIP Lien Priority.

(a)    *DIP Liens*.  The DIP Liens shall be junior only to the (i) DIP Carve Out and (ii) any Prepetition Permitted Liens, and shall otherwise be senior in priority and any other security, mortgage, collateral interest, lien or claim on or to any of the DIP Collateral.  Other than as set forth herein, the DIP Liens shall not be made subject to or *pari passu* with any lien or security interest hereinafter granted in the Case or any Successor Case.  The DIP Liens shall be valid and enforceable against any trustee or other estate representative appointed in the Case or any Successor Case, upon the conversion of the Case to a case under chapter 7 of the Bankruptcy Code (or in any other Successor Cases), and/or upon the dismissal of the Case or Successor Case. The DIP Liens shall not be subject to challenge under sections 510, 549, or 550 of the Bankruptcy Code.  No lien or interest avoided and preserved for the benefit of the estate pursuant to section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the DIP Liens.

---

[4] For the avoidance of doubt, the DIP Liens extend only to the proceeds of leased real property and are not direct liens on the Debtor's leases of real property unless such liens are expressly permitted pursuant to the underlying lease documents.

[5] For the avoidance of doubt, the DIP Liens shall extent to all proceeds from claims or causes of action to avoid a transfer of property (or an interest in property) or an obligation incurred by the Debtor pursuant to any applicable section of the Bankruptcy Code, including, without limitation, chapter 5 and section 724(a) of the Bankruptcy Code ("Avoidance Actions") only upon entry of the Final Order.

RLF1 18599614v.1

8.    <u>DIP Superpriority Claim</u>.

(a)    *DIP Lender Superpriority Claim*.  Upon entry of this Interim Order, the DIP Lender is hereby granted, pursuant to section 364(c)(1) of the Bankruptcy Code, an allowed superpriority administrative expense claim in the Case and any Successor Case (collectively, the "<u>DIP Superpriority Claim</u>") for all DIP Obligations.  The DIP Superpriority Claim shall be subordinate only to the DIP Liens, the DIP Carve Out or any Prepetition Permitted Liens, and shall otherwise have priority over any and all administrative expenses of the kinds specified in or ordered pursuant to sections 503(b) and 507(b) of the Bankruptcy Code, as provided under section 364(c)(1) of the Bankruptcy Code.

(b)    *Priority of DIP Superpriority Claim*.  The DIP Superpriority Claim shall be payable from and have recourse to all pre- and post-petition property of the Debtor and all proceeds thereof, subject only to the payment in full in cash of the DIP Obligations, the DIP Carve Out and amounts secured by any Prepetition Permitted Liens to the extent paid from identifiable proceeds of the assets subject to any such Prepetition Permitted Liens.  Upon entry of the Final Order, the DIP Superpriority Claim shall be payable from or have recourse to the proceeds of Avoidance Actions.

9.    <u>No Obligation to Extend Credit</u>.  The DIP Lender shall not have any obligation to make any loan or advance under the DIP Loan Documents unless all of the conditions precedent to the making of such extension of credit under the applicable DIP Loan Documents and this Interim Order have been satisfied in full or waived by the DIP Lender, in its sole discretion.

10.    <u>Use of DIP Facility Proceeds</u>.  From and after the Petition Date, the Debtor shall use advances of credit under the DIP Facility only for the purposes specifically set forth in this Interim Order and the DIP Loan Documents and in compliance with the Budget, a copy of which has been delivered to the DIP Lender; provided that the use of the Post Trigger Notice Carve Out Amount shall not be subject to the Budget.

11.    Amendments.  The DIP Loan Documents may from time to time be amended, modified or supplemented by the parties thereto without notice or a hearing if:  (i) in the reasonable judgment of the Debtor and the DIP Lender, the amendment, modification, or supplement (A) is in accordance with the DIP Loan Documents, (B) is not prejudicial in any material respect to the rights of third parties, and (C) has been consented to by the DIP Lender, and (ii) a copy (which may be provided through electronic mail or facsimile) of the form of amendment, modification or supplement is provided to counsel for any Committee, and the U.S. Trustee at least one (1) Business Day prior to the effective date of the amendment, modification or supplement.

12.    Budget Maintenance.  The Budget and any modification to, or amendment or update of, the Budget shall be in form and substance reasonably acceptable to the DIP Lender and approved by the DIP Lender in its reasonable discretion.  The Debtor will deliver copies of any such amended or updated Budget to the U.S. Trustee and the Committee, if any.  The Debtor shall comply with and update the Budget from time to time in accordance with the DIP Loan Documents (provided that any update shall be in form and substance reasonably acceptable to the DIP Lender and approved by the DIP Lender, in its reasonable discretion).

13.    Modification of Automatic Stay.  The automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby modified as necessary to effectuate all of the terms and provisions of this Interim Order, including, without limitation, to:  (a) permit the Debtor to grant the DIP Liens, the Adequate Protection Liens and the DIP Superpriority Claim; and (b) authorize the Debtor to pay, and the DIP Lender to retain and apply, payments made in accordance with the terms of this Interim Order.

14.    Perfection of DIP Liens and Adequate Protection Liens.

(a)    *Automatic Perfection of Liens*.  This Interim Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of all liens granted herein, including the DIP Liens, without the necessity of filing or recording any financing statement, mortgage, notice, or other instrument or document which may otherwise be required under the law or

13

regulation of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement, collateral access agreement, customs broker agreement or freight forwarding agreement) to validate or perfect (in accordance with applicable non-bankruptcy law) the DIP Liens, or to entitle the DIP Lender to the priorities granted herein.  Notwithstanding the foregoing, the DIP Lender is authorized to file, as it in its permitted discretion deems necessary, such financing statements, mortgages, notices of liens and other similar documents to perfect in accordance with applicable non-bankruptcy law or to otherwise evidence any of the DIP Liens, and all such financing statements, mortgages, notices and other documents shall be deemed to have been filed or recorded as of the Petition Date; provided, however, that no such filing or recordation shall be necessary or required in order to create, perfect or enforce the DIP Liens.  The Debtor is authorized to execute and deliver promptly upon demand to the DIP Lender all such financing statements, mortgages, control agreements, notices and other documents as the DIP Lender may reasonably request.  The DIP Lender, in its permitted discretion, may file a photocopy of this Interim Order as a financing statement with any filing or recording office or with any registry of deeds or similar office, in addition to or in lieu of such financing statements, notices of lien or similar instrument.

15.    Proceeds of Subsequent Financing.  If the Debtor, any trustee, any examiner with enlarged powers, any responsible officer or any other estate representative subsequently appointed in this Case or any Successor Case shall obtain credit or incur debt pursuant to sections 364(b), 364(c) or 364(d) of the Bankruptcy Code in violation of the DIP Loan Documents at any time prior to the repayment in full in cash of all DIP Obligations and the termination of the DIP Lender's obligations to extend credit under the DIP Facility, including subsequent to the confirmation of any plan of reorganization or liquidation with respect to the Debtor and the Debtor's estate, then all the cash proceeds derived from such credit or debt in the amount necessary to satisfy the Debtor's remaining obligations under the DIP Facility shall immediately be turned over to the DIP Lender.

14

16.    <u>Maintenance of DIP Collateral</u>.    Until the payment in full in cash of all DIP Obligations and the termination of the DIP Lender's obligations to extend credit under the DIP Loan Documents, as provided therein, the Debtor shall:  (a) insure the DIP Collateral as required under the DIP Facility; and (b) maintain the cash management system which has been agreed to by the DIP Lender or as otherwise required by the DIP Loan Documents.

17.    <u>Disposition of DIP Collateral</u>.  The Debtor shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral outside the ordinary course of business except as permitted by the DIP Loan Documents.  Nothing provided herein shall limit the right of the DIP Lender to object to any proposed disposition of the DIP Collateral.

18.    <u>Termination Date</u>.  On the Termination Date, (i) all DIP Obligations shall be immediately due and payable and (ii) all commitments to extend credit under the DIP Facility will terminate.

19.    <u>Events of Default</u>.  The occurrence of an "Event of Default" under the DIP Credit Agreement shall constitute an event of default under this Interim Order (each, an "<u>Event of Default</u>").

20.    <u>Rights and Remedies Upon Event of Default</u>.

(a)    *DIP Facility Termination*.  Immediately upon the occurrence and during the continuance of an Event of Default, the DIP Lender may in its discretion (or shall in accordance with the DIP Loan Documents) (i) declare the DIP Facility terminated (such declaration, a "<u>Termination Declaration</u>") or (ii) send a reservation of rights notice to the Debtor, which notice may advise the Debtor that any further advances under the DIP Facility will be made in the sole discretion of the DIP Lender.  Upon the issuance of a Termination Declaration to the Debtor in accordance with the DIP Credit Agreement:  (I) all or any portion of the Commitments of the DIP Lender to make loans or otherwise extend credit may be suspended or terminated in accordance with the DIP Loan Documents; (II) all DIP Obligations may be deemed immediately due and payable in accordance with the DIP Loan Documents; and (III) after expiration of the Remedies Notice Period, defined below, the DIP Lender may exercise all other

15

rights and remedies available to it under Section 10 of the DIP Credit Agreement; and (IV) the DIP Lender shall fund the Post-Trigger Notice Carve-Out Amount. With respect to the DIP Collateral, following the Termination Declaration, subject to the Remedies Notice Period, the DIP Lender may exercise all rights and remedies available to them under the DIP Loan Documents, or applicable law against the DIP Collateral and without limiting the foregoing, the DIP Lender may subject to the Remedies Notice Period, (i) enter onto the premises of the Debtor in connection with an orderly liquidation of the DIP Collateral; and/or (ii) exercise any rights and remedies provided under the DIP Loan Documents, or at law or equity, including all remedies provided under the Bankruptcy Code and pursuant to this Interim Order and the Final Order. For the avoidance of doubt, no party-in-interest (other than the DIP Lender) may at any time exercise any rights and remedies available to them against the DIP Collateral until the DIP Obligations are paid in full in cash.

(b)     *Notice of Termination*. Any Termination Declaration shall be given by facsimile (or other electronic means, including electronic mail) to counsel to the Debtor, counsel to any Committee, and the U.S. Trustee (the earliest date any such Termination Declaration is made shall be referred to herein as the "Termination Declaration Date"). The DIP Obligations shall be due and payable, without notice or demand, on the Termination Declaration Date, except as otherwise provided in this Interim Order. Any automatic stay otherwise applicable to the DIP Lender is hereby modified so that, unless otherwise ordered by the Court, five (5) business days after the Termination Declaration Date (the "Remedies Notice Period") the DIP Lender shall be entitled to exercise all rights and remedies against the DIP Collateral in accordance with the DIP Loan Documents, and this Interim Order, and shall be permitted to satisfy the DIP Liens and the DIP Superpriority Claims, subject only to the DIP Carve Out, any Prepetition Permitted Liens. During the Remedies Notice Period, the Debtor and any Committee shall be entitled to seek an emergency hearing with the Court for the purpose of, among other things, contesting whether an Event of Default has occurred. Unless the Court orders otherwise during the Remedies Notice Period, the automatic stay shall automatically be terminated at the end of the Remedies Notice

Period without further notice or order and the DIP Lender shall be permitted to exercise all remedies set forth herein, in the DIP Credit Agreement, the DIP Loan Documents and as otherwise available at law against the DIP Collateral, without further order of or application or motion to the Court, and without restriction or restraint by any stay under sections 105 or 362 of the Bankruptcy Code, or otherwise, against the enforcement of the liens and security interest in the DIP Collateral or any other rights and remedies granted to the DIP Lender with respect thereto pursuant to the DIP Credit Agreement, the other DIP Loan Documents or this Interim Order.

21.     <u>Good Faith Under Section 364 of the Bankruptcy Code; No Modification or Stay of this Interim Order</u>.  The DIP Lender has acted in good faith in connection with this Interim Order and their reliance on this Interim Order is in good faith.  Based on the findings set forth in this Interim Order and the record made during the Interim Hearing, and in accordance with section 364(e) of the Bankruptcy Code, in the event any or all of the provisions of this Interim Order are hereafter reversed, modified, amended or vacated by a subsequent order of this Court, or any other court, the DIP Lender is entitled to the protections provided in section 364(e) of the Bankruptcy Code.  Any such reversal, modification, amendment or vacatur shall not affect the validity and enforceability of any advances previously made or made hereunder, or lien, claim or priority authorized or created hereby, provided that the Interim Order was not stayed by court order after due notice had been given to the DIP Lender at the time the advances were made or the liens, claims or priorities were authorized and/or created.  Any liens or claims granted to the DIP Lender hereunder arising prior to the effective date of any such reversal, modification, amendment or vacatur of this Interim Order shall be governed in all respects by the original provisions of this Interim Order, including entitlement to all rights, remedies, privileges and benefits granted herein, provided that the Interim Order was not stayed by court order after due notice had been given to the DIP Lender at the time the advances were made or the liens, claims or priorities were authorized and/or created.

22.      <u>DIP and Other Expenses</u>.  The Debtor is authorized to pay all reasonable and documented out-of-pocket expenses of the DIP Lender in connection with the DIP Facility (including, without limitation, expenses incurred prior to the Petition Date), as provided in the DIP Loan Documents.  Payment of all such fees and expenses shall not be subject to allowance by the Court and professionals for the DIP Lender shall not be required to submit their invoices in any particular form.   The professionals for the DIP Lender shall deliver a copy of their respective invoices to counsel for the Debtor, any Committee and the U.S. Trustee, redacted as necessary with respect to any privileged or confidential information contained therein.   Any objections raised by the Debtor, the U.S. Trustee or any Committee with respect to such invoices within ten (10) days of the receipt thereof will be subject to resolution by the Court.  In the event of any objection.  Pending such resolution, the undisputed portion of any such invoice will be paid promptly by the Debtor.  Notwithstanding the foregoing, the Debtor is authorized to pay upon the entry of this Interim Order, all reasonable fees, costs and expenses of the DIP Lender incurred on or prior to such date in connection with the DIP Facility, provided that the professionals engaged by the DIP Lender shall have delivered to the Debtor a copy of their invoiced on or before such date.

23.      <u>Proofs of Claim</u>.  The DIP Lender will not be required to file proofs of claim or requests for approval of administrative expenses in the Case or Successor Case, and the provisions of this Interim Order relating to the amount of the DIP Obligations and the DIP Superpriority Claim shall constitute timely filed proofs of claim and/or administrative expense requests in the Case.

24.      <u>DIP Carve Out</u>.

(a)      *DIP Carve Out*.  As used in this Interim Order, the "<u>DIP Carve Out</u>" means, collectively, the sum of:  (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the U.S. Trustee, in such amounts as agreed to by the U.S. Trustee or as determined by order of the Court, pursuant to 28 U.S.C. §1930(a) and section 3717 of title 31 of the United States Code; (ii) the aggregate amount of unpaid fees and expenses of the Debtor's and any

18

Committee's professionals, in each case retained by final order of the Court (which order has not been reversed, vacated or stayed unless such stay is no longer effective) under sections 363(b), 327(a) or 1103(a) of the Bankruptcy Code (the "Case Professionals"), to the extent such fees and expenses are ultimately allowed and payable pursuant to an order of the Court (which order has not been reversed, vacated or stayed) ("Allowed Professional Fees"), which amount under this clause (ii) shall not exceed the sum of:  (x) commencing with the week ending December 16, 2017, an aggregate amount per week limited to the amount set forth in the Budget for such week for Allowed Professional Fees incurred prior to the delivery of a Carve-Out Trigger Notice, which amount shall be funded into the Professional Fee Escrow Account on Wednesday of each week (or such other day of the week selected by the Debtor) in accordance with the Budget provided that (I) the Termination Date has not occurred and (II) no Event of Default has occurred and is continuing, plus (y) $100,000 for Allowed Professional Fees incurred from and after the delivery of a Carve-Out Trigger Notice (the "Post Trigger Notice Carve Out Amount").

(b)  *Professional Fee Escrow*.  No portion of the DIP Carve Out, nor any cash collateral or proceeds of the DIP Facility may be used in violation of this Interim Order. Notwithstanding anything to the contrary contained in this Interim Order, (A) until an Event of Default or the Termination Date has occurred, the Debtor shall be permitted to borrow under the DIP Credit Agreement on a weekly basis to fund the Professional Fee Escrow Account in the amounts contemplated under clause (x) of the immediately preceding paragraph, (B) the Debtor shall be permitted to pay, from the Professional Fee Escrow Account, as and when the same may become due and payable, the Allowed Professional Fees of Case Professionals regardless of whether an Event of Default or the Termination Date has occurred, and (C) the aggregate amount of Allowed Professional Fees of Case Professionals paid by the Debtor prior to the delivery of a Carve-Out Trigger Notice from any amounts funded into the Professional Fee Escrow Account pursuant to clause (x) of the immediately preceding paragraph (but not, for the avoidance of doubt, amounts paid from any retainers held by such Case Professionals) shall not exceed the amount of such Allowed Professional Fees and Committee Expenses set forth in the Budget.

19

None of the provisions of this Interim Order nor any DIP Loan Document shall prohibit or restrict the payment of the fees and expenses of any Case Professional from any retainers held by such Case Professional.  Any amounts in the Professional Fee Escrow Account after the payment in full of all Allowed Professional Fees of Case Professionals pursuant to final fee applications and orders shall be returned to the DIP Lender, which amounts shall be applied to the DIP Obligations as set forth in the DIP Credit Agreement.  The DIP Liens are hereby deemed to attach to the Debtor's residual interest in such excess.

(c)      *No Direct Obligation to Pay Professional Fees or Committee Expenses*. Except for funding the Professional Fee Escrow Account as provided herein, the DIP Lender shall not be responsible for the funding, direct payment or reimbursement of any fees or disbursements of any Case Professionals incurred in connection with the Case or any Successor Case.  Nothing in this Interim Order or otherwise shall be construed to obligate the DIP Lender in any way to pay compensation to or to reimburse expenses of any Case Professional, or to guarantee that the Debtor have sufficient funds to pay such compensation or reimbursement. Nothing in this Interim Order or otherwise shall be construed to increase the DIP Carve Out if actual Allowed Professional Fees of any Case Professional are higher in fact than the estimated fees and disbursements reflected in the Budget; provided that use of the Post Trigger Notice Carve Out Amount shall not be subject to the Budget.  Notwithstanding anything to the contrary contained in this Interim Order, the Budget, or the DIP Loan Documents, the DIP Lender shall not be responsible for funding into the Professional Fee Escrow Account any "transaction" or "success" fees payable to any investment banker, and, in no event shall any such amounts be paid out of the DIP Carve Out or any funds in the Professional Fee Escrow Account.

(d)      *Payment of DIP Carve Out*.  The funding of the DIP Carve Out with the proceeds of the DIP Facility shall be added to and made a part of the DIP Obligations and secured by the DIP Collateral and otherwise entitled to the protections granted under this Interim Order, the DIP Loan Documents, the Bankruptcy Code and applicable law.

25.     Limitations on the DIP Facility, the DIP Collateral and the Case Professionals DIP Carve Out.  The DIP Facility, the DIP Collateral and the DIP Carve Out may not be used:  (a) in connection with or to finance in any way any action, suit, arbitration, proceeding, application, motion or other litigation of any type (i) adverse to or against the interests of the DIP Lender, and related parties, or its rights or remedies under the DIP Loan Documents, this Interim Order or the Final Order, including, without limitation, for the payment of any services rendered by the professionals retained by the Debtor or any Committee in connection with the assertion of or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defense or other contested matter, the purpose of which is to seek, or the result of which would be to obtain, any order, judgment, determination, declaration or similar relief, (ii) invalidating, setting aside, avoiding or subordinating, in whole or in part, any DIP Obligations, (iii) for monetary, injunctive or other affirmative relief against the DIP Lender or its collateral, or (iv) preventing, hindering or otherwise delaying the exercise by the DIP Lender of any rights and remedies under this Interim Order or the Final Order, the DIP Loan Documents or applicable law, or the enforcement or realization (whether by foreclosure, credit bid, further order of the Court or otherwise) by the DIP Lender upon any of the DIP Collateral; (b) to make any distribution under a plan of reorganization or liquidation in the Case or any Successor Case; (c) to make any payment in settlement of any claim, action or proceeding, before any court, arbitrator or other governmental body to the extent not expressly permitted under the DIP Loan Documents; (d) to pay any fees or similar amounts to any person who has proposed or may propose to purchase interests in the Debtor other than as expressly permitted under the DIP Loan Documents; (e) objecting to, contesting, or interfering with, in any way, the DIP Lender's enforcement or realization upon any of the DIP Collateral once an Event of Default has occurred, except as provided for in this Interim Order or Final Order, or seeking to prevent the DIP Lender from credit bidding in connection with any proposed plan of reorganization or liquidation or any proposed transaction pursuant to section 363 of the Bankruptcy Code; (f) using or seeking to use any insurance proceeds constituting DIP Collateral, without the consent of the DIP Lender; (g) incurring

21

Indebtedness (as defined in the DIP Credit Agreement) outside the ordinary course of business, except as permitted under the DIP Loan Documents; (h) objecting to or challenging in any way the claims, liens, or interests held by or on behalf of the DIP Lender; (i) asserting, commencing or prosecuting any claims or causes of action whatsoever, including, without limitation, any actions under chapter 5 of the Bankruptcy Code, against the DIP Lender in its capacity as DIP Lender; or (j) prosecuting an objection to, contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the DIP Obligations, the DIP Liens or any other rights or interests of the DIP Lender.

26.     <u>Payment of Compensation</u>.  Nothing herein shall be construed as consent to or a cap on the allowance of any professional fees or expenses of any Case Professionals or shall affect the right of any party to object to the allowance and payment of such fees and expenses.

27.     <u>No Third Party Rights</u>.  Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, or incidental beneficiary.

28.     <u>Section 506(c) Claims</u>.  Subject to the entry of the Final Order, no costs or expenses of administration which have been or may be incurred in the Case at any time shall be charged against the DIP Lender or the DIP Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code, or otherwise.

29.     <u>No Marshaling/Applications of Proceeds</u>.  Subject to the entry of the Final Order, the DIP Lender shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral.

30.     <u>Rights Preserved</u>.  Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly DIP Lender's right to seek any other or supplemental relief in respect of the Debtor. Other than as expressly set forth in this Interim Order, any other rights, claims or privileges (whether legal, equitable or otherwise) of the DIP Lender and the Debtor are preserved.

31.  <u>No Waiver by Failure to Seek Relief</u>.  The failure of the DIP Lender to seek relief or otherwise exercise rights and remedies under this Interim Order, the DIP Loan Documents or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise of the DIP Lender.

32.  <u>Binding Effect of Interim Order</u>.  Immediately upon entry by this Court (notwithstanding any applicable law or rule to the contrary), the terms and provisions of this Interim Order shall become valid and binding upon and inure to the benefit of the Debtor, the DIP Lender, all other creditors of any of the Debtor, any Committee or any other court appointed committee, appointed in the Case, and all other parties in interest and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed in the Case, any Successor Case, or upon dismissal of the Case or Successor Case.  Notwithstanding anything contained herein with respect to the obligations or limitations when a Final Order is entered, the terms of the Final Order shall be what is binding on all parties.

33.  <u>No Modification of Interim Order</u>.  Until and unless the DIP Obligations have been paid in full in cash (such payment being without prejudice to any terms or provisions contained in the DIP Facility which survive such discharge by their terms), and all commitments to extend credit under the DIP Facility have been terminated, the Debtor irrevocably waives the right to seek and shall not seek or consent to, directly or indirectly:  (a) without the prior written consent of the DIP Lender (i) any reversal, modification, stay, vacatur or amendment to this Interim Order; or (ii) a priority claim for any administrative expense or unsecured claim against the Debtor (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation any administrative expense of the kind specified in sections 503(b), 507(a) or 507(b) of the Bankruptcy Code) in the Case or Successor Case, equal or superior to the DIP Superpriority Claim, other than the DIP Carve Out; and (b) any lien on any of the DIP Collateral with priority equal or superior to the DIP Liens.  The Debtor irrevocably waives any right to seek any amendment, modification or extension of this Interim Order without the prior written

consent, as provided in the foregoing, of the DIP Lender and no such consent shall be implied by any other action, inaction or acquiescence of the DIP Lender.

34.     <u>Interim Order Controls</u>.  In the event of any inconsistency between the terms and conditions of the DIP Loan Documents or this Interim Order, the provisions of this Interim Order shall govern and control.

35.     <u>Survival</u>.  The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered:  (a) confirming any plan of reorganization or liquidation in the Case; (b) converting the Case to a case under chapter 7 of the Bankruptcy Code; (c) dismissing the Case or any Successor Case; or (d) pursuant to which this Court abstains from hearing the Case or Successor Case.  The terms and provisions of this Interim Order, including the claims, liens, security interests and other protections granted to the DIP Lender pursuant to this Interim Order and/or the DIP Loan Documents, notwithstanding the entry of any such order, shall continue in the Case, in any Successor Case, or following dismissal of the Case or any Successor Case, and shall maintain its priority as provided by this Interim Order until all DIP Obligations have been paid in full and all commitments to extend credit under the DIP Facility are terminated.

36.     <u>Final Hearing</u>.  The Final Hearing to consider entry of the Final Order and final approval of the DIP Facility is scheduled for [_____] [___], 2018 at [___:__ __].m. (Eastern Standard Time) before the Honorable [_____], United States Bankruptcy Judge, Courtroom [__], at the United States Bankruptcy Court for the District of Delaware located at 824 North Market Street, Wilmington, DE 19801.

37.     <u>Notice of Final Hearing</u>:  On or before December [___], 2017, the Debtor shall serve, by United States mail, first-class postage prepaid, a copy of the Motion and this Interim Order upon:  (a) the Office of the United States Trustee for the District of Delaware; (b) the Internal Revenue Service; (c) the creditors of the Debtor at their last known addresses; (d) any party which has filed prior to such date a request for notices under Bankruptcy Rule 2002 with this Court; and (e) counsel for any Committee.

38.     <u>Objection Deadline</u>:  Objections, if any, to the relief sought in the Motion shall be in writing, shall set forth with particularity the grounds for such objections or other statement of position, shall be filed with the clerk of the Bankruptcy Court, and served via electronic mail upon (a) Sills Cummis & Gross P.C. (Attn:  Andrew Sherman, asherman@sillscummis.com) and Richards, Layton & Finger, P.A. (Attn:  Jason M. Madron, Esq., madron@rlf.com), proposed co-counsel for the Debtor; (b) the Office of the United States Trustee for the District of Delaware, (Attn:  Hannah McCollum, Esq., Hannah.McCollum@usdoj.gov); (c) counsel to any Committee; and (d) Dentons US LLP (Attn: Robert Richards, robert.richards@dentons.com) and Bayard, P.A. (Attn: Justin Alberto, jalberto@bayardlaw.com), attorneys for the DIP Lender, so that such objections are filed with the Court and received by said parties on or before 4:00 p.m. (Eastern Standard Time) on [_____] [____], 201___ with respect to entry of the Final Order.

39.     <u>Effect of this Interim Order</u>.  This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect immediately, notwithstanding anything to the contrary proscribed by applicable law.

40.     <u>Retention of Jurisdiction</u>.  The Court has and will retain jurisdiction to enforce this Interim Order according to its terms.


Dated:  December _____, 2017
          Wilmington, Delaware

_____
THE HONORABLE LAURIE SELBER SILVERSTEIN
UNITED STATES BANKRUPTCY JUDGE

**EXHIBIT B**

**Proposed Final Order**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| MAMMOET-STARNETH LLC, | Case No. 17-12925 (LSS) |
| Debtor.[1] | |

**FINAL ORDER PURSUANT TO 11 U.S.C. §§ 105, 362, 363, 364 AND 507**
**(I) APPROVING POST-PETITION FINANCING, (II) GRANTING LIENS AND**
**PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS,**
**AND (III) GRANTING RELATED RELIEF**

This matter having come before the Court upon the motion (the "Motion") by Mammoet-Starneth, LLC, a Delaware limited liability company (the "Debtor") in the above-captioned chapter 11 case (the "Case"), pursuant to sections 105, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3) and 507 of title 11 of the United States Code, (11 U.S.C. §§ 101, *et seq.,* as amended, the "Bankruptcy Code"), and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") for:

(i)    authorization, under section 364(c) of the Bankruptcy Code and Bankruptcy Rule 4001(c), to obtain, as borrower, secured, superpriority post-petition loans, advances and other financial accommodations (the "DIP Facility"), pursuant to the terms and conditions of that certain Debtor-In-Possession Credit Agreement (as amended, restated, supplemented or otherwise modified from time to time, the "DIP Credit Agreement") by and between (a) the Debtor and (b) Mammoet USA North Inc. (the "DIP Lender"), substantially in the form of Exhibit A attached hereto; and

(ii)    authorization to execute and deliver the DIP Credit Agreement and all other related documents and agreements, including security agreements, deposit account control agreements and promissory notes (collectively, the "DIP Loan Documents") and to perform such other acts as may be necessary or desirable in connection with the DIP Loan Documents; and

---

[1] The last four digits of the Debtor's federal tax identification number is 4518.  The Debtor's address is 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808.

(iii)     until the Termination Date (as defined in the DIP Credit Agreement), and subject to the terms, conditions, limitations on availability and reserves set forth in the DIP Loan Documents, the DIP Facility and this Final Order, authorization, prior to the entry of the Final Order, to request extensions of credit under the DIP Facility up to an aggregate principal amount of $5,500,000 at any one time outstanding (the "DIP Financing"); and entry of this final order (the "Final Order") approving the DIP Financing; and

(iv)     the granting of allowed superpriority administrative expense claim status pursuant to section 364(c)(1) of the Bankruptcy Code in the Case and any Successor Case (as defined herein) to all obligations owing under the DIP Credit Agreement and the other DIP Loan Documents (collectively, and including all "Obligations" as described in the DIP Credit Agreement, including all obligations with respect to letters of credit issued or deemed issued under the DIP Credit Agreement, respectively, and, together, the "DIP Obligations"), subject to the priorities set forth herein; and

(v)     the granting to the DIP Lender automatically perfected security interests in and liens on all of the DIP Collateral (as defined herein), including, without limitation, which liens shall be subject to the priorities set forth herein; and

(vi)     authorization to pay the principal, interest, fees, expenses and other amounts payable under each of the DIP Loan Documents as they become due, including, without limitation, the commitment fee and any other fees set forth in the DIP Loan Documents, the reasonable fees and disbursements of the DIP Lender's attorneys, and other consultants (solely for their work in such capacity) and all related expenses of the DIP Lender, all to the extent provided by and in accordance with the terms of the respective DIP Loan Documents; and

(vii)     vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Loan Documents and this Final Order; and

(viii)    granting related relief.

2

The Court having considered the Motion, the *Declaration of Christiaan Lavooij in Support of Chapter 11 Petitions and Request for First Day Relief* including the Motion, the exhibits attached thereto, the DIP Loan Documents, and the evidence submitted or adduced and the arguments of counsel made at the interim hearing held on the Motion (the "Interim Hearing") and the final hearing held on the Motion (the "Final Hearing"); and notice of the Interim Hearing and Final Hearing having been given in accordance with Bankruptcy Rules 4001, 9014, and Local Bankruptcy Rule 9013-1; and the Interim Hearing and Final Hearing to consider the relief requested in the Motion having been held and concluded; and all objections, if any, to the relief requested in the Motion having been withdrawn, resolved or overruled by the Court; and it appearing to the Court that, pursuant to Bankruptcy Rule 4001(c)(2), granting the relief requested is necessary to avoid immediate and irreparable harm to the Debtor and its estate, and otherwise is fair and reasonable and in the best interests of the Debtor, its estate, and its creditors and equity holder, and after due deliberation and consideration, and for good and sufficient cause appearing therefor;

BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING AND AT THE FINAL HEARING BY THE DEBTOR, INCLUDING THE SUBMISSIONS OF DECLARATIONS AND THE REPRESENTATIONS OF COUNSEL, THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:[2]

A.      *Petition Date*.  On December 13, 2017 (the "Petition Date"), the Debtor filed a voluntary petition under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Court"), commencing this Case.

B.      *Debtor in Possession*.  The Debtor is continuing in the management of its properties as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in this Case.

---

[2] The findings and conclusions set forth herein constitute the Bankruptcy Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052. To the extent any findings of fact constitute conclusions of law, they are adopted as such. To the extent any conclusions of law constitute findings of fact, they are adopted as such.

3

C.      *Jurisdiction and Venue*.  This Court has jurisdiction, pursuant to 28 U.S.C. §§ 157(b) and 1334, over these proceedings, and over the persons and property affected hereby. Consideration of the Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2).  Venue for the Case and proceedings on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.  The bases for the relief sought in the Motion and granted in this Final Order are sections 105, 362, 363, 364 and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001 and 9014, and Local Rule 4001-2.

D.      *Committee Formation*.  As of the date hereof, the Office of the United States Trustee (the "U.S. Trustee") has not appointed any official committee of unsecured creditors in this Case pursuant to section 1102 of the Bankruptcy Code (a "Committee").

E.      *Findings Regarding the Post-petition Financing*.

(i)      *Request for Post-petition Financing*.  The Debtor seeks authority to enter into the DIP Facility on the terms described herein and in the DIP Loan Documents.

(ii)      *Immediate Need for Post-petition Financing*.  The Debtor's need to obtain credit pursuant to the DIP Facility is immediate and critical in order to enable the Debtor to administer and preserve the value of its estate.  The Debtor does not have sufficient available sources of working capital and financing to maintain its properties in the ordinary course of business without the DIP Facility.

(iii)      *No Credit Available on More Favorable Terms*.  Given its current financial condition, and capital structure, the Debtor is unable to obtain financing from sources other than the DIP Lender on terms more favorable than the DIP Facility.  The Debtor has been unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.  The Debtor has also been unable to obtain credit:  (a) having priority over that of administrative expenses of the kind specified in sections 503(b), 507(a) and 507(b) of the Bankruptcy Code; (b) secured by a lien on property of the Debtor and its estate that is not otherwise subject to a lien; or (c) secured solely by a junior lien on property of the Debtor and its estates that is subject to a lien.  Financing on a post-petition basis is not otherwise available

4

without granting the DIP Lender, (1) perfected security interests in and liens on (each as provided herein) all of the Debtor's existing and after-acquired assets with the priorities set forth herein, (2) superpriority claims, and (3) the other protections set forth in this Final Order.

(iv)    *Use of Proceeds of the DIP Facility*.  As a condition to entry into the DIP Credit Agreement and the extensions of credit under the DIP Facility, the DIP Lender requires, and the Debtor has agreed, that proceeds of the DIP Facility shall be used (a) in a manner consistent with the terms and conditions of the DIP Loan Documents and in accordance with the budget (a copy of which is attached as <u>Exhibit B</u> hereto, as the same may be modified from time to time consistent with the terms of the DIP Loan Documents, and subject to such variances as may be permitted thereby, the "<u>Budget</u>") solely for (i) post-petition operating expenses and other working capital and general business purposes, (ii) certain transaction fees and expenses, (iii) permitted payment of costs of administration of the Case, including prior to the delivery of a Carve-Out Trigger Notice (as defined below), to fund the DIP Carve Out through deposits into the Professional Fee Escrow Account, and (iv) as otherwise permitted under the DIP Loan Documents, and (c) after the delivery of a Carve-Out Trigger Notice to fund the Post Trigger Notice Carve-Out Amount (as defined below).

(v)    *Application of Proceeds of DIP Collateral*.  As a condition to entry into the DIP Loan Documents and the extension of credit under the DIP Facility, the Debtor and the DIP Lender have agreed that the proceeds of DIP Collateral (as defined herein) shall be applied in accordance with paragraph 18(a) of this Final Order.

F.    <u>*Sections 506(c) and 552(b)*</u>.  In light of the DIP Lender's agreement to subordinate its liens and superpriority claims, as applicable, to the DIP Carve Out (as defined herein) and any Prepetition Permitted Liens and agreement to fund the Budget in accordance with the terms of the DIP Loan Documents, upon entry of the Final Order, the DIP Lender is entitled to the benefits of a waiver of (a) the provisions of section 506(c) of the Bankruptcy Code, and (b) any "equities of the case" claims under section 552(b) of the Bankruptcy Code.

5

G.      *Good Faith of the DIP Lender*.

(i)      *Willingness to Provide Financing*.  The DIP Lender has indicated a willingness to provide financing to the Debtor subject to:  (a) the entry of this Final Order and the Final Order; (b) approval of the terms and conditions of the DIP Facility and the DIP Loan Documents; and (c) entry of findings by this Court that such financing is essential to the Debtor's estate, that the DIP Lender is extending credit to the Debtor pursuant to the DIP Loan Documents in good faith, and that the DIP Lender's claims, superpriority claims, security interests, liens, rights, and other protections granted pursuant to this Final Order and the DIP Loan Documents will have the protections provided in section 364(e) of the Bankruptcy Code and will not be affected by any subsequent reversal, modification, vacatur, amendment, reargument or reconsideration of this Final Order or any other order.

(ii)      *Business Judgment and Good Faith Pursuant to Section 364(e)*.  The extension of credit under the DIP Facility reflects the Debtor's exercise of prudent business judgment consistent with its fiduciary duties, and is supported by reasonably equivalent value and consideration.  The DIP Facility was negotiated in good faith and at arms' length by and between the Debtor and the DIP Lender.  The credit to be extended under the DIP Loan Documents shall be deemed to have been so allowed, advanced, made, used or extended in good faith, and for valid business purposes and uses, within the meaning of section 364(e) of the Bankruptcy Code, and the DIP Lender is therefore entitled to the protection and benefits of section 364(e) of the Bankruptcy Code and this Final Order.

H.      *Notice*.  Notice of the Final Hearing and the emergency relief requested in the Motion has been provided by the Debtor, whether by facsimile, email, overnight courier or hand delivery, to certain parties in interest, including:  (a) the Office of the United States Trustee for the District of Delaware; (b) the Internal Revenue Service; (c) the creditors of the Debtor at their last known addresses; (d) any party which has filed prior to such date a request for notices under Bankruptcy Rule 2002 with this Court; and (e) counsel for any Committee.  The Debtor has made reasonable efforts to afford the best notice possible under the circumstances and such

6

notice is good and sufficient to permit the relief set forth in this Final Order, and no other or further notice is or shall be required.

I.      _Immediate Entry_.  Sufficient cause exists for immediate entry of this Final Order pursuant to Bankruptcy Rule 4001(c)(2).

Based upon the foregoing findings and conclusions, the Motion and the record before the Court with respect to the Motion, and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED that:

1.      <u>DIP Financing Approved</u>.  The Motion is granted, the DIP Financing (as defined herein) is authorized and approved on a final basis, subject to the terms and conditions set forth in this Final Order.

2.      <u>Objections Overruled</u>.  All objections to the DIP Financing to the extent not withdrawn or resolved are hereby overruled.

## **DIP Facility Authorization**

3.      <u>Authorization of the DIP Facility and DIP Loan Documents</u>.  The Debtor is expressly and immediately authorized and empowered (i) to execute and deliver the DIP Loan Documents, (ii) to incur and to perform the DIP Obligations in accordance with, and subject to, the terms of this Final Order, the DIP Loan Documents, and the Budget, and (iii) to deliver all instruments and documents that may be necessary or required for performance by the Debtor under the DIP Facility and the creation and perfection of the DIP Liens described in and provided for by this Final Order and the DIP Loan Documents.  The Debtor is hereby authorized to pay the principal, interest, fees, expenses and other amounts described in the DIP Loan Documents as such become due and without need to obtain further Court approval, including, without limitation, commitment fees and any additional fees set forth in the DIP Loan Documents, and the reasonable fees and disbursements of the DIP Lender's attorneys and other consultants (solely in connection with the DIP Facility), whether or not the transactions

7

contemplated hereby are consummated, all to the extent provided in the DIP Loan Documents, with invoices to be provided in accordance with paragraph 22 below. All collections and proceeds, whether from ordinary course collections, asset sales, debt issuances, insurance recoveries, condemnations or otherwise, will be deposited and applied as required by this Final Order and the DIP Loan Documents. Upon execution and delivery, the DIP Loan Documents shall represent valid and binding, and joint and several, obligations of the Debtor, enforceable against the Debtor and its estate in accordance with their terms.

4.    <u>Authorization to Borrow</u>.  Until the Termination Date (as defined in the DIP Credit Agreement), and subject to the terms, conditions, limitations on availability and reserves set forth in the DIP Loan Documents, the DIP Facility and this Final Order, and in order to prevent immediate and irreparable harm to the Debtor's estate, the Debtor is hereby authorized to request extensions of credit under the DIP Facility up to an aggregate principal amount of $5,500,000 at any one time outstanding, and the Lender, subject to the satisfaction of the conditions to lending set forth in the DIP Loan Documents and this Final Order, shall extend such credit Debtor .

5.    <u>DIP Obligations</u>.  The DIP Loan Documents and this Final Order shall constitute and evidence the validity and binding effect of the Debtor's DIP Obligations, which DIP Obligations shall be enforceable against the Debtor, its estate and any successors thereto, including without limitation, any trustee or other estate representative appointed in the Case, or any case under chapter 7 of the Bankruptcy Code upon the conversion of any of the Case (collectively, "<u>Successor Cases</u>").  Upon entry of this Final Order, the DIP Obligations will include all loans and any other indebtedness or obligations, contingent or absolute, which may now or from time to time be owing by the Debtor to the DIP Lender under the DIP Loan

Documents or this Final Order, including, without limitation, all principal, accrued interest, costs, fees, expenses and other amounts owed pursuant to the DIP Loan Documents, and shall be joint and several obligations of the Debtor in all respects.

   6. <u>Post-petition Liens and Collateral</u>.

   (a) Effective immediately upon the entry of this Final Order, pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code, the DIP Lender is hereby granted, continuing valid, binding, enforceable, non-avoidable and automatically and properly perfected post-petition security interests in and liens on (collectively, the "<u>DIP Liens</u>") any and all presently owned and hereafter acquired assets and real and personal property of the Debtor, including, without limitation, the following (the "<u>DIP Collateral</u>"):[3]

   (i) all of the Borrower's now-owned and hereafter acquired or arising accounts, accounts receivable and rights to payment of every kind and description, and all of the Borrower's contract rights, chattel paper, documents and instruments with respect thereto, together with all fees and other payments due the Borrower and all of the Borrower's rights, remedies, security and liens, in, to and in respect of such accounts, including, without limitation, rights of stoppage in transit, replevin, repossession and reclamation and other rights and remedies of an unpaid vendor, lienor or secured party;

   (ii) all moneys, securities, cash, cash equivalents, and other property and the proceeds thereof, now or hereafter held or received by Borrower;

   (iii) all of the proceeds from the sale of any of the Borrower's assets;

   (iv) all of the Borrower's now owned and hereafter acquired or arising general intangibles and any other property of every kind and description with respect to, evidencing, or relating to its accounts, accounts receivable, and other rights to payment,

---

[3] All defined terms in the description of DIP Collateral shall have the meanings ascribed thereto in the DIP Loan Documents. All terms not specifically defined in the DIP Loan Documents shall have the meanings ascribed to such terms in Article 8 or 9 of the Uniform Commercial Code, as applicable.

including, but not limited to, all existing and future customer lists, chose in action, claims, books, records, ledger cards, contracts, licenses, formulae, tax and other types of refunds, deposits, returned and unearned insurance premiums, rights and claims under insurance policies, and computer programs, information, software, records, and data as the same relates to the accounts;

(v)     all of the Borrower's other general intangibles (including, without limitation, any proceeds from insurance policies after payment of prior interests), patents, unpatented inventions, trade secrets, copyrights, contract rights, goodwill, literary rights, rights to performance, rights under licenses, chose-in-action, claims, information contained in computer media (such as data bases, source and object codes, and information therein), things in action, trademarks and trademarks applied for (together with the goodwill associated therewith) and derivatives thereof, trade names, including the right to make, use, and vend goods utilizing any of the foregoing, and permits, licenses, certifications, authorizations and approvals, and the rights of the Borrower thereunder, issued by any governmental, regulatory, or private authority, agency, or entity whether now owned or hereafter acquired, together with all cash and non-cash proceeds and products thereof;

(vi)    all of the Borrower's now owned and hereafter acquired inventory of every kind and character which is held by the Borrower for sale or lease, or is furnished by the Borrower under any contract of service, or is held by the Borrower as raw materials, work in process, or materials used or consumed in business, wherever located and as the same may now or hereafter be constituted, together with all cash and non-cash proceeds and products thereof;

(vii)    all of the Borrower's now owned or hereafter acquired real property[4], machinery, equipment, tools, tooling, furniture, fixtures, goods, supplies, materials, work in process, together with additions, parts, fittings, accessories, special tools, attachments, and accessions, and all replacements and substitutions thereof;

(viii)   all commercial tort claims; and

(ix)    the income, profits and proceeds of all of the foregoing.[5]

7.    <u>DIP Lien Priority</u>.

(a)    *DIP Liens*.  The DIP Liens shall be junior only to the (i) DIP Carve Out and (ii) any Prepetition Permitted Liens, and shall otherwise be senior in priority and any other security, mortgage, collateral interest, lien or claim on or to any of the DIP Collateral.  Other than as set forth herein, the DIP Liens shall not be made subject to or *pari passu* with any lien or security interest hereinafter granted in the Case or any Successor Case.  The DIP Liens shall be valid and enforceable against any trustee or other estate representative appointed in the Case or any Successor Case, upon the conversion of the Case to a case under chapter 7 of the Bankruptcy Code (or in any other Successor Cases), and/or upon the dismissal of the Case or Successor Case. The DIP Liens shall not be subject to challenge under sections 510, 549, or 550 of the Bankruptcy Code.  No lien or interest avoided and preserved for the benefit of the estate pursuant to section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the DIP Liens.

8.    <u>DIP Superpriority Claim</u>.

(a)    *DIP Lender Superpriority Claim*.  Upon entry of this Final Order, the DIP Lender is hereby granted, pursuant to section 364(c)(1) of the Bankruptcy Code, an allowed superpriority administrative expense claim in the Case and any Successor Case (collectively, the

---

[4] For the avoidance of doubt, the DIP Liens extend only to the proceeds of leased real property and are not direct liens on the Debtor's leases of real property unless such liens are expressly permitted pursuant to the underlying lease documents.

[5] For the avoidance of doubt, the DIP Liens shall extent to all proceeds from claims or causes of action to avoid a transfer of property (or an interest in property) or an obligation incurred by the Debtor pursuant to any applicable section of the Bankruptcy Code, including, without limitation, chapter 5 and section 724(a) of the Bankruptcy Code ("<u>Avoidance Actions</u>") upon entry of the Final Order.

"DIP Superpriority Claim") for all DIP Obligations.  The DIP Superpriority Claim shall be subordinate only to the DIP Liens, the DIP Carve Out or any Prepetition Permitted Liens, and shall otherwise have priority over any and all administrative expenses of the kinds specified in or ordered pursuant to sections 503(b) and 507(b) of the Bankruptcy Code, as provided under section 364(c)(1) of the Bankruptcy Code.

(b)      *Priority of DIP Superpriority Claim.*  The DIP Superpriority Claim shall be payable from and have recourse to all pre- and post-petition property of the Debtor and all proceeds thereof, subject only to the payment in full in cash of the DIP Obligations, the DIP Carve Out and amounts secured by any Prepetition Permitted Liens to the extent paid from identifiable proceeds of the assets subject to any such Prepetition Permitted Liens.  Upon entry of the Final Order, the DIP Superpriority Claim shall be payable from or have recourse to the proceeds of Avoidance Actions.

9.      No Obligation to Extend Credit.  The DIP Lender shall not have any obligation to make any loan or advance under the DIP Loan Documents unless all of the conditions precedent to the making of such extension of credit under the applicable DIP Loan Documents and this Final Order have been satisfied in full or waived by the DIP Lender, in its sole discretion.

10.     Use of DIP Facility Proceeds.  From and after the Petition Date, the Debtor shall use advances of credit under the DIP Facility only for the purposes specifically set forth in this Final Order and the DIP Loan Documents and in compliance with the Budget, a copy of which has been delivered to the DIP Lender; provided that the use of the Post Trigger Notice Carve Out Amount shall not be subject to the Budget.

11.     Amendments.  The DIP Loan Documents may from time to time be amended, modified or supplemented by the parties thereto without notice or a hearing if:  (i) in the reasonable judgment of the Debtor and the DIP Lender, the amendment, modification, or supplement (A) is in accordance with the DIP Loan Documents, (B) is not prejudicial in any material respect to the rights of third parties, and (C) has been consented to by the DIP Lender, and (ii) a copy (which may be provided through electronic mail or facsimile) of the form of

amendment, modification or supplement is provided to counsel for any Committee, and the U.S. Trustee at least one (1) Business Day prior to the effective date of the amendment, modification or supplement.

12.     Budget Maintenance.    The Budget and any modification to, or amendment or update of, the Budget shall be in form and substance reasonably acceptable to the DIP Lender and approved by the DIP Lender in its reasonable discretion.    The Debtor will deliver copies of any such amended or updated Budget to the U.S. Trustee and the Committee, if any.    The Debtor shall comply with and update the Budget from time to time in accordance with the DIP Loan Documents (provided that any update shall be in form and substance reasonably acceptable to the DIP Lender and approved by the DIP Lender, in its reasonable discretion).

13.     Modification of Automatic Stay.    The automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby modified as necessary to effectuate all of the terms and provisions of this Final Order, including, without limitation, to:    (a) permit the Debtor to grant the DIP Liens, the Adequate Protection Liens and the DIP Superpriority Claim; and (b) authorize the Debtor to pay, and the DIP Lender to retain and apply, payments made in accordance with the terms of this Final Order.

14.     Perfection of DIP Liens and Adequate Protection Liens.

(a)     *Automatic Perfection of Liens.*    This Final Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of all liens granted herein, including the DIP Liens, without the necessity of filing or recording any financing statement, mortgage, notice, or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement, collateral access agreement, customs broker agreement or freight forwarding agreement) to validate or perfect (in accordance with applicable non-bankruptcy law) the DIP Liens, or to entitle the DIP Lender to the priorities granted herein.    Notwithstanding the foregoing, the DIP Lender is authorized to file, as it in its permitted discretion deems necessary, such financing statements, mortgages, notices of liens and

13

other similar documents to perfect in accordance with applicable non-bankruptcy law or to otherwise evidence any of the DIP Liens, and all such financing statements, mortgages, notices and other documents shall be deemed to have been filed or recorded as of the Petition Date; provided, however, that no such filing or recordation shall be necessary or required in order to create, perfect or enforce the DIP Liens.  The Debtor is authorized to execute and deliver promptly upon demand to the DIP Lender all such financing statements, mortgages, control agreements, notices and other documents as the DIP Lender may reasonably request.  The DIP Lender, in its permitted discretion, may file a photocopy of this Final Order as a financing statement with any filing or recording office or with any registry of deeds or similar office, in addition to or in lieu of such financing statements, notices of lien or similar instrument.

15.    Proceeds of Subsequent Financing.  If the Debtor, any trustee, any examiner with enlarged powers, any responsible officer or any other estate representative subsequently appointed in this Case or any Successor Case shall obtain credit or incur debt pursuant to sections 364(b), 364(c) or 364(d) of the Bankruptcy Code in violation of the DIP Loan Documents at any time prior to the repayment in full in cash of all DIP Obligations and the termination of the DIP Lender's obligations to extend credit under the DIP Facility, including subsequent to the confirmation of any plan of reorganization or liquidation with respect to the Debtor and the Debtor's estate, then all the cash proceeds derived from such credit or debt in the amount necessary to satisfy the Debtor's remaining obligations under the DIP Facility shall immediately be turned over to the DIP Lender.

16.    Maintenance of DIP Collateral.  Until the payment in full in cash of all DIP Obligations and the termination of the DIP Lender's obligations to extend credit under the DIP Loan Documents, as provided therein, the Debtor shall:  (a) insure the DIP Collateral as required under the DIP Facility; and (b) maintain the cash management system which has been agreed to by the DIP Lender or as otherwise required by the DIP Loan Documents.

17.    Disposition of DIP Collateral.  The Debtor shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral except as permitted by the DIP Loan

14

Documents. Nothing provided herein shall limit the right of the DIP Lender to object to any proposed disposition of the DIP Collateral.

18.     <u>Termination Date</u>.  On the Termination Date, (i) all DIP Obligations shall be immediately due and payable and (ii) all commitments to extend credit under the DIP Facility will terminate.

19.     <u>Events of Default</u>.  The occurrence of an "Event of Default" under the DIP Credit Agreement shall constitute an event of default under this Final Order (each, an "<u>Event of Default</u>").

20.     <u>Rights and Remedies Upon Event of Default</u>.

(a)     *DIP Facility Termination*.  Immediately upon the occurrence and during the continuance of an Event of Default, the DIP Lender may in its discretion (or shall in accordance with the DIP Loan Documents) (i) declare the DIP Facility terminated (such declaration, a "<u>Termination Declaration</u>") or (ii) send a reservation of rights notice to the Debtor, which notice may advise the Debtor that any further advances under the DIP Facility will be made in the sole discretion of the DIP Lender.  Upon the issuance of a Termination Declaration to the Debtor in accordance with the DIP Credit Agreement:  (I) all or any portion of the Commitments of the DIP Lender to make loans or otherwise extend credit may be suspended or terminated in accordance with the DIP Loan Documents; (II) all DIP Obligations may be deemed immediately due and payable in accordance with the DIP Loan Documents; and (III) after expiration of the Remedies Notice Period, defined below, the DIP Lender may exercise all other rights and remedies available to it under Section 10 of the DIP Credit Agreement; and (IV) the DIP Lender shall fund the Post-Trigger Notice Carve-Out Amount.  With respect to the DIP Collateral, following the Termination Declaration, subject to the Remedies Notice Period, the DIP Lender may exercise all rights and remedies available to them under the DIP Loan Documents, or applicable law against the DIP Collateral and without limiting the foregoing, the DIP Lender may subject to the Remedies Notice Period, (i) enter onto the premises of the Debtor in connection with an orderly liquidation of the DIP Collateral; and/or (ii) exercise any rights and

15

remedies provided under the DIP Loan Documents, or at law or equity, including all remedies provided under the Bankruptcy Code and pursuant to this Final Order. For the avoidance of doubt, no party-in-interest (other than the DIP Lender) may at any time exercise any rights and remedies available to them against the DIP Collateral until the DIP Obligations are paid in full in cash.

        (b)    *Notice of Termination*. Any Termination Declaration shall be given by facsimile (or other electronic means, including electronic mail) to counsel to the Debtor, counsel to any Committee, and the U.S. Trustee (the earliest date any such Termination Declaration is made shall be referred to herein as the "Termination Declaration Date"). The DIP Obligations shall be due and payable, without notice or demand, on the Termination Declaration Date, except as otherwise provided in this Final Order. Any automatic stay otherwise applicable to the DIP Lender is hereby modified so that, unless otherwise ordered by the Court, five (5) business days after the Termination Declaration Date (the "Remedies Notice Period") the DIP Lender shall be entitled to exercise all rights and remedies against the DIP Collateral in accordance with the DIP Loan Documents, and this Final Order, and shall be permitted to satisfy the DIP Liens and the DIP Superpriority Claims, subject only to the DIP Carve Out, any Prepetition Permitted Liens. During the Remedies Notice Period, the Debtor and any Committee shall be entitled to seek an emergency hearing with the Court for the purpose of, among other things, contesting whether an Event of Default has occurred. Unless the Court orders otherwise during the Remedies Notice Period, the automatic stay shall automatically be terminated at the end of the Remedies Notice Period without further notice or order and the DIP Lender shall be permitted to exercise all remedies set forth herein, in the DIP Credit Agreement, the DIP Loan Documents and as otherwise available at law against the DIP Collateral, without further order of or application or motion to the Court, and without restriction or restraint by any stay under sections 105 or 362 of the Bankruptcy Code, or otherwise, against the enforcement of the liens and security interest in the DIP Collateral or any other rights and remedies granted to the DIP Lender with respect thereto pursuant to the DIP Credit Agreement, the other DIP Loan Documents or this Final Order.

21.    <u>Good Faith Under Section 364 of the Bankruptcy Code; No Modification or Stay of this Final Order</u>.  The DIP Lender has acted in good faith in connection with this Final Order and their reliance on this Final Order is in good faith.  Based on the findings set forth in this Final Order and the record made during the Final Hearing, and in accordance with section 364(e) of the Bankruptcy Code, in the event any or all of the provisions of this Final Order are hereafter reversed, modified, amended or vacated by a subsequent order of this Court, or any other court, the DIP Lender is entitled to the protections provided in section 364(e) of the Bankruptcy Code.  Any such reversal, modification, amendment or vacatur shall not affect the validity and enforceability of any advances previously made or made hereunder, or lien, claim or priority authorized or created hereby, provided that the Final Order was not stayed by court order after due notice had been given to the DIP Lender at the time the advances were made or the liens, claims or priorities were authorized and/or created.  Any liens or claims granted to the DIP Lender hereunder arising prior to the effective date of any such reversal, modification, amendment or vacatur of this Final Order shall be governed in all respects by the original provisions of this Final Order, including entitlement to all rights, remedies, privileges and benefits granted herein, provided that the Final Order was not stayed by court order after due notice had been given to the DIP Lender at the time the advances were made or the liens, claims or priorities were authorized and/or created.

22.    <u>DIP and Other Expenses</u>.  The Debtor is authorized to pay all reasonable and documented out-of-pocket expenses of the DIP Lender in connection with the DIP Facility (including, without limitation, expenses incurred prior to the Petition Date), as provided in the DIP Loan Documents.  Payment of all such fees and expenses shall not be subject to allowance by the Court and professionals for the DIP Lender shall not be required to submit their invoices in any particular form.  The professionals for the DIP Lender shall deliver a copy of their respective invoices to counsel for the Debtor, any Committee and the U.S. Trustee, redacted as necessary with respect to any privileged or confidential information contained therein.  Any objections raised by the Debtor, the U.S. Trustee or any Committee with respect to such invoices

17

within ten (10) days of the receipt thereof will be subject to resolution by the Court.  In the event of any objection.  Pending such resolution, the undisputed portion of any such invoice will be paid promptly by the Debtor.  Notwithstanding the foregoing, the Debtor is authorized to pay upon the entry of this Final Order, all reasonable fees, costs and expenses of the DIP Lender incurred on or prior to such date in connection with the DIP Facility, provided that the professionals engaged by the DIP Lender shall have delivered to the Debtor a copy of their invoiced on or before such date.

23.    <u>Proofs of Claim</u>.  The DIP Lender will not be required to file proofs of claim or requests for approval of administrative expenses in the Case or Successor Case, and the provisions of this Final Order relating to the amount of the DIP Obligations and the DIP Superpriority Claim shall constitute timely filed proofs of claim and/or administrative expense requests in the Case.

24.    <u>DIP Carve Out</u>.

(a)    *DIP Carve Out*.  As used in this Final Order, the "<u>DIP Carve Out</u>" means, collectively, the sum of:  (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee, in such amounts as agreed to by the U.S. Trustee or as determined by order of the Court, pursuant to 28 U.S.C. §1930(a) and section 3717 of title 31 of the United States Code; (ii) the aggregate amount of unpaid fees and expenses of the Debtor's and any Committee's professionals, in each case retained by final order of the Court (which order has not been reversed, vacated or stayed unless such stay is no longer effective) under sections 363(b), 327(a) or 1103(a) of the Bankruptcy Code (the "<u>Case Professionals</u>"), to the extent such fees and expenses are ultimately allowed and payable pursuant to an order of the Court (which order has not been reversed, vacated or stayed) ("<u>Allowed Professional Fees</u>"), which amount under this clause (ii) shall not exceed the sum of:  (x) commencing with the week ending December 16, 2017, an aggregate amount per week limited to the amount set forth in the Budget for such week for Allowed Professional Fees incurred prior to the delivery of a Carve-Out Trigger Notice, which amount shall be funded into the Professional Fee Escrow Account on

18

Wednesday of each week (or such other day of the week selected by the Debtor) in accordance with the Budget provided that (I) the Termination Date has not occurred and (II) no Event of Default has occurred and is continuing, plus (y) $100,000 for Allowed Professional Fees incurred from and after the delivery of a Carve-Out Trigger Notice (the "Post Trigger Notice Carve Out Amount").

(b)     *Professional Fee Escrow*.  No portion of the DIP Carve Out, nor any cash collateral or proceeds of the DIP Facility may be used in violation of this Final Order. Notwithstanding anything to the contrary contained in this Final Order, (A) until an Event of Default or the Termination Date has occurred, the Debtor shall be permitted to borrow under the DIP Credit Agreement on a weekly basis to fund the Professional Fee Escrow Account in the amounts contemplated under clause (x) of the immediately preceding paragraph, (B) the Debtor shall be permitted to pay, from the Professional Fee Escrow Account, as and when the same may become due and payable, the Allowed Professional Fees of Case Professionals regardless of whether an Event of Default or the Termination Date has occurred, and (C) the aggregate amount of Allowed Professional Fees of Case Professionals paid by the Debtor prior to the delivery of a Carve-Out Trigger Notice from any amounts funded into the Professional Fee Escrow Account pursuant to clause (x) of the immediately preceding paragraph (but not, for the avoidance of doubt, amounts paid from any retainers held by such Case Professionals) shall not exceed the amount of such Allowed Professional Fees and Committee Expenses set forth in the Budget. None of the provisions of this Final Order nor any DIP Loan Document shall prohibit or restrict the payment of the fees and expenses of any Case Professional from any retainers held by such Case Professional.  Any amounts in the Professional Fee Escrow Account after the payment in full of all Allowed Professional Fees of Case Professionals pursuant to final fee applications and orders shall be returned to the DIP Lender, which amounts shall be applied to the DIP Obligations as set forth in the DIP Credit Agreement.  The DIP Liens are hereby deemed to attach to the Debtor's residual interest in such excess.

(c)     *No Direct Obligation to Pay Professional Fees or Committee Expenses*. Except for funding the Professional Fee Escrow Account as provided herein, the DIP Lender shall not be responsible for the funding, direct payment or reimbursement of any fees or disbursements of any Case Professionals incurred in connection with the Case or any Successor Case.  Nothing in this Final Order or otherwise shall be construed to obligate the DIP Lender in any way to pay compensation to or to reimburse expenses of any Case Professional, or to guarantee that the Debtor have sufficient funds to pay such compensation or reimbursement. Nothing in this Final Order or otherwise shall be construed to increase the DIP Carve Out if actual Allowed Professional Fees of any Case Professional are higher in fact than the estimated fees and disbursements reflected in the Budget; provided that use of the Post Trigger Notice Carve Out Amount shall not be subject to the Budget.  Notwithstanding anything to the contrary contained in this Final Order, the Budget, or the DIP Loan Documents, the DIP Lender shall not be responsible for funding into the Professional Fee Escrow Account any "transaction" or "success" fees payable to any investment banker, and, in no event shall any such amounts be paid out of the DIP Carve Out or any funds in the Professional Fee Escrow Account.

(d)     *Payment of DIP Carve Out*.  The funding of the DIP Carve Out with the proceeds of the DIP Facility shall be added to and made a part of the DIP Obligations and secured by the DIP Collateral and otherwise entitled to the protections granted under this Final Order, the DIP Loan Documents, the Bankruptcy Code and applicable law.

25.     <u>Limitations on the DIP Facility, the DIP Collateral and the Case Professionals DIP Carve Out</u>.  The DIP Facility, the DIP Collateral and the DIP Carve Out may not be used:  (a) in connection with or to finance in any way any action, suit, arbitration, proceeding, application, motion or other litigation of any type (i) adverse to or against the interests of the DIP Lender, and related parties, or its rights or remedies under the DIP Loan Documents or this Final Order, including, without limitation, for the payment of any services rendered by the professionals retained by the Debtor or any Committee in connection with the assertion of or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defense or other

20

contested matter, the purpose of which is to seek, or the result of which would be to obtain, any order, judgment, determination, declaration or similar relief, (ii) invalidating, setting aside, avoiding or subordinating, in whole or in part, any DIP Obligations, (iii) for monetary, injunctive or other affirmative relief against the DIP Lender or its collateral, or (iv) preventing, hindering or otherwise delaying the exercise by the DIP Lender of any rights and remedies under this Final Order, the DIP Loan Documents or applicable law, or the enforcement or realization (whether by foreclosure, credit bid, further order of the Court or otherwise) by the DIP Lender upon any of the DIP Collateral; (b) to make any distribution under a plan of reorganization or liquidation in the Case or any Successor Case; (c) to make any payment in settlement of any claim, action or proceeding, before any court, arbitrator or other governmental body to the extent not expressly permitted under the DIP Loan Documents; (d) to pay any fees or similar amounts to any person who has proposed or may propose to purchase interests in the Debtor other than as expressly permitted under the DIP Loan Documents; (e) objecting to, contesting, or interfering with, in any way, the DIP Lender's enforcement or realization upon any of the DIP Collateral once an Event of Default has occurred, except as provided for in this Final Order, or seeking to prevent the DIP Lender from credit bidding in connection with any proposed plan of reorganization or liquidation or any proposed transaction pursuant to section 363 of the Bankruptcy Code; (f) using or seeking to use any insurance proceeds constituting DIP Collateral, without the consent of the DIP Lender; (g) incurring Indebtedness (as defined in the DIP Credit Agreement) outside the ordinary course of business, except as permitted under the DIP Loan Documents; (h) objecting to or challenging in any way the claims, liens, or interests held by or on behalf of the DIP Lender; (i) asserting, commencing or prosecuting any claims or causes of action whatsoever, including, without limitation, any actions under chapter 5 of the Bankruptcy Code, against the DIP Lender in its capacity as DIP Lender; or (j) prosecuting an objection to, contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the DIP Obligations, the DIP Liens or any other rights or interests of the DIP Lender.

26.     <u>Payment of Compensation</u>.  Nothing herein shall be construed as consent to or a cap on the allowance of any professional fees or expenses of any Case Professionals or shall affect the right of any party to object to the allowance and payment of such fees and expenses.

27.     <u>No Third Party Rights</u>.  Except as explicitly provided for herein, this Final Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, or incidental beneficiary.

28.     <u>Section 506(c) Claims</u>.  Subject to the entry of the Final Order, no costs or expenses of administration which have been or may be incurred in the Case at any time shall be charged against the DIP Lender or the DIP Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code, or otherwise.

29.     <u>No Marshaling/Applications of Proceeds</u>.  Subject to the entry of the Final Order, the DIP Lender shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral.

30.     <u>Rights Preserved</u>.  Notwithstanding anything herein to the contrary, the entry of this Final Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly DIP Lender's right to seek any other or supplemental relief in respect of the Debtor. Other than as expressly set forth in this Final Order, any other rights, claims or privileges (whether legal, equitable or otherwise) of the DIP Lender and the Debtor are preserved.

31.     <u>No Waiver by Failure to Seek Relief</u>.  The failure of the DIP Lender to seek relief or otherwise exercise rights and remedies under this Final Order, the DIP Loan Documents or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise of the DIP Lender.

32.     <u>Binding Effect of Final Order</u>.   Immediately upon entry by this Court (notwithstanding any applicable law or rule to the contrary), the terms and provisions of this Final Order shall become valid and binding upon and inure to the benefit of the Debtor, the DIP Lender, all other creditors of any of the Debtor, any Committee or any other court appointed committee, appointed in the Case, and all other parties in interest and their respective successors

and assigns, including any trustee or other fiduciary hereafter appointed in the Case, any Successor Case, or upon dismissal of the Case or Successor Case. Notwithstanding anything contained herein with respect to the obligations or limitations when a Final Order is entered, the terms of the Final Order shall be what is binding on all parties.

33.     <u>No Modification of Final Order</u>.  Until and unless the DIP Obligations have been paid in full in cash (such payment being without prejudice to any terms or provisions contained in the DIP Facility which survive such discharge by their terms), and all commitments to extend credit under the DIP Facility have been terminated, the Debtor irrevocably waives the right to seek and shall not seek or consent to, directly or indirectly:  (a) without the prior written consent of the DIP Lender (i) any reversal, modification, stay, vacatur or amendment to this Final Order; or (ii) a priority claim for any administrative expense or unsecured claim against the Debtor (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation any administrative expense of the kind specified in sections 503(b), 507(a) or 507(b) of the Bankruptcy Code) in the Case or Successor Case, equal or superior to the DIP Superpriority Claim, other than the DIP Carve Out; and (b) any lien on any of the DIP Collateral with priority equal or superior to the DIP Liens.  The Debtor irrevocably waives any right to seek any amendment, modification or extension of this Final Order without the prior written consent, as provided in the foregoing, of the DIP Lender and no such consent shall be implied by any other action, inaction or acquiescence of the DIP Lender.

34.     <u>Final Order Controls</u>.  In the event of any inconsistency between the terms and conditions of the DIP Loan Documents, the Interim Order or this Final Order, the provisions of this Final Order shall govern and control.

35.     <u>Survival</u>.  The provisions of this Final Order and any actions taken pursuant hereto shall survive entry of any order which may be entered:  (a) confirming any plan of reorganization or liquidation in the Case; (b) converting the Case to a case under chapter 7 of the Bankruptcy Code; (c) dismissing the Case or any Successor Case; or (d) pursuant to which this Court abstains from hearing the Case or Successor Case.  The terms and provisions of this Final

Order, including the claims, liens, security interests and other protections granted to the DIP Lender pursuant to this Final Order and/or the DIP Loan Documents, notwithstanding the entry of any such order, shall continue in the Case, in any Successor Case, or following dismissal of the Case or any Successor Case, and shall maintain its priority as provided by this Final Order until all DIP Obligations have been paid in full and all commitments to extend credit under the DIP Facility are terminated.

36.     <u>Effect of this Final Order</u>.  This Final Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect immediately, notwithstanding anything to the contrary proscribed by applicable law.

37.     <u>Retention of Jurisdiction</u>.  The Court has and will retain jurisdiction to enforce this Final Order according to its terms.


Dated:  January _____, 2018
            Wilmington, Delaware


                                                 _____
                                                 THE HONORABLE LAURIE SELBER SILVERSTEIN
                                                 UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT C

## DIP Credit and Security Agreement

**DEBTOR IN POSSESSION CREDIT AND SECURITY AGREEMENT**

Dated as of December 13, 2017

between

MAMMOET-STARNETH LLC

as Borrower

and

MAMMOET USA NORTH INC.

as Secured Lender

This **DEBTOR IN POSSESSION CREDIT AND SECURITY AGREEMENT** (this "Agreement") is made as of December 13, 2017, by and between MAMMOET-STARNETH LLC, a Delaware limited liability company, debtor in the chapter 11 case described below (the "Borrower"), and MAMMOET USA NORTH INC., a Delaware corporation (the "Secured Lender").

**RECITALS:**

A.      On December 13, 2017 (the "Petition Date"), the Borrower filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). The petition commenced Case No. 17-[_____] ([___]) (the "Case").

B.      The Secured Lender is willing to provide post-petition financing pursuant to section 364(c) of the Bankruptcy Code in an amount not to exceed $1,000,000 on an interim basis and $5,500,000 on a final basis, but only for the purposes and upon the terms and conditions set forth in this Agreement.

C.      It is contemplated by the parties hereto that the Bankruptcy Court will enter an Interim Post-Petition Financing Order (as defined herein) and then a Final Post-Petition Financing Order (as defined herein) which will approve this Agreement and will authorize the Borrower, pursuant to section 364 of the Bankruptcy Code, to incur senior secured indebtedness under the terms and conditions set forth in this Agreement.

D.      In accordance with the applicable Financing Order, and subject to the terms and conditions of this Agreement, the Secured Lender will make post-petition loans under a line of credit to the Borrower as set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual promises and covenants set forth herein, the parties agree as follows:

1.      **DEFINITIONS**

Capitalized terms used in this Agreement shall have the following respective meanings when used herein:

1.1      "Advances" shall mean the advances, in an aggregate amount not to exceed the Availability, by the Secured Lender to the Borrower (each such advance constituting a Loan) to fund the payment of expenses in accordance with the Budget and pursuant to Section 2 hereof and shall only be requested for expenses due and payable in the upcoming week.

1.2      "Agreement" shall have the meaning ascribed to such term in the introductory paragraph of this Agreement.

1.3      "Availability" shall mean a line of credit of up to $1,000,000 in the aggregate under the Interim Post-Petition Financing Order and up to $5,500,000 in the aggregate under the Final Post-Petition Financing Order to pay expenses of the Borrower under the Budget when due.

1.4　　"Bankruptcy Code" shall mean title 11 of the United States Code, 11 U.S.C. §§ 101-1330, together with all amendments and modifications thereto.

1.5　　"Bankruptcy Court" shall have the meaning ascribed to such term in the recitals of this Agreement.

1.6　　"Borrower" shall have the meaning ascribed to such term in the introductory paragraph of this Agreement.

1.7　　"Budget" shall mean the budget setting forth approved expenditures by the Borrower, as such budget may be modified (including, without limitation, by adding additional, removing or combining existing types of disbursements specified in the line items set forth in the budget or by increasing or decreasing the particular amounts allocated to such types of disbursements specified therein) or extended to subsequent periods upon the written agreement of both the Borrower and the Secured Lender, provided that the Borrower may be permitted to exceed the budgeted amount during any budgeted period by the Disbursement Carryover Amount plus a cumulative variance for such period of no more than fifteen per cent (15%) (the "Permitted Variance").

1.8　　"Business Day" shall mean any day other than a Saturday, a Sunday, any day which is a legal holiday under the laws of the State of Delaware, or any day on which banking institutions located in the State of Delaware are required by law or other governmental action to close.

1.9　　"Carve Out" shall have the meaning ascribed to such term or the term "DIP Carve Out" in the Interim Post-Petition Financing Order and the Final Post-Petition Financing Order.

1.10　　"Case" shall have the meaning ascribed to such term in the recitals of this Agreement.

1.11　　"Claim" shall have the meaning set forth in section 101(5) of the Bankruptcy Code.

1.12　　"Closing Date" shall mean the first date on which each of the conditions set forth in Section 3.1 have been satisfied.

1.13　　"Collateral" shall have the meaning set forth in Section 4.1 hereof.

1.14　　"Commitment Fee" shall mean 0.50% of the commitment amount of $5,500,000 or such other commitment amount set forth in the Final Post-Petition Financing Order.

1.15　　"Disbursement Carryover Amount" shall mean the amount by which the aggregate disbursements permitted under the Budget for the period commencing on the Effective Date and ending on the last day of the week preceding the date of determination exceeds the amount of disbursements actually made by Borrower during that period.

1.16　　"Disclosure Statement" shall mean the Disclosure Statement filed by the Borrower in the Case related to the Plan.

- 2 -

1.17    "Effective Date" shall mean the first date on which all of the conditions precedent contained in Sections 3.1 hereof are duly satisfied (or waived by the Lender).

1.18    "Event of Default" shall have the meaning set forth in Section 10.1 hereof.

1.19    "Final Post-Petition Financing Order" shall mean the order entered by the Bankruptcy Court pursuant to section 364(c)(1) and 364(c)(2) of the Bankruptcy Code approving this Agreement and authorizing the incurrence by the Borrower of post-petition senior secured indebtedness in accordance with the terms and conditions of this Agreement, and as to which no stay has been entered and which has not been reversed, modified, vacated or overturned, in a form and substance that is satisfactory to the Secured Lender.

1.20    "Financing Orders" shall mean the Interim Post-Petition Financing Order and the Final Post-Petition Financing Order and "Financing Order" shall mean whichever of the Interim Post-Petition Financing Order or Final Post-Petition Financing Order is currently in effect.

1.21    "Indebtedness" of any Person shall mean (a) all indebtedness of such Person for borrowed money or for the deferred purchase price of property or services (including, without limitation, reimbursement and all other obligations with respect to surety bonds, letters of credit and bankers' acceptances, whether or not matured), (b) all obligations evidenced by notes, debentures, bonds, or similar instruments, (c) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (d) all indebtedness referred to in clauses (a) through (c) above secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien upon or in property (including, without limitation, accounts and contract rights) owned by such Person, even though such Person has not assumed or become liable for the payment of such Indebtedness, (e) the Obligations and (f) any guaranty of such Person relating to any Indebtedness set forth in clauses (a)-(e) above.

1.22    "Interest Rate" means a per annum interest rate equal to 6.00%.

1.23    "Interim Post-Petition Financing Order" shall mean an order of the Bankruptcy Court approving this Agreement on an interim basis, in a form and substance that is satisfactory to the Secured Lender.

1.24    "Lien" shall mean any mortgage or deed of trust, pledge, hypothecation, assignment, deposit arrangement, lien, charge, claim, security interest, easement or encumbrance, or preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including, without limitation, any lease or title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, and the filing of, or agreement to give, any financing statement perfecting a security interest under the law of any jurisdiction).

1.25    "Loans" shall mean the Advances made by the Secured Lender pursuant to this Agreement in accordance with the Budget in an aggregate amount not to exceed the Availability.

- 3 -

1.26    "Maturity Date" shall have the meaning set forth in Section 2.2 hereof.

1.27    "Milestone" means any of the following dates and events:

(i)    on the Petition Date, the Borrower shall have filed a petition for relief under chapter 11 of the Bankruptcy Code,

(ii)    on or before December 15, 2017, the Borrower shall have filed the Chapter 11 Plan, Disclosure Statement and the Stored Equipment Sale Motion in form and substance reasonably acceptable to the DIP Lender;

(iii)    on or before January 19, 2018, the Bankruptcy Court shall have entered an order granting the Subcontractor Rejection Motion;

(iv)    on or before January 17, 2018, the Bankruptcy Court shall have entered an order approving the adequacy of the information in the Disclosure Statement and scheduled a confirmation hearing to be held in March, 2018;

(v)    on or before February 14, 2018, the Bankruptcy Court shall have entered an order granting the Stored Equipment Sale Motion;

(vi)    on or before March 15, 2018, the Bankruptcy Court shall have entered an order confirming the Plan; and

(vii)    on or before March 31, 2018, the effective date of the Plan shall have occurred.

1.28    "Obligations" means the Loans, the interest thereon, and all other advances, debts, liabilities, obligations, covenants and duties owing by the Borrower to the Secured Lender arising under this Agreement, including, without limitation, the Commitment Fee and any other fees, charges, or expenses incurred by the Secured Lender in connection with the enforcement of any rights or remedies under this Agreement.

1.29    "Person" shall mean any individual, sole proprietorship, partnership, firm, association, joint venture, trust, limited liability company, unincorporated organization, association, corporation, institution, public benefit corporation, entity or government body (whether federal, state, county, city, municipal or otherwise, including, without limitation, any instrumentality, division, agency, body or department thereof).

1.30    "Petition Date" shall have the meaning ascribed to such term in the recitals of this Agreement.

1.31    "Plan" shall mean the Borrower's filed Chapter 11 Plan as the same may be amended from time to time by the Borrower.

1.32    "Post-Petition Loan Documents" shall mean this Agreement and all other instruments and agreements executed in connection with this Agreement.

- 4 -

1.33    "Secured Lender" shall have the meaning ascribed to such term in the introductory paragraph of this Agreement.

1.34    "Stored Equipment Sale Motion" shall mean a motion for approval of the sale of any interest of the Borrower in equipment built pursuant to or relating to that certain March 5, 2014 Design-Build Agreement between New York Wheel, LLC and Mammoet-Starneth LLC, as amended, under section 363 of the Bankruptcy Code.

1.35    "Subcontract Rejection Motion" shall mean a motion to reject the subcontracts of the Borrower entered into in furtherance of or in relation to that certain March 5, 2014 Design-Build Agreement between New York Wheel, LLC and Mammoet-Starneth LLC, as amended, under section 365 of the Bankruptcy Code.

1.36    All other undefined terms contained in this Agreement shall, unless the context indicates otherwise, have the meanings provided for by the Bankruptcy Code to the extent the same are used or defined therein.  The words "herein," "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole, including any exhibits attached hereto, as the same may from time to time be amended, modified or supplemented and not to any particular section, subsection or clause contained in this Agreement.

1.37    Each reference to a section or exhibit are to a section or exhibit of or to this Agreement, unless otherwise specified or the context otherwise requires.

1.38    Wherever from the context it appears appropriate, each term stated in either the singular or plural shall include the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, the feminine and the neuter.

2.    **AMOUNT AND TERMS OF LOAN**

2.1    Credit Facility.  Subject to the terms and conditions hereof, the Secured Lender agrees to make the Advances to the Borrower (each such advance constituting a Loan), in an aggregate amount not to exceed the Availability, solely to fund the payment of expenses in accordance with the Budget.

2.2    Maturity Date.  The Obligations relating to the Advances provided for hereunder shall mature and become immediately due and payable to the Secured Lender by the Borrower upon the earliest of the following (the "Maturity Date"):

(a)    March 31 2018, or such other date as may be agreed to in a writing by both the Borrower and the Secured Lender after the date hereof (without the need for further Bankruptcy Court approval);

(b)    the expiration of the Budget, which may be updated by the parties as necessary;

(c)    dismissal of the Case or conversion of the Case to a case under another chapter of the Bankruptcy Code;

(d)     the appointment of a Chapter 11 Trustee or a Chapter 11 Examiner with expanded powers;

(e)     the date of acceleration of the Obligations by the Secured Lender upon the occurrence of an Event of Default; or

(f)     upon the Effective Date of the Plan.

2.3     Repayment and Prepayment

(a)     The entire unpaid principal amount of the Loans relating to the Advances, together with all accrued and unpaid interest thereon, shall be due and payable to the Secured Lender on the Maturity Date.

(b)     The Borrower may prepay the Loans or any portion thereof to the Secured Lender at any time, which prepayment shall be applied first, to accrued and unpaid interest on such Loans and capitalized interest, fees and expenses, if any, on the Obligations and second, to principal in respect of such Loans.

2.4     Use of Proceeds.   Except as otherwise provided in this Agreement, the Interim Post-Petition Financing Order, or the Final Post-Petition Financing Order, the Borrower agrees that the proceeds from the Advances may be used only to pay post-petition operating, maintenance and chapter 11 expenses of the Borrower in accordance with the Budget (after giving effect to the Permitted Variance and Disbursement Carryover Amount).

2.5     Interest on Loan.   Interest on the Loans shall accrue at a rate per annum equal to the Interest Rate.  **All interest calculated under this Agreement shall be computed based on the stated rate "365/365" method, *i.e.*, the method based on the actual number of days elapsed in a year consisting of three hundred sixty-five (365) days.**

2.6     Access.   The Secured Lender and any of its officers, employees and/or agents shall have the right, exercisable as frequently as the Secured Lender reasonably determines to be appropriate, during normal business hours (or at such other times as may reasonably be requested by such parties), to inspect the Borrower's facilities and to inspect, audit and make extracts from any and all of the Borrower's records, files and books of account.  The Borrower shall deliver to the Secured Lender any document or instrument whatsoever requested by the Secured Lender and shall instruct the Borrower or the Borrower's banking and other financial institutions, accountants and other advisors and agents to make available to the Secured Lender such information and records from those parties as the Secured Lender may reasonably request.  The Secured Lender shall take the steps reasonably necessary to protect the secrecy of and avoid disclosure or use of any information furnished to the Secured Lender pursuant to this Section 2.6 and to prevent such information from becoming publically available or entering the possession of persons other than the Secured Lender, its affiliates, directors, officers, employees, consultants, attorneys, advisors, investors and agents.  Such measures shall include the same degree of care that the Secured Lender utilizes to protect its own confidential information of a similar nature.

3.     **CONDITIONS PRECEDENT**

3521803

3.1    Conditions Precedent to Obligation of the Secured Lender to Make Initial Operations Advance.  The obligations of the Secured Lender to make its initial Advances to the Borrower under this Agreement shall be subject to and conditioned upon the full satisfaction by the Borrower or the written waiver by the Secured Lender (at its sole discretion) of each of the following conditions:

(a)    the Interim Post-Petition Financing Order, in a form acceptable to the Secured Lender in its sole discretion, shall be in full force and effect and shall not have been vacated, revised, modified or amended;

(b)    no Event of Default shall have occurred and be continuing;

(c)    the Maturity Date shall not have occurred;

(d)    the Availability shall be greater or equal to the sum of (i) the aggregate amount of all Advances previously made pursuant to this Agreement and (ii) the amount of the Advance then requested;

(e)    the Borrower shall have complied in all material respects with each of its covenants and obligations under this Agreement;

(f)    all representations and warranties made by the Borrower shall be accurate in all material respects as of the date of this Agreement and as of each date that an Advance is to be made; and

(g)    no less than three (3) Business Days prior to the date that the Advance is requested, the Borrower shall have delivered to the Secured Lender a written request for the Advance stating the date that such Advance is requested and the dollar amount of the Advance and the Secured Lender shall have, in its reasonable discretion, consented to such Advance.

3.2    Conditions Precedent to Obligation of the Secured Lender to Make Subsequent Advances.  The obligations of the Secured Lender to make it any subsequent Advances to the Borrower under this Agreement shall be subject to and conditioned upon the full satisfaction by the Borrower or the written waiver by the Secured Lender (at its reasonable discretion) of each of the conditions identified in section 3.1 of this Agreement and the Final Post-Petition Financing Order shall have been entered by the Bankruptcy Court, is in full force and effect, and no order amending or modifying (without the consent of the Secured Lender) or reversing, staying or vacating the Final Post-Petition Financing Order shall have been entered.

4.    **SECURITY**

4.1    Post-Petition Financing Liens.  The Loans shall further be secured by (and the Borrower hereby grants the Secured Lender, subject only to the Carve Out) a duly perfected, legal, valid, binding and enforceable Lien on all assets and properties of the Borrower or Borrower's estate now owned or hereafter acquired pursuant to the Financing Orders, including all real and personal property of the Borrower of any nature, and further including, without limitation, the following (the "Collateral"):

3521803

(a)      all of the Borrower's now-owned and hereafter acquired or arising accounts, accounts receivable and rights to payment of every kind and description, and all of the Borrower's contract rights, chattel paper, documents and instruments with respect thereto, together with all fees and other payments due the Borrower and all of the Borrower's rights, remedies, security and liens, in, to and in respect of such accounts, including, without limitation, rights of stoppage in transit, replevin, repossession and reclamation and other rights and remedies of an unpaid vendor, lienor or secured party;

(b)      all moneys, securities, cash, cash equivalents, and other property and the proceeds thereof, now or hereafter held or received by Borrower;

(c)      all of the proceeds from the sale of any of the Borrower's assets;

(d)      all of the Borrower's now owned and hereafter acquired or arising general intangibles and any other property of every kind and description with respect to, evidencing, or relating to its accounts, accounts receivable, and other rights to payment, including, but not limited to, all existing and future customer lists, chose in action, claims, books, records, ledger cards, contracts, licenses, formulae, tax and other types of refunds, deposits, returned and unearned insurance premiums, rights and claims under insurance policies, and computer programs, information, software, records, and data as the same relates to the accounts;

(e)      all of the Borrower's other general intangibles (including, without limitation, any proceeds from insurance policies after payment of prior interests), patents, unpatented inventions, trade secrets, copyrights, contract rights, goodwill, literary rights, rights to performance, rights under licenses, chose-in-action, claims, information contained in computer media (such as data bases, source and object codes, and information therein), things in action, trademarks and trademarks applied for (together with the goodwill associated therewith) and derivatives thereof, trade names, including the right to make, use, and vend goods utilizing any of the foregoing, and permits, licenses, certifications, authorizations and approvals, and the rights of the Borrower thereunder, issued by any governmental, regulatory, or private authority, agency, or entity whether now owned or hereafter acquired, together with all cash and non-cash proceeds and products thereof;

(f)      all of the Borrower's now owned and hereafter acquired inventory of every kind and character which is held by the Borrower for sale or lease, or is furnished by the Borrower under any contract of service, or is held by the Borrower as raw materials, work in process, or materials used or consumed in business, wherever located and as the same may now or hereafter be constituted, together with all cash and non-cash proceeds and products thereof;

(g)      all of the Borrower's now owned or hereafter acquired real property, machinery, equipment, tools, tooling, furniture, fixtures, goods, supplies, materials, work in process, together with additions, parts, fittings, accessories, special tools, attachments, and accessions, and all replacements and substitutions thereof;

(h)      all commercial tort claims; and

(i)      the income, profits and proceeds of all of the foregoing.

- 8 -

4.2     Liens.  The Secured Lender is entitled to the protections and priorities provided under section 364(c) of the Bankruptcy Code, in accordance with the Final Post-Petition Financing Order.  No other claim, having a priority superior to that granted to the Secured Lender by the Final Post-Petition Financing Order pursuant to sections 364 and 507(b) of the Bankruptcy Code, shall be granted while any portion of the Loans remain outstanding.  The Secured Lender's security interests and Liens in the Collateral shall maintain their priority until all of the Borrower's obligations (and any amounts that may become due under this Agreement or any of the other Post-Petition Loan Documents) are indefeasibly paid in full in cash or otherwise satisfied pursuant to the Bankruptcy Code.

4.3     Effectiveness of Liens.  Upon entry of the Final Post-Petition Financing Order, the Liens and security interests granted to the Secured Lender on the Collateral by virtue of the Final Post-Petition Financing Order and this Agreement with respect to the Loans shall be valid and perfected without regard to applicable federal, state or local filing or recording statutes; provided, however, that the Secured Lender may, but need not, take such steps as it deems desirable and applicable to comply with such statutes, and upon request, the Borrower shall take such reasonable actions as may be required to assist the Secured Lender in complying with such statutes.  The stay imposed by section 362(a) of the Bankruptcy Code hereby is modified to allow the filing and recording of a certified copy of this Agreement and the Final Post-Petition Financing Order or any such financing statements, notices of Lien, mortgages, deeds of trust or similar instruments, and all such documents shall be deemed to have been filed or recorded coincident with the entry of the Final Post-Petition Financing Order.  The post-petition Liens (a) shall be deemed perfected as of the Petition Date and (b) shall not be subject to or *pari passu* with any Lien or security interest existing as of the Petition Date.

5.     **REPRESENTATIONS AND WARRANTIES**

The Borrower hereby represents and warrants, as of the date hereof and as of the date of each Advance, that:

5.1     Authorization of Agreement.  Subject to entry of the applicable Financing Order, the Borrower has all requisite power and authority to execute and deliver this Agreement and each of the other Post-Petition Loan Documents, to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.  Subject to entry of the applicable Financing Order, this Agreement has been, and each of the other Post-Petition Loan Documents will be at or prior to the Closing Date, duly executed and delivered by the Borrower.

5.2     Enforceability.  This Agreement and each of the Post-Petition Loan Documents has been duly executed and delivered by the Borrower and constitutes a legal, valid and binding obligation of the Borrower, and to the best of her knowledge, enforceable against the Borrower in accordance with its terms, subject to the Bankruptcy Code.

6.     **REPORTING REQUIREMENTS**

6.1     Reporting Requirements.  The Borrower covenants and agrees that from and after the Closing Date and until the Maturity Date, repayment in full of the Obligations, and termination of this Agreement, the Borrower shall deliver the following to the Secured Lender:

(a)     as soon as practicable, but in any event within one (1) Business Day after the Borrower becomes aware of the existence of any Event of Default, written notice specifying the nature of such Event of Default, including the anticipated effect thereof;

(b)     copies of all federal, state, and local tax returns and reports filed by the Borrower; and

(c)     such other information with respect to the Borrower's business, operations, financial condition, use of Advances, collection of accounts receivable or otherwise, reasonably requested.

## 7.     **AFFIRMATIVE COVENANTS**

The following covenants shall be binding on the Borrower, as applicable, from and after the date hereof and until the repayment in full of the Obligations and termination of this Agreement:

7.1     Maintenance of Existence and Conduct of Business.  The Borrower covenants and agrees to do all things reasonably necessary to preserve the condition and value of the Borrower's assets and business.

7.2     Supplemental Disclosure.  From time to time as may be necessary (in the event that such information is not otherwise delivered by the Borrower to the Secured Lender pursuant to this Agreement), so long as there are Obligations outstanding, the Borrower covenants and agrees to supplement or amend each representation herein with respect to any matter hereafter arising which, if existing or occurring at the date of this Agreement, would have been required to be set forth or described in an exception to such representation or which is necessary to correct any information in such representation which has been rendered inaccurate thereby.

## 8.     **NEGATIVE COVENANTS**

The following covenants shall be binding on the Borrower from and after the date hereof and until the repayment in full of the Obligations and termination of this Agreement:

8.1     Mergers, and Other Material Transactions.  The Borrower shall not directly or indirectly, by operation of law or otherwise, merge with, consolidate with, acquire all or substantially all of the assets or capital stock of, or otherwise combine with, any Person, unless otherwise agreed to in writing by the Secured Lender.

8.2     Sales of Assets.  The Borrower shall not sell, lease, transfer, convey, abandon or otherwise dispose of any of the Borrower's assets or properties or attempt or contract to do so, except in the ordinary course of business unless agreed to in writing by the Secured Lender; provided, however, that the Borrower shall be permitted to sell, lease, transfer, convey or otherwise dispose of its assets outside the ordinary course of business if such sale (a) is approved by the Bankruptcy Court pursuant to section 363, (b) complies with all requirements of the

Bankruptcy Court and of section 363 of the Bankruptcy Code and (c) provides for the repayment to the Secured Lender of all Obligations hereunder.

8.3     Events of Default.  The Borrower shall not take or omit to take any action, which act or omission would constitute an Event of Default.

## 9.     **TERM**

9.1     Termination.  Subject to the provisions of Section 10 hereof, the Loans provided for under this Agreement with respect to the Advances shall be in effect from the Closing Date until the Maturity Date.

9.2     Survival of Obligations upon Termination of this Agreement.  No termination or cancellation of any financing arrangement under this Agreement (regardless of the cause or procedure) shall in any way affect or impair the duties and obligations of the Borrower or the rights and powers of the Secured Lender relating to any transaction or event occurring prior to such termination and all claims granted to the Secured Lender hereunder shall continue in full force and effect until all Obligations are paid in full.  All undertakings, agreements, covenants, warranties, and representations of the Borrower contained in the Post-Petition Loan Documents shall survive such termination or cancellation and shall continue in full force and effect until such time as all of the Obligations have been paid in full in accordance with the terms of the agreements creating such Obligations.

## 10.     **EVENTS OF DEFAULT; RIGHTS AND REMEDIES**

10.1     Events of Default.  The occurrence of any one or more of the following events shall constitute an "Event of Default" hereunder:

(a)     the Borrower fails to pay the Loans on the Maturity Date (whether by acceleration or otherwise) or any other Obligation to the Secured Lender when due;

(b)     the Borrower fails or neglects to perform, keep or observe any provision of this Agreement or any other Post-Petition Loan Document (other than those specifically enumerated in other clauses of  this Section 10.1), if such failure is not cured within ten (10) days after written notice from the Secured Lender;

(c)     the Borrower by motion, adversary action or other means, (i) challenges or disputes the nature, extent or validity of the Secured Lender's Liens on the Collateral or (ii) seeks subordination, in whole or in part, of any Claim filed by the Secured Lender in the Case;

(d)     if there occurs any uninsured damage to or loss, theft or destruction of any portion of the Collateral that individually or in the aggregate is material to the business, operations or value of the Borrower;

(e)     if the Borrower breaches or violates any term of the Final Post-Petition Financing Order or fails to comply with the Budget, in each case, in any material respect;

- 11 -

(f)     dismissal of the Case; or conversion of the Case to a case under another Chapter of the Bankruptcy Code;

(g)     the appointment of a Chapter 11 Trustee or a Chapter 11 Examiner;

(h)     the Borrower uses Advances for purposes not authorized under the Budget;

(i)     the failure to timely meet any Milestone;

(j)     if any representation or warranty made by the Borrower herein or in any of the Post-Petition Loan Documents, any financial statement, or any statement or representation made in any other certificate, report or opinion delivered in connection herewith or therewith proves to have been incorrect or misleading in any material respect when made;

(k)     the voluntary creation, existence or allowance of any Indebtedness, whether recourse or nonrecourse, and whether superior or junior, resulting from borrowings, loans, advances, or the granting of credit, whether secured or unsecured, except (a) Indebtedness to the Secured Lender arising under or as a consequence of this Agreement or the other Post-Petition Loan Documents and (b) other Indebtedness existing on the Petition Date;

(l)     the creation, existence or allowance of any Liens on any of the Borrower's properties or assets except the Liens created under this Agreement, the other Post-Petition Financing Documents, the Final Post-Petition Financing Order; *provided, however*, if the Liens were created without the Borrower's acquiescence, the Borrower shall have ten (10) days to remove same; or

(m)     the Borrower gives the Secured Lender notice of any Event of Default that is not waived by the Secured Lender.

10.2    <u>Contractual Remedies</u>.  Upon the occurrence of an Event of Default, the Secured Lender may, without notice (other than notice required by the Post-Petition Financing Orders), (a) accelerate any or all of the Obligations, whereupon such accelerated Obligations will be immediately due and payable, (b) terminate this Agreement, whereupon all outstanding Obligations will be immediately due and payable, (c) reduce the Availability to zero ($0.00), whereupon no further Advances may be made pursuant to this Agreement, and/or (d) exercise any and all rights and remedies provided under this Agreement and the Post-Petition Loan Documents and under applicable law, including the Uniform Commercial Code.

10.3    <u>Legal Remedies</u>

(a)     Execution of this Agreement and entry of the Final Post-Petition Financing Order shall be without prejudice to the right of the Secured Lender to seek relief from the automatic stay pursuant to section 362 of the Bankruptcy Code, or any other relief under the Bankruptcy Code or applicable nonbankruptcy law, including, without limitation, the right of the Secured Lender to (a) request additional adequate protection of its interests in the Collateral, or (b) relief from or modification of the automatic stay under section 362 of the Bankruptcy Code. Upon the occurrence of an Event of Default, the Secured Lender shall be entitled to seek and

- 12 -

obtain relief from the automatic stay under section 362(d) of the Bankruptcy Code without objection or opposition by the Borrower.  The Borrower releases and waives its rights, if any, to stay, enjoin, or otherwise delay or impede the Secured Lender's rights and remedies against the Collateral (including, without limitation, any rights under section 105 and 362 of the Bankruptcy Code) upon the occurrence of an Event of Default.  The Borrower hereby acknowledges and agrees that the occurrence of an Event of Default shall constitute "cause" for granting the Secured Lender relief from the automatic stay within the meaning of section 362(d)(1) of the Bankruptcy Code.

(b)      Notwithstanding Section 10.3(a) above, upon the occurrence of an Event of Default, the Secured Lender may, subject to the notice period provided in the Post-Petition Financing Orders, exercise all rights and remedies provided under the Uniform Commercial Code in effect in any applicable jurisdiction and under any other applicable law.  The rights and remedies provided for under this Section 10.3(b) include, without limitation, the following:

(i)      The right to take possession of, send notices regarding, and collect directly the Collateral, with or without judicial process, and to exercise all rights and remedies available to the Secured Lender with respect to the Collateral under the Uniform Commercial Code in effect in any jurisdiction in which such Collateral is located;

(ii)      The right to (A) notify any and all parties to any of the Borrower's accounts and accounts receivable that the same have been assigned to the Secured Lender and that all performance thereunder shall thereafter be rendered to the Secured Lender; (B) renew, extend, modify, amend, accelerate, accept partial performance on, release, settle, compromise, compound, collect or otherwise liquidate or deal with, on terms acceptable to the Secured Lender, in whole or in part, such accounts and accounts receivable; (C) enter into any other agreement relating to or affecting such accounts and accounts receivable; (D) enforce performance and prosecute any action or proceeding with respect to any and all of such accounts and accounts receivable; and (E) exercise all other rights, powers and remedies of the Secured Lender with respect to such accounts and accounts receivable; provided, however, that the Secured Lender shall have no liability or responsibility for any act or omission taken with respect thereto.  The Borrower hereby nominates and appoints the Secured Lender as attorney-in-fact to perform all acts and execute all documents deemed necessary by the Secured Lender in furtherance of the terms hereof; and

(iii)      The right to (by its own means or with judicial assistance) enter any of the Borrower's premises and take possession of the Collateral, or render it unusable, or dispose of the Collateral on such premises without any liability for rent, storage, utilities, or other sums.  The Borrower hereby covenants and agrees not to resist or interfere with such actions.

11.    **MISCELLANEOUS**

11.1    Complete Agreement.  This Agreement, the Post-Petition Loan Documents and the applicable Financing Order constitute the complete agreement between the parties with respect to the subject matter hereof.

11.2    <u>Sale of Interests</u>.  The Borrower may not sell, assign or transfer this Agreement or any of the Post-Petition Loan Documents or any portion thereof, including, without limitation, the Borrower's duties and obligations thereunder.  The Borrower hereby consents to the Secured Lender's sale of participation, assignment, transfer or other dispositions, at any time or times following an Event of Default, of any of the Post-Petition Loan Documents or of any portion thereof or interest therein, including, without limitation, the Secured Lender's rights, title, interest, remedies, powers, or duties thereunder, whether evidenced by a writing or not.  For the avoidance of doubt, any such proposed sale, assignment, transfer, or other disposition prior to an Event of Default requires the written approval of the Borrower, such approval not to be unreasonably withheld.  No rights are intended to be created hereunder for the benefit of any third party or creditor or any direct or indirect incidental beneficiary, except as specifically provided herein.

11.3    <u>Modification of Agreement</u>.  No amendment, modification or alteration to this Agreement or the Note or any other Post-Petition Loan Document shall be effective unless the same shall be in writing and be signed by each of the Secured Lender and the Borrower.  No waiver of any provision of this Agreement nor any consent to any departure by the Secured Lender therefrom, shall be effective unless the same shall be in writing and signed by each of the Secured Lender and the Borrower, and then, such waiver or consent shall be effective only in the specific instance and for the specific purpose for which it is given.

11.4    <u>No Waiver by the Secured Lender</u>.  The failure of the Secured Lender at any time to require strict performance by the Borrower of any provision of this Agreement or the Note or any other Post-Petition Loan Document shall not waive, affect, or diminish any right of the Secured Lender thereafter to demand strict compliance and performance therewith.  Any suspension or waiver by the Secured Lender of an Event of Default by the Borrower under this Agreement, the Note or any other Post-Petition Loan Document shall not suspend, waive, or affect any other Event of Default by the Borrower under this Agreement, the Note, any other Post-Petition Loan Document whether the same are prior or subsequent thereto and whether of the same or of a different type.  None of the undertakings, agreements, warranties, covenants, and representations of the Borrower contained in this Agreement shall be deemed to have been suspended or waived by the Secured Lender, unless such suspension or waiver is by an instrument in writing signed by the Secured Lender and directed to the Borrower specifying such suspension or waiver.

11.5    <u>Additional Remedies</u>.  The Secured Lender's rights and remedies under this Agreement shall be cumulative and nonexclusive of any other rights and remedies that the Secured Lender may have under any other agreement, including, without limitation, any other Post-Petition Loan Document, the Final Post-Petition Financing Order, the Bankruptcy Code, by operation of law or otherwise.  This Agreement is without prejudice to any rights of the Secured Lender under the Bankruptcy Code or under applicable non-bankruptcy law.

11.6    <u>Severability</u>.  Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

3521803

11.7    Parties.  This Agreement and the Post-Petition Loan Documents shall be binding upon the parties hereto and their respective successors, and shall inure to the benefit of the parties and their assigns, transferees and endorsees.

11.8    Conflict of Terms.  Except as otherwise provided in this Agreement or the Note by specific reference to the applicable provisions of this Agreement, if any provision contained in this Agreement is in conflict with, or inconsistent with, any provision in the Note, the provision contained in this Agreement shall govern and control.

11.9    Governing Law; Litigation.  Except as otherwise expressly provided in any of the Post-Petition Loan Documents, in all respects, including all matters of construction, validity and performance, this Agreement and the Obligations arising hereunder shall be governed by, and be construed and enforced in accordance with, the laws of the State of Delaware applicable to contracts made and performed in such state, without regard to the principles thereof regarding conflict of laws, and any applicable laws of the United States of America.  Service of process on the Borrower or the Secured Lender in any action arising out of or relating to any of the Post-Petition Loan Documents shall be effective if mailed to such party at the address listed in Section 11.11 hereof.

11.10    Venue.  The Borrower and the Secured Lender hereby agree that the Bankruptcy Court or, if the Case has closed or the Bankruptcy Court refuses or declines jurisdiction for any reason, any state or federal court located in the State of Delaware, shall have jurisdiction to hear and determine any claims or disputes between the Borrower and the Secured Lender, pertaining directly or indirectly to this Agreement, the Loans or to any matter relating thereto.  The parties expressly submit and consent in advance to such jurisdiction in any action or proceeding commenced in such courts, hereby waiving personal service of the summons and complaint, or other process or papers issued therein, and agreeing that service of such summons and complaint, or other process or papers may be made by registered or certified mail addressed to the Borrower or the Secured Lender, as the case may be, at their respective addresses set forth in Section 11.11 hereof.  Should a party fail to appear or answer any summons, complaint, process or papers so served within thirty (30) days after the mailing thereof, it shall be deemed in default and an order or judgment may be entered against it as demanded or prayed for in such summons, complaint, process or papers.  The choice of forum set forth in this section shall not be deemed to preclude the enforcement of any judgment obtained in such forum or the taking of any action under this Agreement to enforce same in any other jurisdiction.

11.11    Notices.  All notices, consents, waivers and communications hereunder given by any party to the other shall be in writing (including electronic mail) and delivered personally, by electronic mail, by a recognized overnight courier, or by dispatching the same by certified or registered mail, return receipt requested, with postage prepaid, in each case addressed:

If to the Borrower to:

      Mammoet-Starneth LLC
      c/o Sills Cummis & Gross P.C.
      Attn: Andrew H. Sherman, Esquire
      One Riverfront Plaza

Newark, New Jersey 07102
Email: asherman@sillscummis.com

If to the Secured Lender to:

Mammoet USA North Inc.
c/o Dentons US LLP
Attention:  Robert E. Richards
233 South Wacker Drive
Suite 5900
Chicago, IL 60606
Email:  robert.richards@dentons.com

or to such other address or addresses as the Borrower or the Secured Lender may from time to time designate by notice as provided herein, except that notices of changes of address shall be effective only upon receipt.  All such notices, consents, waivers and communications shall:  (a) when posted by certified or registered mail, postage prepaid, return receipt requested, be effective three (3) Business Days after dispatch, (b) when sent by electronic mail, be effective upon transmission, or (c) when delivered by a recognized overnight courier or in person, be effective upon receipt when hand delivered.

11.12   <u>Reversal of Payments</u>.   To the extent that the Borrower makes a payment or payments to the Secured Lender that are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a Borrower, receiver, or any other party under any bankruptcy law, state or federal law, common law, or equitable cause, then, to the extent of such payment or proceeds received, the Obligations or part thereof intended to be satisfied shall be revived and shall continue in full force and effect, as if such payment or proceeds had not been received by the Secured Lender.

11.13   <u>No Control</u>.   By agreeing to and executing this Agreement, by making advances or extending financial accommodations of any type, kind or nature under this Agreement, the Budget or the applicable Financing Order, the Secured Lender shall not be deemed to be (i) in control of the Borrower's operations or business or (ii) acting as a "responsible person," "managing agent" or "owner or operator" with respect to the operation or maintenance of the Borrower.

11.14   <u>Survival</u>.   The representations and warranties of the Borrower in this Agreement shall survive the execution, delivery and acceptance hereof by the parties hereto and the closing of the transactions described herein or related hereto.

11.15   <u>Section Titles</u>.   The section titles and table of contents contained in this Agreement are and shall be without substantive meaning or content of any kind whatsoever.

11.16   <u>Counterparts</u>.   This Agreement may be executed in any number of separate counterparts, each of which shall, collectively and separately, constitute one agreement. Signature sent by pdf shall be binding.

- 16 -

IN WITNESS WHEREOF, this Agreement have been duly executed as of the date first written above.

**MAMMOET-STARNETH LLC**

By:_____
Name:
Title:

**MAMMOET USA NORTH INC.**

By:_____
Name:
Title:

**[Signature Page to Debtor In Possession Credit and Security Agreement]**

3521803