**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| MAMMOET-STARNETH, LLC, | Case No. 17-12925 (LSS) |
| Debtor.[1] | **Hearing Date (Bidding Procedures Only): January 8, 2018 at 2:00 p.m.** |
| | **Objection Deadline (Bidding Procedures Only): December 29, 2017 at 4:00 p.m.** |

**DEBTOR'S MOTION FOR (I) AN ORDER ESTABLISHING BIDDING
PROCEDURES AND GRANTING RELATED RELIEF AND
(II) AN ORDER OR ORDERS APPROVING THE SALE OF THE ASSETS**

The debtor and debtor in possession in the above-captioned chapter 11 case (the "Debtor") seeks entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Bidding Procedures Order"), (i) approving the proposed bidding procedures attached hereto as **Exhibit B** (the "Bidding Procedures") by which the Debtor will solicit and select the highest or otherwise best offer for the sale of all or a portion of its interest in the Wheel component assets listed on **Schedule 1**[2] attached to the Bidding Procedures (the "Assets") through one or more sales of the Assets (each, a "Sale Transaction" or "Sale"); (ii) approving the form and manner of notice with respect to certain procedures, protections, schedules, and agreements described herein and attached hereto; (iii) scheduling (a) a hearing (the "Stalking Horse Hearing"), on

---

[1] The last four digits of the Debtor's federal tax identification number is 4518. The Debtor's address is 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808.

[2] The Debtor reserves the right, at any time before the Auction, to add to, remove from or otherwise modify Schedule 1. In the event the Debtor exercises this right, it will promptly serve the revised Schedule 1 by first class mail, postage prepaid, or, for those parties who have consented to receive notice by the Electronic Case Files ("ECF") system, by ECF, upon the Sale Notice Parties (defined below); *provided, however*, that to the extent email addresses are available (and with respect to international parties in interest), any of the Sale Notice Parties may be served by email.

expedited notice, to approve the Debtor's selection of one or more stalking horse bidders (each a "Stalking Horse Bidder"), if any, and the provision of Bid Protections (as defined below) to such Stalking Horse Bidder, if necessary; (b) an auction (the "Auction") if the Debtor receives two or more timely and acceptable Qualified Bids (as defined below) for all or some of the Assets; and (c) a final hearing (the "Sale Hearing") to the Sale; and (iv) granting related relief.  The Debtor further requests that this Court enter an order (the "Sale Order"), which will be filed before the Sale Hearing, (i) authorizing the sale of the Assets free and clear of liens, claims, interests, and encumbrances (collectively, the "Interests"); and (ii) granting related relief.  In support of this motion, the Debtor respectfully state as follows:

## PRELIMINARY STATEMENT[3]

1.      By this motion, the Debtor seeks authority to sell all or a portion of Assets comprising various components of a 625-foot tall giant observation wheel (the "Wheel") contemplated to be built on the north shore of Staten Island on land leased from the City of New York (the "Project").  Prior to the commencement of this case, the Debtor entered into a Design Build Agreement (the "DBA") with New York Wheel Owner LLC ("NYW"), pursuant to which the Debtor agreed to design, procure, fabricate, construct and commission the Wheel.  In order to deliver on the Project, the Debtor relied upon NYW to issue advances and progress payments in accordance with its obligations under the DBA.  In contravention of the DBA, in November 2016, NYW stopped making payments to the Debtor, leaving the Debtor in a financially unsustainable position.  Based on NYW's uncured breaches of the DBA, in July 2017, the Debtor exercised its contractual right to withdraw from the DBA because NYW, among other things, failed to pay tens of millions of dollars for the work the Debtor and various

---

[3] Capitalized terms used but not defined in the Preliminary Statement shall have the meaning ascribed to them in the Background section.

subcontractors had performed.   The parties are currently engaged in litigation in the United States District Court for the Southern District of New York styled *New York Wheel Owner LLC v. Mammoet-Starneth LLC*, 1:17-cv-04026-JMF (the "NYW Litigation").   The Debtor's sole business purpose—to design and erect the Wheel—no longer exists and the Debtor seeks to utilize this chapter 11 case, to *inter alia*, maximize the value of its Assets through an orderly and efficient sales process in a centralized forum, free and clear of any claims, interests or encumbrances.   The Debtor believes that the procedures and processes set forth herein will assist it to achieve such goals.

2.      Pursuant to the DBA, because NYW has not paid in full for any of the Wheel components, the Debtor owns all of the fully or partially fabricated components of the Wheel, many of which are in various stages of completion and stored at fabrication shops and storage facilities located throughout Europe and the United States.   Since the DBA has been terminated, the Debtor no longer has any use for the Wheel components, which comprise the Assets listed on Schedule 1 of the Bidding Procedures.   Moreover, storing the massive Wheel components around the world costs the Debtor approximately $700,000 a month and there is a risk that certain creditors could exercise remedies available in such foreign jurisdictions to attempt to take possession, custody or control over such property despite the clear mandate of the automatic stay embodied in section 362 of title 11 of the United States Code.   Substantial storage costs and the risks attendant to cross-border remedies may diminish the recovery that may be available to creditors in this case, which further supports the Debtor's business justification to request that this Court consider procedures to sell the Assets outlined herein on an expedited basis and at the inception of this case.

RLF1 18617374v.1

3.     The Debtor has determined, in consultation with its advisors, that a sale process that is designed to maximize potential purchasers' participation in the sale, while maintaining flexibility for the Debtor to maximize the value of the Assets, is both a valid exercise of the Debtor's business judgment and consistent with its fiduciary obligations to its creditors. The Debtor has further determined that conducting the Sale on an expedited basis will benefit the estate, as the potential purchasers of the Assets are limited and extending the Sale time frame is not likely to produce additional potential purchasers or maximize the value of the Assets. The Assets are custom made for one specific project and located in storage facilities across the world. Due to the sheer size and weight of many of the Wheel components, transportation and disposition of the Assets is a complex, difficult and costly task. Any potential purchaser will therefore likely use the Assets to continue construction of a project similar to the Wheel, attempt to repurpose such Assets, if feasible, for some alternate project or convert the Assets to scrap. The Debtor has already begun to identify potential purchasers and can complete the marketing process for the Assets in a short timeframe to minimize the monthly cash burn and the risks attendant to continued storage of the Assets in many foreign jurisdictions.

4.     The sale process proposed herein is an integral part of the Debtor's overall strategy to effectuate an expeditious orderly liquidation for the benefit of its creditors. Simultaneously with the filing of this Motion, the Debtor has filed a proposed plan (the "Plan") and disclosure statement. The Debtor believes that the Plan is an orderly means to maximize recoveries for its creditors in a timely manner and the proceeds of the Sale will be used, in part, to fund distributions to creditors under the Plan. In the interim, cognizant of its current monthly cash outlay for storage fees for the Assets, the Debtor seeks to proceed with a sale process that is open to all potential bidders and protects the best interests of the Debtor's estate and its creditors.

For all of the foregoing reasons and those set forth in more detail below, the Debtor submits that the sale process pursuant to the Bidding Procedures is a valid exercise of its business judgment, is in the best interests of its estate and creditors, and should be approved.

## JURISDICTION

5.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).[4]

6.    Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

7.    The predicates for the relief requested herein are sections 105 and 363 of title 11 of the United States Code (the "Bankruptcy Code"); rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"); and Local Rules 2002-1 and 6004-1.

## BACKGROUND

**A.    General Background**

8.    On December 13, 2017, the Debtor filed a voluntary petition in this Court commencing a case for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Case"). The factual background regarding the Debtor, including the events leading to the filing of the Chapter 11 Case, is set forth in detail in the *Declaration of Christian Lavooij In Support of First Day Motions* [D.I. 9] and is fully incorporated herein by reference.

9.    The Debtor continues to manage and operate its assets as debtor in possession pursuant to Bankruptcy Code Sections 1107(a) and 1108.  No trustee or examiner has been requested in the Chapter 11 Case and no committees have yet been appointed.

---

[4] Under rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), the Debtor hereby confirms its consent to the entry of a final order by this Court in connection with this motion if it is later determined that this Court, absent consent of the parties, cannot enter final orders or judgments in connection therewith consistent with Article III of the United States Constitution.

RLF1 18617374v.1

**B.    Specific Background**

        *i.  NYW's Breach of the DBA*

10.    In order to deliver on the Project, the Debtor relied upon NYW to perform: (a) certain construction requirements such as supplying all temporary foundations and crane supports, the permanent foundations and pad to which the Wheel was connected, as well as obtaining a building permit to allow for the construction of the Wheel; and (b) issue advances and progress payments in accordance with its obligations under the DBA.  These monies were needed to pay subcontractors down the line of the contracting train.  Accordingly, maintaining a healthy cash flow from NYW was critical to the success of the Debtor's business and when that cash flow fell behind the Debtor's downstream obligations, it put the Debtor at risk.  On this Project, not only did the costs far exceed the cash flow received by NYW, but in November 2016, NYW stopped paying the Debtor altogether, leaving the Debtor in a financially unsustainable position.  Moreover, NYW did not timely perform its construction related obligations.

11.    Cash flow became a problem early in the Project.  Among other things, the Debtor encountered problems with site conditions and foundations supplied by NYW that delayed progress and increased engineering costs.  At the same time that costs were escalating due to NYW's breaches, NYW also fell behind on obtaining financing that was to fund the fabrication and erection of the Wheel.

12.    The Debtor initially stemmed the cash flow shortage these issues caused, and kept the Project moving, by obtaining a series of documented loans from MUSA and affiliated entities.  The Debtor also negotiated contract amendments with NYW,[5] although those

---

[5] During the course of the Project, NYW and the Debtor entered into two amendments to the DBA.  The parties executed the First Amendment to the Design Build Agreement, known as "CAR 1,"

amendments only addressed some of NYW's contractual breaches and thus costs still outweighed projected revenues.

13.     NYW exacerbated these problems further when, in November 2016, it ceased making any progress payments to the Debtor.  As a result, the Debtor's only source of cash to pay subcontractors since November 2016 were the monies MUSA and its affiliated entities loaned to the Debtor.

*ii.   The Debtor's Withdrawal from the DBA*

14.     MUSA's willingness to continue to fund the Debtor long-term ended, however, when in July 2017, the Debtor exercised its contractual right to withdraw from the DBA and NYW asserted a competing claim to terminate the DBA for cause.

15.     The breaches by NYW caused other repercussions and additional problems because the Debtor owns partially fabricated Wheel components that are primarily stored at fabrication shops in Europe.  The Debtor has limited funding for such storage costs and there are risks that certain creditors in foreign jurisdictions may attempt to exercise rights which may be adverse to the Assets, such as self-help.

16.     Given these circumstances, the most orderly way for the Debtor to liquidate and resolve its obligations to creditors, including subcontractors, protect the value of its assets, and preserve the value of its claims against NYW is through the Plan submitted herewith which, in large part, is premised upon the sale contemplated herein.

---

which increased the original Contract Sum of $145 million to $158.5 million, on December 11, 2014. Five months later, on May 18, 2015, the parties executed the Second Amendment to the Design Build Agreement, known as "CAR 2," which increased the Contract Sum to $165 million.  The parties also negotiated a potential further amendment to the DBA through 2016, but those negotiations ended without an agreement in January 2017.

7

## THE PROPOSED SALE

17.     The Debtor, in consultation with its advisors, believes that pursuing a Sale Transaction at this time without a Stalking Horse Bidder is the course of action most likely to maximize value and encourage robust bidder participation.[6]  Indeed, given the nature of the Assets, this approach facilitates an expedited sale process without the delay attendant to first identifying the initial bidder and negotiating a stalking horse agreement, provides flexibility for the sale of all or a portion of the Assets, and delivers market feedback that may incentivize a resolution of this Chapter 11 Case.

18.     Accordingly, by this Motion, the Debtor seeks authority to implement the Bidding Procedures outlined herein so as to efficiently market and solicit offers for the Assets.  The Debtor believes that the relief requested herein will bolster the prospects of an efficient and value-maximizing exit from chapter 11.

### A.      The Proposed Bidding and Notice Procedures

#### i.     Proposed Timeline for the Sale

19.     The Debtor proposes the following timeline for the Sale:[7]

| Deadline | Action |
|---|---|
| February 7, 2018 at 4:00 p.m. (Eastern Standard Time) | Bid Deadline |
| February 7, 2018 at 4:00 p.m. (Eastern Standard Time) | Sale Objection Deadline (defined below) |
| February 12, 2018 at 10:00 a.m. (Eastern Standard Time) | Auction |
| February 13, 2018 at 4:00 p.m. (Eastern Standard Time) | Reply Deadline (defined below) |
| February 14, 2018 at 10:00 a.m. (Eastern Standard Time) | Sale Hearing |

---

[6] As discussed below, the Debtor reserves its right to select a Stalking Horse Bidder or Stalking Horse Bidders under the appropriate circumstances in accordance with the Bidding Procedures.

[7] The Debtor, in the exercise of its business judgment, reserves the right to change these sale-related dates to achieve the maximum value for the Assets, subject to approval from the Court.

The Debtor submits that this proposed timeline is eminently reasonable, will foster participation in the sale process, is consistent with local practice and custom, and will not prejudice any parties in interest.

*ii.    The Bidding Procedures*

20.    The Bidding Procedures are designed to maximize value for the Debtor's estate and to minimize future storage costs, while ensuring an orderly and efficient sale process. The Bidding Procedures describe, among other things, (i) the procedures for interested parties to access due diligence materials, submit bids, and become qualified as a Stalking Horse Bidder or to participate in the Auction; (ii) the time, place, and process of any Auction; (iii) the selection and approval of any ultimately successful bidders; and (iv) the deadlines with respect to the foregoing. The Debtor believes that the Bidding Procedures provide for a sale process that will maximize the value of its estate and encourage participation in the bid process from all potential bidders. Indeed, as discussed above, moving forward with this process at this time, and in the manner described herein, will support three very important goals: (a) encouraging participation from the widest possible group of bidders for the Assets; (b) minimizing going forward storage costs; and (c) improving recoveries for the Debtor's various creditor constituencies by, among other things, advancing this case toward a prompt conclusion, and in turn, ending the Debtor's substantial monthly outlay of cash in storage costs of the Assets.

21.    A summary of the principal terms of the Bidding Procedures, a complete copy of which is attached hereto as **Exhibit B**, including the terms that are required to be highlighted in accordance with Local Rule 6004-1, is as follows:[8]

---

[8] The following summary is qualified in its entirety by reference to the provisions of the Bidding Procedures. In the event of any inconsistencies between the provisions of the Bidding Procedures and the

RLF1 18617374v.1

| | |
|---|---|
| **Assets to Be Sold (p. 1)** | All or a portion of the Assets listed on Schedule 1 of the Bidding Procedures either through one sale to a Successful Bidder or multiple sales to multiple Successful Bidders, in either case on an as is/where is basis, without any representations or warranties. |
| **Access to Diligence Materials (pp. 1-2)** | To receive access to due diligence materials and to participate in the bidding process, an interested party must submit to the Debtor (i) evidence demonstrating the party's financial ability to consummate a sale transaction for the Assets, and (ii) a statement that such party has a bona fide interest in purchasing all or some of the Assets.<br><br>A party who, in the Debtor's reasonable discretion, satisfies the requirements set forth in the immediately preceding sentence for receiving access to diligence materials shall be a "Diligence Party." The Debtor will afford any Diligence Party the time and opportunity to conduct reasonable due diligence before the Bid Deadline. Notwithstanding the foregoing, the Debtor reserves the right to withhold any diligence materials that the Debtor determines is sensitive or otherwise not appropriate for disclosure to a Diligence Party. Neither the Debtor nor its representatives shall be obligated to furnish information of any kind whatsoever to any person that is not determined to be a Diligence Party. |
| **Qualification of Bidders and Qualified Bids (pp. 2-4)** | To be eligible to participate in the Auction, each offer, solicitation, or proposal (each, a "Bid"), and each party submitting such a Bid (each, a "Bidder") must satisfy each of the conditions set forth below, as determined by the Debtor. A Bid will not be considered qualified for the Auction if such Bid does not satisfy each of the following conditions:<br><br>(a) <u>Good Faith Deposit</u>: Each Bid for all or a portion of the Assets must be accompanied by a deposit (a "Good Faith Deposit") submitted by wire transfer of immediately available funds to an account identified by the Debtor. Each Good Faith Deposit must equal the amount of ten percent (10%) of the purchase price.<br><br>(b) <u>Bids for Portions of the Assets</u>: A Bid may offer to purchase all or substantially all of the Debtor's Assets or only a portion of the Assets. The Debtor may waive or modify the application of the Qualified Bid conditions in respect of Bids for a portion of the Assets, including, *inter alia*, the amount of the Good Faith Deposit.<br><br>(c) <u>Same or Better Terms</u>: To the extent a Stalking Horse Bidder |

terms herein, the terms of the Bidding Procedures shall govern. Capitalized terms not defined in this table shall have the meaning ascribed to them in the Bidding Procedures.

is selected, each subsequent Bid for any Assets subject to the Stalking Horse Agreement (alone or combined with Bids for other Assets subject to the Stalking Horse Agreement) must be on terms that, in the Debtor's business judgment are the same or better than the terms of the Stalking Horse Agreement.

(d)   Executed Agreement:  Each Bid must be accompanied by a duly executed purchase agreement in a form reasonably acceptable to the Debtor.

(e)   Closing Date:   Each Bid must provide that the Bidder, if designated the Successful Bidder, shall close the Sale Transaction on or before February 16, 2018 (the "Closing Date").

(f)   Removal of Purchased Assets:  Each Bid must provide that the Bidder, if designated the Successful Bidder, shall (i) remove the purchased Assets from their current location on or before thirty (30) days after the Closing Date (the "Removal Period") and (ii) pay any and all costs, including storage costs, relating to the purchased Assets during the Removal Period.

(g)   Corporate Authority:  A Bid must include written evidence reasonably acceptable to the Debtor demonstrating appropriate corporate authorization to consummate the proposed Sale Transaction.

(h)   Disclosure of Identity of Bidder:  A Bid must fully disclose the identity of each entity that will be bidding for or purchasing the Assets or otherwise participating in connection with such Bid (including any equity holder or other financial backer if the Bidder is an entity specifically formed for the purpose of effectuating the Sale Transaction), and the complete terms of any such participation, including any binding agreements, arrangements, or understandings concerning a collaborative or joint bid or any other combination concerning the proposed Bid.

(i)   Proof of Financial Ability to Perform:  A Bid must include written evidence that the Debtor reasonably concludes demonstrates that the Bidder has the necessary financial ability to close the Sale Transaction on or before the Closing Date.   Such information must include, *inter alia*, the following:

> > (1)    contact names and numbers for verification of financing sources;
> >
> > (2)    the Bidder's current financial statements (audited if they exist) or other similar financial information reasonably acceptable to the Debtor; and
> >
> > (3)    any such other form of financial disclosure or credit-quality support information or enhancement reasonably requested by the Debtor demonstrating that such Bidder has the ability to close the Sale Transaction.
>
> (j)    <u>Contingencies</u>:  Each Bid may not be conditioned on obtaining financing or any internal approval, or on the outcome or review of any due diligence.
>
> (k)    <u>Irrevocable</u>:  Each Bid must expressly provide that the offer reflected in such Bid shall remain open and irrevocable until the conclusion of the Auction, *provided* that if such Bid is accepted as the Successful Bid or the Backup Bid, such Bid shall continue to remain open and irrevocable as provided under "Closing the Auction; Successful Bidder" and "Backup Bidder" below.
>
> (l)    <u>Bid Deadline</u>:  Each Bid must be received by each of the following parties, in writing, on or before February 7, 2018 at 4:00 p.m. (Eastern Standard Time) or such earlier date as may be designated by the Debtor (the "<u>Bid Deadline</u>"): (1) proposed co-counsel for the Debtor, Sills Cummis & Gross P.C., One Riverfront Plaza, Newark, NJ 07102, Attn: Andrew H. Sherman, Esq. (asherman@sillscummis.com) and Boris I. Mankovetskiy, Esq. (bmankovetskiy@sillscummis.com); and (2) proposed co-counsel for the Debtor, Richards, Layton & Finger, P.A., One Rodney Square, 920 North King St., Wilmington, DE 19801, Attn: Jason M. Madron, Esq. (madron@rlf.com).

A Bid received from a Bidder on or before the Bid Deadline that meets the requirements set forth above for the applicable Assets shall constitute a "<u>Qualified Bid</u>" for such Assets, and such Bidder shall constitute a "<u>Qualified Bidder</u>" for such Assets, subject to the Debtor's reasonable determination that, in its business judgment, acceptance of the Bid would not be in the best interests of the Debtor's estate because, among other things, the Bid does not include a fair and adequate price for the Debtor's Assets.

| | |
|---|---|
| **Option to Select Stalking Horse with Bid Protections (pp. 4-5)** | Subject to the provisions set forth in the Bidding Procedures, the Debtor reserves the right, up to three (3) business days before the commencement of the Auction, to enter into a purchase agreement (the "Stalking Horse Agreement"), subject to higher or otherwise better offers at the Auction, with any Qualified Bidder that submits a Qualified Bid acceptable to the Debtor, to establish a minimum Qualified Bid at the Auction. The Stalking Horse Agreement may contain certain customary terms and conditions, including expense reimbursement and a break-up fee in favor of the Stalking Horse Bidder (the "Bid Protections") in amounts to be determined by the Debtor. To the extent the Debtor enters into a Stalking Horse Agreement, the Debtor shall seek expedited approval of its entry into such agreement and any Bid Protections included therein together with the terms and conditions under which such Bid Protections would be payable to the Stalking Horse Bidder, at least one (1) day prior to the Auction. The Debtor shall serve notice of the Stalking Horse Agreement and the Stalking Horse Hearing on all parties on the Debtor's Rule 2002 Notice List, all parties expressing interest in the Assets and all parties in possession of the Assets (each, a "Stalking Horse Notice") at least two (2) days prior to the Auction. Each Stalking Horse Notice will include (i) the identity of the proposed Stalking Horse Bidder, (ii) a summary of the key terms of the Stalking Horse Agreement, (iii) a summary of the type and amount of Bid Protections, if any, proposed to be afforded to the Stalking Horse Bidder, and (iv) a correct and complete copy of the Stalking Horse Agreement. At least two (2) days prior to the Auction, the Debtor shall distribute complete and correct copies of the Stalking Horse Agreement(s), if any, to each of the other Qualified Bidders. Notwithstanding anything in the Bidding Procedures or in the Bidding Procedures Order to the contrary, all parties in interest shall have the right, at any time before the start of the Stalking Horse Hearing, to object to the designation of a Stalking Horse Bidder, the provision of Bid Protections to such Stalking Horse Bidder and the terms and conditions under which such Bid Protections would be payable to the Stalking Horse Bidder.<br><br>Any Stalking Horse Agreement executed by the Debtor and the transactions contemplated thereby will be deemed a Qualified Bid for all purposes, and any Stalking Horse Bidder party to a Stalking Horse Agreement executed by the Debtor will be deemed to be Qualified Bidder. |
| **Auction (pp. 5-6)** | If two or more Qualified Bids for the same Assets are received by the Bid Deadline, the Debtor will conduct the Auction to determine the highest or otherwise best Qualified Bid. If less than two Qualified Bids are received by the Bid Deadline with respect to any portion of the Assets, the Debtor shall not conduct the Auction with respect to such Assets. If only one Qualified Bid is received with respect to all or a portion of the Assets, the Debtor may designate such Qualified Bid as a Successful Bid. Only Qualified Bidders may participate in the Auction. |

If there are multiple Qualified Bids, the Auction shall take place on February 12, 2018 at 10:00 a.m. (Eastern Standard Time) at Richards, Layton & Finger, P.A., One Rodney Square, 920 North King St., Wilmington, DE 19801, or such other place and time as the Debtor shall notify all Qualified Bidders. Any Qualified Bidder or any party in interest may participate in the Auction telephonically. The Auction shall be conducted according to the following procedures:

Only the Debtor, the Stalking Horse Bidder(s) (if any), any other Qualified Bidders, and/or other party as the Debtor may determine to include in its discretion, in each case along with their representatives and advisors, shall be entitled to attend the Auction and only Qualified Bidders will be entitled to make any Overbids (as defined below) at the Auction.

The Debtor and its advisors shall direct and preside over the Auction, which shall be transcribed. Other than as expressly set forth in the Bidding Procedures, the Debtor may conduct the Auction in the manner it determines will result in the highest or otherwise best offer for any of the Assets. The Debtor shall use its best efforts to, at least 24 hours prior to commencement of the Auction, provide each Qualified Bidder participating in the Auction with a copy of the purchase agreement associated with the highest or otherwise best Qualified Bid with respect to the Assets for which such Qualified Bidder is bidding (the "Baseline Purchase Agreement"), as determined by the Debtor (such highest or otherwise best Qualified Bid, the "Auction Baseline Bid"). In the event that the Debtor enters into a Stalking Horse Agreement with respect to any Assets, such Stalking Horse Agreement shall be the Auction Baseline Bid with respect to such Assets and shall be provided to each Qualified Bidder at least two (2) days prior to the Auction. At the start of the Auction, the Debtor shall describe the material terms of the Auction Baseline Bid and each Qualified Bidder participating in the Auction must confirm that (a) it has not engaged in any collusion with respect to the bidding or sale of any of the Assets described in the Bidding Procedures, (b) it has reviewed, understands, and accepts the Bidding Procedures, (c) it has consented to the core jurisdiction of the Bankruptcy Court (as described more fully below), and (d) its Qualified Bid is a good faith bona fide offer that it intends to consummate if selected as the Successful Bidder.

| | |
|---|---|
| **Terms and Announcement of Overbids (pp. 6-7)** | An "Overbid" is any bid made at the Auction, in accordance with the requirements set forth in the Bidding Procedures, subsequent to the Debtor's announcement of the respective Auction Baseline Bid. To submit an Overbid for purposes of this Auction, a Bidder must comply with the following conditions:<br><br>(a) Minimum Overbid Increments: The initial Overbid, if any, shall provide for total consideration to the Debtor with a value |

that exceeds the value of the consideration under the Auction Baseline Bid by an incremental amount that is not less than the sum of (x) $100,000 (the "Minimum Overbid Increment") plus (y) in the event that the Debtor has entered into a Stalking Horse Agreement with respect to the Assets to which the Overbid relates, the aggregate amount of any Bid Protections under such Stalking Horse Agreement, and each successive Overbid shall exceed the then-existing Overbid by an incremental amount that is not less than the Minimum Overbid Increment. The Debtor reserves the right to announce reductions or increases in the Minimum Overbid Increment at any time during the Auction.

(b)   Remaining Terms Are the Same as for Qualified Bids: Except as modified in the Bidding Procedures, an Overbid at the Auction must comply with the conditions for a Qualified Bid set forth above, provided, however, that the Bid Deadline shall not apply. Any Overbid must include, in addition to the amount and the form of consideration of the Overbid, a description of all changes requested by the Bidder to the Baseline Purchase Agreement in connection therewith. For the avoidance of doubt, any Overbid shall be irrevocable and shall remain open and binding on the Bidder in accordance with these Bidding Procedures and the conditions for a Qualified Bid.

At the Debtor's discretion, to the extent not previously provided, a Bidder submitting an Overbid at the Auction must submit, as part of its Overbid, written evidence (in the form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtor), as the Debtor, in its reasonable business judgment, may request, demonstrating such Bidder's ability to consummate the Sale Transaction proposed by such Overbid.

**Announcement and Consideration of Overbids.**

(c)   Announcement of Overbids: A Bidder submitting an Overbid at the Auction shall announce at the Auction the material terms of such Overbid, including the total amount and type of consideration offered in such Overbid. All bidding shall be on the record.

(d)   Consideration of Overbids: The Debtor reserves the right, in its reasonable business judgment, to make one or more continuances of the Auction to, among other things: facilitate

| | |
|---|---|
| | discussions between the Debtor and individual Qualified Bidders; allow individual Qualified Bidders to consider how they wish to proceed; and give Qualified Bidders the opportunity to provide the Debtor with such additional evidence as the Debtor, in its reasonable business judgment, may require, that the Qualified Bidder has sufficient internal resources, or has received sufficient non-contingent debt and/or equity funding commitments, to consummate the proposed Sale Transaction at the prevailing Overbid amount. |
| **Modification of Bidding and Auction Procedures (p. 7)** | The Debtor, in the exercise of its discretion, may modify the Bidding Procedures and implement additional procedural rules for conducting the Auction. Specifically, among other things, the Debtor may determine to select more than one Successful Bid and more than one Successful Bidder (and/or more than one Backup Bid and more than one Backup Bidder, in which event such Backup Bids may provide for groupings of Assets that are different from the groupings of Assets reflected in the Successful Bid(s)) for separate portions of the Assets. |
| **Closing the Auction; Successful Bidder (p. 8)** | The Auction shall continue until there is only one Qualified Bid for the Assets that the Debtor determines in its reasonable business judgment is the highest or otherwise best Qualified Bid at the Auction. Thereafter, the Debtor shall select such Qualified Bid as the overall highest or otherwise best Qualified Bid (such Bid, the "<u>Successful Bid</u>," and the Bidder submitting such Successful Bid, the "<u>Successful Bidder</u>"). In making this decision, the Debtor shall consider the Bid Assessment Criteria.<br><br>The Auction shall close when the Successful Bidder(s) submits fully executed sale and transaction documents memorializing the terms of the Successful Bid(s).<br><br>As soon as reasonably practicable following the Debtor's selection of the Successful Bid(s) and the conclusion of the Auction, the Debtor shall announce the Successful Bid(s) and Successful Bidder(s) and shall file with the Bankruptcy Court notice of the Successful Bid(s) and Successful Bidder(s).<br><br>The Debtor shall not consider any Bids submitted after the conclusion of the Auction, unless the Debtor, in a reasonable exercise of its business judgment, believes that considering such Bids submitted after the conclusion of the Auction will maximize value for its estate. In the event that further Bids are considered at the Sale Hearing, then such bidding shall proceed in a manner directed by this Court. The Successful Bidder(s) shall be required to keep the Successful Bid(s) open and irrevocable until the closing of the transactions contemplated thereby. No Bid shall be deemed accepted by the Debtor unless and until such Bid is approved by the Bankruptcy Court. |

| | |
|---|---|
| **Closing with Alternative Backup Bidders (p. 8)** | Notwithstanding anything in the Bidding Procedures to the contrary, the Qualified Bid for the Assets that the Debtor determines in its reasonable business judgment is the next highest or otherwise best Qualified Bid at the Auction after the Successful Bid, will be designated as the "<u>Backup Bid</u>" and the Bidder submitting such Backup Bid, the "<u>Backup Bidder</u>." The Backup Bidder shall be required to keep the Backup Bid open and irrevocable until the earlier of 5:00 p.m. (Eastern Standard Time) on the date that is thirty (30) days after the date of entry of the Sale Order (the "<u>Outside Backup Date</u>") or the closing of the transaction with the Successful Bidder (defined herein).<br><br>Following entry of the Sale Order, if the Successful Bidder fails to consummate the Successful Bid, the Debtor may designate the Backup Bid to be the new Successful Bid and the Backup Bidder to be the new Successful Bidder, and the Debtor will be authorized, but not required, to consummate the transaction with the Backup Bidder without further order of the Bankruptcy Court. In such case of a breach or failure to perform on the part of the Successful Bidder, the defaulting Successful Bidder's deposit shall be forfeited to the Debtor. The Debtor specifically reserves the right to seek all available damages, including specific performance, from any defaulting Successful Bidder (including any Backup Bidder designated as a Successful Bidder) in accordance with the terms of the Bidding Procedures. |

*iii. Reservation of Rights Regarding Potential Stalking Horse Bidder(s) and Form of Purchase Agreement*

22.     As discussed above, the Debtor has determined, in a reasonable exercise of its business judgment, that seeking the relief requested herein and commencing a sale process without entering into a Stalking Horse Agreement is warranted and necessary. The Debtor will continue discussions with potential purchasers and, in accordance with the Bidding Procedures, seeks the right to enter into a purchase agreement with any Stalking Horse Bidder acceptable to the Debtor (the "<u>Stalking Horse Agreement</u>") up to three (3) business days before the commencement of the Auction, to establish a minimum Qualified Bid at, and subject to higher or otherwise better offers during, the Auction.

23.     To facilitate a competitive, value-maximizing Sale Transaction, the Debtor is reserving the right and is requesting authority, in the exercise of its business judgment, to offer

any Stalking Horse Bidder: (i) a break-up fee (the "Break-Up Fee"); (ii) reimbursement of the

Stalking Horse Bidder's reasonable fees and expenses (the "Expense Reimbursement"); and/or

(iii) initial overbid protection (the "Minimum Overbid Increment" and, together with the Break-

Up Fee and the Expense Reimbursement, the "Bid Protections"), subject to further Order of this

Court in accordance with the Bidding Procedures.

**B.      Notice Procedures**

24.      The Debtor proposes the following notice procedures to be implemented in

connection with the sale process.

*i.   Notice of Sale, Auction, and Sale Hearing*

25.      Within seven (7) days after the entry of the Bidding Procedures Order or as soon

as reasonably practicable thereafter (the "Mailing Date"), the Debtor shall serve a sale notice,

substantially in the form attached hereto as **Exhibit C** (the "Sale Notice"), the Bidding

Procedures Order and the Bidding Procedures by first-class mail, postage prepaid, or, for those

parties who have consented to receive notice by ECF, by ECF, upon (i) all entities reasonably

known to have expressed an interest in a transaction with respect to all or part of the Assets

within the past two years; (ii) all entities in possession of the Assets; and (iii) the U.S. Trustee

(collectively, the "Sale Notice Parties"); *provided, however*, that to the extent email addresses are

available (and with respect to international parties in interest), any of the Sale Notice Parties may

be served by email.

26.      In addition, within seven (7) days after the entry of the Bidding Procedures Order

or as soon as reasonably practicable thereafter, the Debtor shall serve the Sale Notice by

first-class mail, postage prepaid or, for those parties who have consented to receive notice by the

ECF system, by ECF, upon all parties entitled to notice pursuant to Local Rule 2002-1(b) and all

known creditors of the Debtor. The Debtor requests that such notice be deemed sufficient and proper notice of the Sale Transaction with respect to known interested parties.

27.    Notice by mail to all parties potentially interested in purchasing the Debtor's Assets or participating in the Auction is impracticable. As a result, the Debtor has determined that it is in the best interest of its estate to also provide notice by publication. Pursuant to Bankruptcy Rules 2002 and 6004, the Debtor proposes to publish the Sale Notice in the *Wall Street Journal*, *USA Today* and *Staten Island Advance* on one occasion on the Mailing Date or as soon as reasonably practicable thereafter (the "Publication Notice"). In addition, the Debtor respectfully requests the authority, but not the direction, to publish the Sale Notice in additional publications (either domestic or international) as the Debtor deems appropriate in its discretion.

### ii. Notice of Stalking Horse Hearing

28.    To the extent the Debtor enters into a Stalking Horse Agreement, the Debtor shall seek expedited approval of its entry into such agreement, any Bid Protections included therein and the terms and conditions under which such Bid Protections would be payable to the Stalking Horse Bidder, at least one (1) day prior to the Auction. The Debtor shall serve a Stalking Horse Notice on all parties that have requested notice in this chapter 11 case pursuant to Bankruptcy Rule 2002 (the "Rule 2002 Notice List"), all parties expressing interest in the Assets, and all parties in possession of the Assets at least two (2) days prior to the Auction. Each Stalking Horse Notice will include (i) the identity of the proposed Stalking Horse Bidder, (ii) a summary of the key terms of the Stalking Horse Agreement, (iii) a summary of the type and amount of Bid Protections, if any, proposed to be afforded to the Stalking Horse Bidder, and (iv) a copy of the Stalking Horse Agreement.

### iii.  Date, Time, Place, and Notice of Auction

29.    The Auction, if any, shall take place on February 12, 2018 at 10:00 a.m. (Eastern Standard Time) at Richards, Layton & Finger, P.A., One Rodney Square, 920 North King St., Wilmington, DE 19801, or such other place and time as the Debtor shall notify all Qualified Bidders.    Any Qualified Bidder or any party in interest may participate in the Auction telephonically.

### iv.  Notice of Successful Bidder

30.    As soon as reasonably practicable after the conclusion of the Auction, the Debtor shall file on the docket, but not serve, a notice identifying any Successful Bidder(s) (the "Post-Auction Notice").

### v.  Date, Time, and Place of Sale Hearing

31.    The Sale Hearing shall be conducted by the Bankruptcy Court on **February 14, 2018 at 10:00 a.m. (Eastern Standard Time)** or such other date as the Court is available and may, in accordance with the Bidding Procedures Order, be adjourned or rescheduled without notice.    At the Sale Hearing, the Debtor will seek Bankruptcy Court approval of the Successful Bid and the Backup Bid (if any).    Unless the Bankruptcy Court orders otherwise, the Sale Hearing shall be an evidentiary hearing on matters relating to the Sale Transaction and there will be no further bidding at the Sale Hearing, unless the Debtor, in a reasonable exercise of its business judgment, believes that considering Bids submitted at the Sale Hearing will maximize value for its estate.    In the event that further bids are considered at the Sale Hearing, then such bidding shall proceed in a manner directed by this Court.    In the event that the Successful Bidder cannot or refuses to consummate the Sale because of the breach or failure on the part of the Successful Bidder, the Backup Bidder will be deemed the new Successful Bidder and the Debtor

shall be authorized, but not required, to close with the Backup Bidder on the Backup Bid without further order of the Bankruptcy Court.

> *vi. Objection Deadline*

32.     Any and all objections, if any, to any Sale Transaction (a "Sale Objection"), must be filed by **February 7, 2018 at 4:00 p.m. (Eastern Standard Time)** (the "Sale Objection Deadline") and served on (i) proposed co-counsel for the Debtor, Sills Cummis & Gross P.C., One Riverfront Plaza, Newark, NJ 07102, Attn: Andrew H. Sherman, Esq. (asherman@sillscummis.com) and Boris I. Mankovetskiy, Esq. (bmankovetskiy@sillscummis.com); (ii) proposed co-counsel for the Debtor, Richards, Layton & Finger, P.A., One Rodney Square, 920 North King St., Wilmington, DE 19801, Attn: Jason M. Madron, Esq. (madron@rlf.com); (iii) the U.S. Trustee, 844 King Street, Suite 2207, Wilmington, DE 19801, Attn: Hannah McCollum, Esq.; (iv) if applicable, counsel to any Stalking Horse Bidder(s); (v) all parties that have requested notice in the Chapter 11 Case; and (vi) counsel to any Successful Bidder(s), if known on the Sale Objection Deadline.

33.     All replies to any Sale Objection must be filed by **February 13, 2018 at 4:00 p.m. (Eastern Standard Time)** (the "Reply Deadline").

34.     Any party failing to timely file an objection to any Sale Transaction will be forever barred from objecting and will be deemed to have consented to any Sale Transaction, including the transfer of the Debtor's right, title and interest in, to, and under the Debtor's Assets free and clear of any and all liens, claims, encumbrances and other interests in accordance with a definitive agreement for any Sale Transaction.

## **RELIEF REQUESTED**

35.     By this motion, the Debtor requests entry of the Bidding Procedures Order, which will authorize and approve, among other things: (i) the Bidding Procedures for soliciting bids;

21

(ii) the form and manner of notice with respect to certain procedures, protections, schedules, and agreements described herein and attached hereto;[9] (iii) the scheduling of the Stalking Horse Hearing (if any), the Auction (if any), and the Sale Hearing; and (iv) granting related relief. The Debtor also requests entry of the Sale Order (or Sale Orders), (i) authorizing the sale of the Assets free and clear of the Interests; and (ii) granting related relief.

## SUPPORTING AUTHORITY

36.    Bankruptcy Code section 363(b)(1) provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Courts in this Circuit and others, in applying this section, have required that the sale of a debtor's assets be based upon the sound business judgment of the debtor. *See, e.g., Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147 (Bankr. D. Del. 1999) (holding that an asset sale may be authorized under Bankruptcy Code section 363 if the court finds a "sound business purpose" for the sale) (citing *Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983)); *see also Official Comm. of Unsecured Creditors v. LTV Corp. (In re Chateaugay Corp.)*, 973 F.2d 141, 143 (2d Cir. 1992) (holding that a judge reviewing a section 363(b) application must find from the evidence presented a good business reason to grant such application).

37.    "Under Delaware law, the business judgment rule operates as a presumption 'that directors making a business decision, not involving self-interest, act on an informed basis, in good faith and in the honest belief that their actions are in the corporation's best interest.'" *Continuing Creditors' Comm. of Star Telecomms., Inc. v. Edgecomb*, 385 F.Supp.2d 449, 462

---

[9] To the extent that any of the deadlines set forth in this motion do not comply with the Local Rules, the Debtor hereby requests a waiver of any such Local Rule.

RLF1 18617374v.1

(D. Del. 2004) (quoting *Grobow v. Perot*, 539 A.2d 180, 187 (Del. 1988) *overruled on other grounds*, *Brehm v. Eisner*, 746 A.2d 244 (Del. 2000)); *see also Ad Hoc Comm. of Equity Holders of Tectonic Network, Inc. v. Wolford*, 554 F. Supp.2d 538, 555 n.111 (D. Del. 2008) (same). Thus, this Court should grant the relief requested in this motion if the Debtor demonstrates a sound business justification therefor. *See In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 179 (D. Del. 1991).

38.    The Debtor has sound business justifications for selling the Assets at this time. The Debtor is currently incurring approximately $700,000 a month on storage costs for its Assets, and there is not enough cash on hand for such storage costs absent the DIP financing. There are risks that certain creditors or other parties could purport to take actions adverse to the Debtor's interests in the Assets in the various jurisdictions in which the Assets are currently stored.    The subcontractors may not recognize the breadth and scope of the automatic stay provided for in section 362 of the Bankruptcy Code and there may be a need to seek to enforce the automatic stay in non-US courts. While the Debtor is simultaneously filing a liquidating plan, it recognizes that confirming a plan will be a more time consuming process. As such, the Debtor is pursuing a sale pursuant to section 363, in the sound exercise of its business judgment, to sell its Assets more expeditiously and end the excessive monthly cash outlay it is currently spending on storage costs and to try to minimize the risks of adverse actions affecting the Assets. Stopping these payments will prevent money from leaving the Debtor's estate, reduce the amount to be borrowed under the DIP financing and could facilitate there being more cash available for distribution to the Debtor's creditors.    Further, the Debtor believes that commencing a fair and robust sale and auction process at this time will maximize the distributable value of its estate and elicit valuable market feedback for its stakeholders.

39.     Accordingly, the Debtor submits that the Bidding Procedures are designed to maximize the value of the Assets and that the sale of the Assets to a Successful Bidder (or Successful Bidders), is in the Debtor's best interests and should be approved.

**A.     The Bidding Procedures Are Fair, Designed To Maximize The Value Received For The Debtor's Assets and Are Consistent with the Debtor's Reasonable Business Judgment**

40.     The Bidding Procedures are consistent with the Debtor's reasonable business judgment and should be approved.  Courts have made clear that a debtor's business judgment is entitled to substantial deference.  *See, e.g.*, *Stanizale v. Nachtomi (In re Tower Air, Inc.)*, 416 F.3d 229, 234 (3d Cir. 2005)  (indicating the "business judgment rule creates a presumption that directors making a business decision, not involving self-interest, act on an informed basis, in good faith and in the honest belief that their actions are in the corporation's best interest" (quotations omitted)).  To that end, courts recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy sales.  *See, e.g.*, *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 659 (S.D.N.Y. 1992), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993) (noting that such procedures "encourage bidding and [] maximize the value of the debtor's assets"); *see also In re Cal Dive Int'l, Inc.*, No. 15-10458 (CSS) (Bankr. D. Del. June 25, 2015) [D.I. 539].

41.     The Debtor believes that the Bidding Procedures are appropriate under Bankruptcy Code sections 105 and 363 to ensure that the bidding process is fair and reasonable and will yield the maximum value for its estate and creditors.  The currently proposed Bidding Procedures will establish parameters pursuant to which the value of the Assets may be fully tested at the Auction and ensuing Sale Hearing.  Such procedures will increase the likelihood that the Debtor receives the greatest possible consideration for the Assets because they will ensure a

24

competitive and fair bidding process that will encourage participation by financially capable bidders who demonstrate the ability to close such a transaction. Indeed, the Debtor has put limited (if any) constraints on the ability of prospective purchasers to bid on the Assets, and instead has encouraged bid flexibility by, *inter alia*, allowing the Debtor to consider all competing offers—including offers for all or some Assets—and to select, in its reasonable business judgment, the highest or otherwise best offer for the Assets. The Bidding Procedures also provide potential bidders with sufficient notice and an opportunity to acquire information necessary to submit a timely and informed bid. Further, the Debtor, in consultation with its restructuring advisor, Getzler Henrich, has instituted mechanisms to ensure an open and robust bidding process at the Auction.

42.    The Bidding Procedures are also consistent with the precedent in this District. *See, e.g.*, *In re Endeavour Operating Corp.*, No. 14-12308 (KJC) (Bankr. D. Del. May 20, 2015) [D.I. 668]; *In re Old FOH Inc. (f/k/a/ Frederick's of Hollywood, Inc.)*, No. 15-10836 (KG) (May 6, 2015) [D.I. 120]; *In re Caché Inc.*, No. 15-10172 (MFW) (Bankr. D. Del. Feb. 25, 2015) [D.I. 196]; *In re RS Legacy Corp. (f/k/a RadioShack Corp.)*, No. 15-10197 (BLS) (Bankr. D. Del. Feb. 20, 2015) [D.I. 457]; *In re Dendreon Corp.*, No. 14-12515 (PJW) (Bankr. D. Del. Dec. 17, 2014) [D.I. 195]; *In re PSL – N. Am. LLC*, No. 14-11477 (PJW) (Bankr. D. Del. July 14, 2014) [D.I. 97]; *In re Phoenix Payment Sys., Inc.*, No. 14-11848 (MFW) (Bankr. D. Del. Aug. 26, 2014) [D.I. 95].

43.    Accordingly, for all of the foregoing reasons, the Debtor believes that the Bidding Procedures (i) will encourage robust bidding for the Assets, (ii) are consistent with other procedures previously approved by courts in this District and (iii) are appropriate under the

relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings and should be approved.

**B.      Bid Protections May Be Necessary to Preserve the Value of the Debtor's Estate**

44.      By this motion, the Debtor reserves the right to enter into a Stalking Horse Agreement, as an exercise of its business judgment and in accordance with the Bidding Procedures, and to offer Bid Protections in connection therewith.  Specifically, the Debtor may offer any Stalking Horse Bidder some or all of the following Bid Protections: (i) a Break-Up Fee; (ii) an Expense Reimbursement; and/or (iii) an Minimum Overbid Increment.    Any Bid Protections afforded to a Stalking Horse Bidder shall be subject to further approval of this Court at least one (1) day prior to the Auction.

**C.      Approval of the Sale Is Warranted under Bankruptcy Code Section 363(b)**

45.      As set forth above, a debtor may be authorized to sell assets out of the ordinary course of business pursuant to Bankruptcy Code section 363 and before obtaining a confirmed plan of reorganization when it demonstrates a sound business purpose for doing so. *See In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 147-49 (3d Cir. 1986) (implicitly adopting the "sound business judgment test" of *Lionel*); *In re Dura Auto. Sys., Inc.*, No. 06-11202 (KJC), 2007 WL 7728109, at *5 (Bankr. D. Del. Aug. 15, 2007) (finding that "[t]he Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the Sale prior to, and outside of, a plan of reorganization"); *Dai-Ichi Kangyo Bank Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999) ("In determining whether to authorize the use, sale or lease of property of the estate under [section 363(b)], courts require the debtor to show that a sound business purpose justifies such actions . . . ."); *Delaware & Hudson Ry. Co.*, 124 B.R. at 176 (sale of substantially all of debtor's assets outside of reorganization plan is appropriate when a

sound business reason justifies such a sale); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983) (concluding that "there must be some articulated business justification, other than appeasement of major creditors, for using, selling or leasing property out of the ordinary course of business before the bankruptcy judge may order such disposition under section 363(b)"); *Titusville Country Club v. Pennbank (In re Titusville Country Club)*, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991) (stating that the "sound business purpose test" is appropriate). Once a court has determined there is a sound business justification for a sale outside of a plan, the court must also determine that (i) the trustee has provided the interested parties with adequate and reasonable notice, (ii) the sale price is fair and reasonable and (iii) the purchaser is proceeding in good faith. *Delaware & Hudson*, 124 B.R. at 176.

46.    The Debtor submits that the sale of the Assets is based upon its sound business judgment. As explained above, the Debtor has determined that a sale, conducted in accordance with the Bidding Procedures, is in the best interest of its estate. Although the Debtor is simultaneously pursuing a chapter 11 plan, the plan confirmation process will take time, either consensually or through a cram down. As a result, and cognizant of its current substantial monthly cash outlay for costs associated with storage of the Assets and its fiduciary obligation to maximize distributable value for all creditors, the Debtor determined to seek approval of a sale and marketing process for its Assets. The Debtor believes that commencing a sale process at this time will (i) allow it to obtain the highest market value available for the Assets, (ii) stop the current expenditures on storage costs, and (iii) set a path to a chapter 11 exit. Further, given that the Debtor has terminated the DBA, there is no possibility of reorganizing the Debtor in this case, and the Assets are therefore not necessary for a reorganization.

47.    The Debtor also meets the additional requirements necessary to approve a sale under Bankruptcy Code section 363. As stated herein, the Debtor will provide adequate notice of the Sale to interested parties, and the Debtor believes that the notice procedures described herein are reasonable and adequate under the circumstances. Accordingly, the Debtor submits that it is a valid exercise of its business judgment to seek the relief requested by this motion.

**D.    The Proposed Sale Transaction Satisfies the Requirements of Bankruptcy Code Section 363(f) for a Sale Free and Clear of Interests**

48.    Bankruptcy Code section 363(f) provides that a sale of encumbered property "free and clear of any interest" is permissible, only if:

(1)    applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2)    such entity consents;

(3)    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4)    such interest is in bona fide dispute; *or*

(5)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest. 11 U.S.C. § 363(f).

Bankruptcy Code section 363(f) is drafted in the disjunctive and, as such, it is necessary to meet only one of these five conditions.

49.    A lien is an "interest" in property contemplated by section 363(f) and thus a debtor can sell property free and clear of any lien if the debtor meets one of the requirements of section 363(f). *In re TWA*, 322 F.3d 283, 288 (3d Cir. 2003) (noting that even courts that narrowly interpret "interests" in property pursuant to section 363(f) agree that "interests" includes liens).

50.    Here, the Debtor is not aware of any liens asserted against the Assets. However, to the extent there are any liens asserted against the Assets, the Debtor may sell the Assets free

and clear of such liens under section 363(f)(5) because the liens on any Assets sold will attach to the proceeds of such a sale and entities holding such interests could be compelled to accept money satisfaction in legal or equitable proceedings.

51.    In addition to *in rem* interests, such as liens, the Third Circuit has held that "the term 'any interest' is intended to refer to obligations that are connected to, or arise from, the property being sold." *Id.* at 289 (*citing Folger Adam Sec., Inc. v. DeMatteis/MacGregor, JV*, 209 F.3d 252, 259 (3d Cir. 2000)). "Indeed, to equate interests in property with only *in rem* interests such as liens would be inconsistent with section 363(f)(3), which contemplates that a lien is but one type of interest." *Id.*    In *In re TWA*, the Third Circuit held that rights under a travel voucher program and employment discrimination claims were "interests" in property within the meaning of section 363(f) in the sense they arose from the property being sold. *Id.* at 290. The debtor could therefore sell its assets free and clear of such interests.

52.    Here, NYW has no right, title or ownership interests in the Assets.  Pursuant to the DBA, before right, title or ownership passes from the Debtor to NYW, NYW must pay in full for the Wheel components, which it has not done.  Indeed, at the time the DBA was terminated, NYW had not paid the Debtor the Full Scheduled Value of the Wheel components under the DBA.  The status of the fabrication of the various components and NYW's payment at the time the DBA was terminated are summarized below:

| Description of Work | Scheduled Value | Amount Completed (% Completed) | Amount Paid for by New York Wheel (% Paid) | Difference |
|---|---|---|---|---|
| Legs | $9,262,411 | $9,219,498 (99.5%) | $8,731,600 (94.3%) | $487,898 (5.2%) |
| A Frame Braces | $3,448,417 | $2,153,960 | $1,520,000 | $633,960 |

| | | (62.5%) | (44.1%) | (18.4%) |
|---|---|---|---|---|
| Rim Parts | $13,971,399 | $13,855,381 (99.2%) | $9,241,080 (66.1%) | $4,614,301 (33%) |
| Drive towers | $3,387,390 | $1,968,792 (58.1%) | $1,765,996 (52.1%) | $202,796 (6%) |
| Supply of Cable Spokes | $4,487,500 | $4,026,307 (89.7%) | $2,700,000 (60.2%) | $1,326,307 (29.5%) |
| Bend Limiters | $847,500 | $836,275 (98.7%) | $409,875 (48.4%) | $426,400 (50.3%) |
| Dampers | $565,000 | $355,255 (62.9%) | $136,625 (24.2%) | $218,630 (38.7%) |
| Hubs and Spindle | $2,780,869 | $2,665,524 (95.9%) | $2,200,000 (79.1%) | $465,524 (16.7%) |
| Bearings | $1,200,000 | $1,200,000 (100%) | $814,798 (67.9%) | $385,202 (32.1%) |
| Capsules | $23,700,000 | $12,819,482 (54.1%) | $5,822,669 (24.6%) | $6,996,813 (29.5%) |
| Drive & Control Units and System | $6,400,000 | $6,400,000 (100%) | $5,277,364 (82.5%) | $1,122,636 (17.5%) |

Because NYW has not paid in full for any of the Assets, it has no right, title or interest in such Assets.

53.     However, to the extent NYW claims right, title or ownership interests in the Assets, such "interests" would be subject to section 363(f), as the interests are connected to, or arise from, the property being sold. *See In re TWA*, 322 F.3d 283, 289 (3d Cir. 2003). If the

Debtor can satisfy one of the five conditions of section 363(f), it can therefore sell the Assets free and clear of any interests asserted by NYW.

54.        Section 363(f)(4) is applicable in this case.  Section 363(f)(4) allows a debtor to sell property when the interest asserted in the property is in bona fide dispute.  11 U.S.C. § 363(f)(4); *see also D'Antonio v. Bella Vista Assocs., LLC (In re Bella Vista Assocs., LLC)*, 2007 Bankr. LEXIS 4348, at *11 (Bankr. D.N.J. Dec. 18, 2007).  The phrase "bona fide dispute" is not defined in the Code.  "Courts interpreting § 363(f)(4) generally look to whether there is an objective basis for either a factual or legal dispute as to the validity of the asserted interest.  The court does not have to resolve the dispute prior to the sale; it need only determine that such a dispute exists." *Id.* (internal citations omitted).  The goal is to allow the sale of the property subject to dispute so that liquidation of the estate's assets is not delayed while such disputes are litigated." *Id.*

55.        Here, a dispute clearly exists regarding the validity of any ownership interests asserted by NYW in the Assets.  This dispute has been raised in the NYW Litigation in which the parties are currently embroiled.  As any interest asserted by NYW in the Assets would be in bona fide dispute, the Debtor can sell the Assets free and clear of NYW's alleged interests pursuant to section 363(f)(4).

56.        The Debtor also submits that it is appropriate to sell the Assets free and clear of successor liability relating to the Debtor's business.  Such a provision ensures that the Successful Bidder is protected from any claims or lawsuits premised on the theory that the Successful Bidder is a successor in interest to the Debtor.  Courts have consistently held that a buyer of a debtor's assets pursuant to a Bankruptcy Code section 363 sale takes free and clear from successor liability relating to the debtor's business. *See, e.g., In re TWA*, 322 F.3d at 288-90

(sale of assets pursuant to section 363(f) barred successor liability claims for employment discrimination and rights under travel voucher program); *United Mine Workers of Am. 1992 Benefit Plan v. Leckie Smokeless Coal. Co. (In re Leckie Smokeless Coal Co.)*, 99 F.3d 573, 585-86 (4th Cir. 1996) (affirming the sale of debtors' assets free and clear of certain taxes); *Amphenol Corp. v. Shandler (In re Insilco Techs., Inc.)*, 351 B.R. 313, 321-22 (Bankr. D. Del. 2006) (stating that a 363 sale permits a buyer to take ownership of property without concern that a creditor will file suit based on a successor liability theory); *In re General Motors Corp.*, 407 B.R. 463, 505-06 (Bankr. S.D.N.Y. 2009), *aff'd sub nom., In re Motors Liquidation Corp.*, 428 B.R. 43 (S.D.N.Y. 2010) & 430 B.R. 65 (S.D.N.Y. 2010) (holding that "[T]he law in this Circuit and District is clear; the Court will permit GM's assets to pass to the purchaser free and clear of successor liability claims, and in that connection, will issue the requested findings and associated injunction."); *In re Chrysler LLC*, 405 B.R. 84, 111 (Bankr. S.D.N.Y. 2009) ("[*I*]n personam claims, including any potential successor or transferee liability claims against New Chrysler, as well as *in rem* interests, are encompassed by section 363(f) and are therefore extinguished by the Sale Transaction.").

57.    The purpose of an order purporting to authorize the transfer of assets free and clear of all liens, claims, encumbrances, and all other interests would be frustrated if claimants could thereafter use the transfer as a basis to assert claims against a purchaser arising from a seller's pre-sale conduct. Moreover, without such assurances, the Debtor would run the risk that potential bidders may not enter the auction or, if they did, would do so with reduced bid amounts. To that end, the Successful Bidder should not be liable under any theory of successor liability relating to the Debtor's business, but should hold the Assets free and clear.

**E.    A Successful Bidder Should Be Entitled to the Protections of Bankruptcy Code Section 363(m)**

58.    Pursuant to Bankruptcy Code section 363(m), a good faith purchaser is one who purchases assets for value, in good faith, and without notice of adverse claims. *Mark Bell Furniture Warehouse, Inc., v. D. M. Reid Assocs., Ltd. (In re Mark Bell Furniture Warehouse, Inc.)*, 992 F.2d 7, 8 (1st Cir. 1993); *In re Willemain v. Kivitz*, 764 F.2d 1019, 1023 (4th Cir. 1985); *In re Congoleum Corp.*, No. 03-51524, 2007 WL 1428477, *2 (Bankr. D. N.J. May 11, 2007); *Abbotts Dairies of Pa.*, 788 F.2d 143, 147 (3d Cir. 1986).

59.    Any agreement consummating a Sale or Sales will be negotiated at arm's-length by sophisticated parties, each represented by their own advisors. Accordingly, the Debtor requests that the Sale Order (or Sale Orders) include a provision that the Successful Bidder (or Successful Bidders) for the Assets, is a "good faith" purchaser within the meaning of Bankruptcy Code section 363(m). The Debtor believes that providing any Successful Bidder with such protection will ensure that the maximum price will be received by the Debtor for the Assets and closing of the same will occur promptly.

**F.    Entities Currently Storing the Assets Shall Cooperate with Purchasers**

60.    The Debtor requests that the Sale Order require parties currently storing the Assets cooperate with any purchaser of the Assets to facilitate the removal of the purchased Assets, helping facilitate the Sale process and providing purchasers an added benefit that would not be available outside chapter 11.

**G.    Notice of the Auction and Sale Hearing Is Reasonable and Appropriate**

61.    The Debtor submits that the Sale Notice as set forth above, along with publication of the Sale Notice as described herein above on one occasion on the Mailing Date or as soon as reasonably practicable thereafter (and in local publications of general circulation as the Debtor

deems appropriate) is reasonable and appropriate and will be adequate to ensure that all interested parties have the opportunity to bid for the Assets, and/or object to the proposed sale of the Debtor's Assets.  Accordingly, the Debtor submits that the foregoing method of notice is reasonable under the circumstances.

**H.     Request for Relief Pursuant to Bankruptcy Rules 6004(h) and 6006(d)**

62.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).

63.     The Debtor believes that any Sale Transaction should be consummated as soon as practicable to preserve and maximize value.  Accordingly, the Debtor requests that any Sale Order approving the sale of the Assets be effective immediately upon entry of such order and that the fourteen-day stay under Bankruptcy Rules 6004(h) be waived.

**I.     Request for Waiver of Local Rule 6004-1(b)**

64.     Local Rule 6004-1(b) requires, among other things, that any motion to sell property of the estate pursuant to section 363 of the Bankruptcy Code attach "[a] copy of the proposed purchase agreement, or a form of such agreement substantially similar to the one the debtor reasonably believes it will execute in connection with the proposed sale [and a] copy of a proposed form of sale order." Del. Bankr. L. R. 6004-1(b).  As set forth above, the Debtor and its professionals have been and are continuing to market the Assets.  Nevertheless, the terms of the Sale are uncertain as of the date hereof.  Any such forms the Debtor might submit at this time would be merely generic in nature, rather than based on any actual transaction or terms being proposed, and the ultimate transaction(s) and term(s) proposed could differ materially from any speculative forms presented at this time.  Consequently, filing such forms would offer little

benefit and may be confusing to the parties receiving notice of the Motion.  Accordingly, the Debtor requests a waiver of the provisions of Local Rule 6004-1 to the extent applicable.

## **NOTICE**

65.    No trustee or examiner has been appointed in the Chapter 11 Case.  The Debtor shall provide notice of this Motion on the date hereof via U.S. first class mail to (i) the U.S. Trustee, Attn: Hannah McCollum, Esq.; (ii) New York Wheel, care of Gibson, Dunn & Crutcher LLP; (iii) the Debtor's twenty (20) largest unsecured creditors; (iv) any parties entitled to notice pursuant to Local Rule 2002-1(b); and (v) all parties in possession of the Debtor's Assets.  The Debtor submits that, under the circumstances, no other or further notice is required.

*[Remainder of page intentionally left blank.]*

RLF1 18617374v.1

**WHEREFORE**, the Debtor respectfully requests that the Court (i) enter the Bidding Procedures Order, (ii) enter the Sale Order or Sale Orders and (iii) grant such other and further relief as is just and proper.

Dated: December 15, 2017
       Wilmington, Delaware

Mark D. Collins (No. 2981)
Jason M. Madron (No. 4431)
Joseph C. Barsalona II (No. 6102)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King St.
Wilmington, DE 19801
Telephone: 302-651-7700
Facsimile: 302-651-7701
E-mail: collins@rlf.com
      madron@rlf.com
      barsalona@rlf.com

- and -

Andrew H. Sherman
Boris I. Mankovetskiy
SILLS CUMMIS & GROSS P.C.
One Riverfront Plaza
Newark, NJ 07102
Telephone:  973-643-7000
Facsimile:  973-643-6500
Email: asherman@sillscummis.com
      bmankovetskiy@sillscummis.com

*Proposed Counsel for Debtor and*
*Debtor in Possession*

RLF1 18617374v.1